IN THE UNITED STATES DISTRICT COURT FOR NORTHERN DISTRICT
OF MISSISSIPPI, WESTERN DIVISION

FRED BECK, ET AL., )
       )
    Plaintiff, )
       )
    vs.   ) No. 3:03CV60-P-D
       )
KOPPERS, INC., ET AL., )
       )
    Defendants. )
_____)


DEPOSITION OF JAMES DAHLGREN, M.D.
SANTA MONICA, CALIFORNIA
TUESDAY, APRIL 5, 2005
VOLUME 1


Reported by:
VIRGINIA PETERAITIS
CSR No. 6205
Job No. 909896

1

---

IN THE UNITED STATES DISTRICT COURT FOR NORTHERN DISTRICT
OF MISSISSIPPI, WESTERN DIVISION

FRED BECK, ET AL., )
       )
    Plaintiff, )
       )
    vs.   ) No. 3:03CV60-P-D
       )
KOPPERS, INC., ET AL., )
       )
    Defendants. )
_____)


Deposition of JAMES DAHLGREN, M.D.
Volume 1, taken on behalf of Defendants, at
2811 Wilshire Boulevard, Suite 510, Santa Monica,
California, beginning at 9:00 a.m. and ending at
4:00 p.m. on Tuesday, April 5, 2005, before
VIRGINIA PETERAITIS, Certified Shorthand Reporter
No. 6205.

2

---

APPEARANCES:

For Plaintiffs:
    LUNDY & DAVID L.L.P.
    BY: HUNTER W. LUNDY
    Attorney at Law
    501 Broad Street
    Lake Charles, Louisiana 70602
    (337) 439-0707

For Defendants Beazer East, Inc.; Koppers, Inc.:

    WILDMAN, HARROLD, ALLEN & DIXON LLP
    BY: ANTHONY G. HOPP
    Attorney at Law
    225 West Wacker Drive
    Chicago, Illinois 60606
    (312) 201-2537

For Defendant Illinois Central Railroad:
    UPSHAW, WILLIAMS, BIGGERS,
    BECKHAM & RIDDICK, LLP
    BY: LONNIE D. BAILEY
    Attorney at Law
    309 Fulton Street
    Greenwood, Mississippi 38935
    (662) 455-1613

Also Present:

    KAY BANG
    RANDALL COLLINS
    MICHAEL HANNIGAN

3

---

INDEX

WITNESS:        EXAMINATION
JAMES DAHLGREN, M.D.
VOLUME 1

    BY MR. HOPP    5

EXHIBITS

DEFENDANT        PAGE

1    Table 5, 1 page    172

2    Human Exposure - Posters, 4 pages  172

3    External and Internal Human
    Exposure, 5 pages    175

4    Exposure Assessment Article,
    6 pages    179

5    James Dahlgren Article, 5 pages  183

6    Human Levels and Trends, 6 pages  185

7    Article by James Dahlgren, M.D.
    28 pages    189

4

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

Santa Monica, California, Tuesday, April 5, 2005
9:00 a.m. - 4:00 p.m.

JAMES DAHLGREN, M.D.
having been first administered an oath, was examined and testified as follows:
EXAMINATION
BY MR. HOPP:

Q Good morning, Dr. Dahlgren. We met a few minutes ago and I'm Anthony Hopp and I represent several defendants in this case and I'm here for your expert deposition. I know you've done this many times before and likely as often as I have.

Let me state a few ground rules so we're clear. I'm going to be asking a series of questions and it's important that you answer out loud yes or no, as opposed to shakes or nods of the head. When appropriate answer yes or no or verbally, as opposed to uh-huh or huh-uh and that's for the court reporter's benefit so we have a clear record.

If you answer a question, I'll assume you understood it. If you don't hear a question, don't understand a question, don't like a question, please ask me to rephrase or restate it and I'll be happy to do that.

5

Does all that sound fair?
A Yes.
Q Do you have anywhere in your office a current up-to-date CV?
A Yes.
Q I'll ask at a break that we get a copy and mark that as an exhibit and dispense with some of the more tedious stuff that we have to go through.
Is that okay with you?
A Yes.
Q Do you currently practice medicine?
A Yes.
Q Where?
A Here in this office.
Q We are in Santa Monica, California?
A Correct.
Q Whom do you treat?
A I have a small treatment practice, treat a handful of patients at this point in time.
Q For what do you treat patients?
A For toxic poisoning of various kinds and that's my specialty.
Q How often do you see patients in this office for any purpose?
A Two to three days a week I see patients in the

6

office here.
Q You drew a distinction earlier between your treatment practice and some other sort of practice, do you distinguish between treatment and some other medicine in your practice?
A Yes, patients I see for evaluation and not for treatment.
Q You say you have a small treatment practice?
A Yes.
Q How small? Give me a ballpark.
A Probably 200 patients or so.
Q And the remainder of the patients you see are evaluations only?
A Correct.
Q In the last 12 months, how many people would you say you've evaluated?
A I don't know. I don't have that figure in my mind.
Q Hundreds, dozens, thousands?
A Hundreds probably.
Q How do you normally get connected with patients for the purpose of evaluation? Do people call to come see you or some are brought to you by others?
A They usually call to make appointments.
Q What I'm driving at -- it was a poor question.

7

Are most of the patients you see for evaluation referred by lawyers?
A Some are, not all.
Q What other sources are there for the patients you see for evaluation?
A Well, insurance company adjusters, other doctors, patients, companies, unions, a whole variety of different sources.
Q What sorts of evaluations do you do when you evaluate patients?
A I'm an internist, and I do what would be called internal medicine evaluations and take a history from the patient and examine them and collect any medical records, perform lab tests; the usual approach to patients.
Q We're here today in a lawsuit dealing with an alleged toxic exposure. Are most of the people you see for evaluation people who claim some kind of toxic exposure?
A Yes. Most patients I see have been exposed to some kind of toxins and that's my sub-specialty.
Q That's why they come to you, they claim to be exposed and you're evaluating them for that purpose; is that right?
A Yes.
Q Let's talk about your treatment practice. You

8

**9**

1  said 200 or so patients you continue to treat. What do
2  you treat them for? What conditions are you treating?
3      A  Well, lead poisoning, pesticide poisoning, mold
4  poisoning, a variety of things.
5      Q  Are you currently treating a group of firemen
6  in New York City?
7      A  Yes.
8      Q  What for?
9      A  What's called WTC syndrome.
10     Q  What is WTC syndrome?
11     A  A World Trade Center syndrome.
12     Q  Describe briefly what's involved in the World
13  Trade Center syndrome.
14     A  Following the World Trade Center collapse,
15  there were several thousand rescue workers, including
16  firemen, who were exposed to the smoke, dust and fumes
17  from the Trade Center collapse, causing many of them, if
18  not all, to become ill to one degree or another.
19         The precise ticket or chemicals involved has
20  not really been identified. We have been using PCBs and
21  dioxins as markers of exposure and those two chemical
22  classes do constitute at least one element of why they
23  got sick, but many, many other chemicals, heavy metals,
24  fine particles, dust, many organic chemicals that were
25  also inhaled or absorbed during the episode contribute to

**10**

1  the illnesses that are seen in these individuals.
2      Q  Is there a typical presentation for the illness
3  or are they all sick in the same way?
4      A  They're sick in similar ways and it's
5  characterized by chronic cough, shortness of breath and
6  varying degrees of respiratory complaints and can have an
7  asthma-like picture, and some have a more interstitial
8  lung problem, so there is some variety but most all of
9  them have respiratory involvement.
10        Second area is the neurologic system. Most of
11  them complained of headaches, light-headedness, memory
12  disturbance, altered mood, depression, anxiety, bad
13  dreams, and a whole spectrum of neurologic complaints,
14  which is compatible with the mixture of chemicals that we
15  saw there.
16        And then a fairly significant number have skin,
17  gastrointestinal immune system problems, probably related
18  to the chemicals they were exposed to, as well, and thus
19  decreases reproductive function, decreased libido,
20  decreased energy, chronic fatigue and all these things
21  are somewhat variable.
22        Two areas that are quite consistent are the
23  respiratory and neurologic, which affected almost all the
24  people at the Trade Center during the days and weeks
25  after the collapse of the two buildings.

**11**

1      Q  Have you taken blood samples from these
2  patients for the purpose of evaluation of the dioxin and
3  furan levels in their blood?
4      A  PCB levels, yes.
5      Q  Have you reported those in some sort of
6  publication or articles you've written on that?
7      A  Yes, I presented the data on the New York City
8  firemen that we studied in Berlin at the dioxin 2004
9  meeting, and the four-page abstract, which was a short
10  article was published as part of the proceedings from
11  that meeting and was published on the Internet and by way
12  of CD ROM.
13        We're preparing an expanded paper for
14  publication in Hemisphere, a journal that publishes
15  articles arising out of the dioxin meeting.
16     Q  You spoke earlier of your treating these
17  patients. What's the goal of your treatment for these
18  individuals from the World Trade Center?
19     A  To reduce their body burden of the PCBs and
20  dioxins is one aspect, but the real purpose is to make
21  them feel better and reduce their symptoms or eliminate
22  their symptoms and get them back to a more normal state.
23     Q  Is there a particular method you're using to
24  try to reduce their body burden of PCBs and dioxins?
25     A  Yes.

**12**

1      Q  Describe that.
2      A  It's a protocol that involves the
3  administration of Niacin or vitamin B 3, I believe it is,
4  and exercise for 30 minutes on a treadmill or bicycle,
5  followed 3 to 5 hours of sauna, increasing the excretion
6  of the chemicals out through the skin and, as part of
7  that, we give vegetable oil and replenish the various
8  minerals lost from sweating, and the mineral oils and
9  vegetable oils are intended to promote the excretion of
10  the PCBs and dioxins through the stool.
11     Q  Is there a label or a name that this treatment
12  regime has?
13     A  Just a detoxification treatment.
14     Q  Have you heard it called the Hubbard treatment
15  or the Hubbard regime?
16     A  I've heard that.
17     Q  Who is that named after?
18     A  L. Ron Hubbard, founder of Scientology.
19     Q  Did Mr. Hubbard develop this treatment regime
20  or was it named after him for some other reason, if you
21  know?
22     A  I believe it's named after him because he was
23  the first guy who wrote up the technique and published
24  it.
25        The utilization of sauna therapy, which is

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

1 actually an old therapy, has been used by most cultures
2 as a therapeutic modality for thousands of years, so I
3 don't think he invented it but described the utilization
4 with the Niacin as an adjunct to it.
5     Q  So somewhere we can find an article written by
6 Mr. Hubbard which describes the treatment regime with
7 sauna and Niacin?
8     A  There's a number of papers published over the
9 years on this detoxification method. It was used in the
10 early 80's to treat patients in northern Michigan exposed
11 to polybrominated biphenyls and was published by a Dr.
12 Schnare, I believe is the name.
13     There was another paper published in the late
14 80's from Yugoslavia on patients who worked in a PCB
15 factory. I participated with Dr. Tretjak, who was from
16 Yugoslavia, the patient's doctor, and was brought to
17 Los Angeles, and she was put through the treatment
18 program that I just told you about and that patient was
19 published in a case report by Dr. Tretjak.
20     Q  That was a single Yugoslavian patient that Dr.
21 Tretjak brought to the United States for treatment?
22     A  Yes.
23     Q  And did Dr. Tretjak publish the paper?
24     A  Yes.
25     Q  Were you a co-author?

13

1 rescue workers written up anywhere?
2     A  It's been written up in the paper briefly,
3 referring to those earlier papers which describe it in
4 more detail.
5     Q  I want to make sure I understand. There was a
6 paper published by Mr. Hubbard, and the abstract you
7 recently published. Has someone else other than you or
8 Mr. Hubbard written some sort of intermediate paper that
9 describes further modifications to the Hubbard method and
10 why they would be effective and what the reasons for the
11 modifications are?
12     A  I told you about two other papers written by
13 Dr. Schnare and Dr. Tretjak and they didn't change the
14 original protocol.
15     Q  With respect to the fire fighters or let's call
16 them the World Trade Center cohorts, you took
17 measurements of dioxin and furan and PCB levels in their
18 blood before starting the regimen?
19     A  Yes.
20     Q  Have you measured the dioxins and furans and
21 PCBs in their blood during the treatment?
22     A  No, afterward.
23     Q  And is the treatment completed?
24     A  Yes.
25     Q  And you took measurements subsequent to the

15

1     A  No, I was not. But we showed in the paper
2 there was a significant reduction in PCBs -- we measured
3 them before and after, and measured the skin oil PCB
4 levels during the treatment, and my main role was as a
5 lab person, establishing the protocols for the
6 laboratory.
7     Q  Let's go back to the fire fighters. I know you
8 say it was the Hubbard method originally written by Mr.
9 Hubbard.
10     Is the current protocol you're using taken
11 directly from Mr. Hubbard's paper or have you modified it
12 in some way?
13     A  We made some modifications.
14     Q  How have you modified the Hubbard method?
15     A  I don't call it the Hubbard method but a
16 detoxification method.
17     Q  How is your detoxification method different
18 from the Hubbard method as written by him?
19     A  We substituted or added cholestyramine to the
20 regimen to reduce the PCBs. We changed the protocol and
21 made a modification because people have a hard time
22 spending 5 hours in the sauna, and we do it for 2 or 3
23 hours and find we're getting good results from using a
24 shorter time frame.
25     Q  Is your protocol for the World Trade Center

14

1 treatment; correct?
2     A  Yes.
3     Q  And how, if at all, did the dioxin, furan and
4 PCB levels in the blood change?
5     A  It went down by a significant percentage --
6 different effects. The most important effect was the
7 TEQs dropped by 60 percent in the 7 patients we measured.
8 The largest reductions were in the patients with the
9 highest levels but there was a consistent reduction of
10 TEQs.
11     Q  You measured 7 patients?
12     A  Yes.
13     Q  Were there more than 7 patients that went
14 through the treatment program?
15     A  Yes, several hundred have gone through the
16 treatment program in New York City.
17     Q  Why did you select 7 to measure?
18     A  Economic constraints. It's very expensive to
19 do the testing.
20     Q  How did you pick the 7 out of the hundred --
21     A  They were the first people that were available
22 as soon as the money was made available.
23     Q  So, I'm sorry, I didn't understand that. The
24 first people who were made available after the money was
25 made available?

16

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

1    A  Well, they were treating patients on a regular
2  basis in the clinic in New York and then found the money
3  to pay for the testing and they donated the money from
4  various fund-raising activities carried out by the
5  clinic. We just did the next 7 patients that came
6  through.
7     Q  You did the 7 patients. Were those 7 patients
8  that you did both before and after, did you follow the 7
9  patients for the purpose of measuring the effect of this
10 treatment technique?
11    A  Yes.
12    Q  So the first 7 who came through, they were the
13 ones who were selected to be tested before and after?
14    A  Correct.
15    Q  Do you believe those 7 are representative of
16 the entire cohort of World Trade Center rescue workers?
17    A  Yes.
18    Q  Why?
19    A  I don't have any reason to think they were any
20 different than anybody else who had similar histories.
21    Q  Similar histories in terms of the exposure,
22 that is the work they did at the WTC?
23    A  Yes, and in terms of the symptoms and health
24 findings.
25    Q  Now, with respect to the 7 you treated, you had

1  years -- 5, 6, 10 years duration, depending on which
2  particular congener we're talking about.
3     Q  I think I understood your answer but have
4  trouble relating it back to my question.
5        How does your treatment regimen help the
6  excretion of PCBs, dioxins and furans from the WTC rescue
7  workers?
8     A  Well, by using the skin as an excretory organ.
9  The skin surface area is large and by putting the patient
10 in the sauna, after they have exercised and taken Niacin,
11 there is a very large increase in the amount of skin oil
12 and sweat which is produced and, therefore, you get a net
13 decrease in the amount of PCB that stays in the body.
14 Secondary it blocks the reabsorption of the bile salts in
15 the small intestine and promotes the excretion of the
16 chemicals through that route, as well, and that's what I
17 was saying about the cholestyramine as a more effective
18 way of accomplishing that blockage.
19    Q  So the Niacin helps -- again I'm trying to
20 understand the theory of the mechanism. Dioxin is stored
21 in fat?
22    A  Yes.
23    Q  Or fat cells of the body?
24    A  Yes.
25    Q  Because it is hydrophobic it doesn't like the

1  no way of knowing what their dioxin, furan and PCB levels
2  were before you first encountered them?
3     A  Right.
4     Q  And you first encountered them after the World
5  Trade Center clean-up; is that correct?
6     A  Yes.
7     Q  If one of the 7 had a higher level before the
8  WTC clean-up, your method would not have picked that up?
9     A  That's correct.
10    Q  Are dioxins hydrophilic or hydrophobic?
11    A  Hydrophobic.
12    Q  So they have preference for fat cells?
13    A  Yes.
14    Q  Is that part of the reason for treatment, to
15 pull the dioxin out of the fat cells?
16    A  Well, the excretion patterns for dioxins and
17 PCBs and furans is primarily through the bile and they
18 don't -- because they're not water soluble, they don't
19 excrete in the urine to any appreciable degree.
20       And the problem is they're secreted along with
21 bile salts which then are reabsorbed in the small
22 intestine, so PCBs and dioxins undergo what is called an
23 enteropatic circulation and they're secreted in the bile
24 and reabsorbed so that they stay in the body, and that's
25 why the half life for dioxins and PCBs is measured in

1  water, it doesn't like the blood?
2     A  It goes in the blood but goes in the -- tends
3  to be absorbed onto the fat in the blood. Hydrophobic
4  simply means it's not water-soluble and doesn't lend
5  itself to excretory excretion in the kidney.
6     Q  So the Niacin increases the blood flow to the
7  skin and increases the enzyme activity in various cells
8  of the body to promote turnover of the lipid solubles,
9  and Niacin is used to help reduce cholesterol levels and
10 speeds up the breakdown of cholesterol.
11       So the Niacin helps blood flow to the skin and
12 helps the dioxin to pass through the skin barrier and
13 then you excrete it actually to the surface of your skin
14 through the sweat?
15    A  Skin oils of the skin are increased when you
16 increase the sweating and increase the body temperature
17 and a greater percentage of the body burden shows up on
18 the skin as a result of this technique.
19    Q  Has there been any effort to measure how many
20 dioxins come through in the sweat?
21    A  I said we measured PCBs in the skin oil of the
22 patients in Yugoslavia and did not do dioxins but did
23 PCBs as a marker. A lot of these chemicals behave the
24 same way and you can't measure all of them, and we use
25 PCBs as a marker, and the concentration in the skin oil

1 was high, much higher than normal, indicating that was
2 indeed an excretory pathway for this type of chemical.
3    Q   That was the one patient from Yugoslavia?
4    A   Yes.
5    Q   Has there been any effort in the Trade Center
6 workers to measure what comes from their skin oil?
7    A   No. We have no money for that.
8    Q   I think you said something about the small
9 intestine and the reuptake of dioxin and then with
10 cholestyramine. So the feces is another avenue of
11 getting rid of dioxins in this technique?
12    A   Yes. That's the techniques used.
13    Q   Has there been any evidence in the World Trade
14 Center cohort to measure dioxin in stool samples?
15    A   No.
16    Q   Now, we talked about Dr. Tretjak and, again,
17 you'll have to help me and I apologize for asking the
18 question again.
19        Dr. Tretjak was the doctor who brought the
20 Yugoslavian patient here to L.A.?
21    A   Yes.
22    Q   And then you administered this techniques or
23 this therapy to the WTC workers.
24        Other than the two events, are there any other
25 documented cases of this detoxification technique being

21

1 administered?
2    A   I told you about the techniques used to treat
3 the patients with polybrominated biphenyl exposure in the
4 early 80's published by Dr. Schnare.
5    Q   So Schnare and Tretjak are the most recent
6 ones; right?
7    A   Yes.
8    Q   Any others?
9    A   I think there is a publication by a Russian
10 author where they used a technique to treat patients of
11 Chernobyl, and I don't recall the author's name, and I
12 think there are some other papers that I have to go look
13 at them and didn't have personal involvement with them so
14 I don't recall the details.
15    Q   We all know what happened at Chernobyl. Was
16 the contaminant concern for the purpose of this treatment
17 PCBs, dioxins and furans or what is the radioactive --
18    A   It was the radioactive components.
19    Q   I want to go back to more generally your
20 practice. How many patients did you see in March of
21 2005, if you know?
22    A   This month?
23    Q   This last full month.
24    A   I probably saw maybe 50, 60 patients.
25    Q   And how many of those again roughly were

22

1 evaluation and treatment?
2    A   5 or 6 for treatment and the rest for
3 evaluation.
4    Q   If say, for example, I wanted to make an
5 appointment with you for an examination, can I do that?
6 Would you accept me as a patient?
7    A   I don't do general internal medicine any longer
8 so depending what your problem was.
9    Q   And irrespective of the fact that I'm a lawyer
10 on the case, if someone called to make an appointment
11 with you, would they need to present with some sort of
12 claimed toxic injury before you'd see them?
13    A   No, but it would be patients who have problems
14 with a toxicity issue and not necessarily a claim for a
15 toxic injury.
16    Q   So you don't take patients who just call you up
17 and you need to sort of pre-qualify them?
18    A   I'm not in internal medicine practice any
19 longer, and I did that for many years and not lately.
20    Q   Do you take Blue Cross or Blue Shield?
21    A   Well, I will help the patient bill their
22 insurance but I don't accept the assignment or don't
23 belong to a PPO.
24    Q   Do you treat Medicare or Medic-aid patients?
25    A   Yes. Again I don't accept assignment.

23

1    Q   You said you're not a member of any PPOs. Are
2 you a member of any HMOs?
3    A   No.
4    Q   Do you take any type of insurance?
5    A   Yes, like I said, but we don't accept -- in
6 other words, accepting the assignment means you accept
7 whatever the insurance company decides to pay you and we
8 don't do that.
9    Q   You'll take reimbursement from insurance but
10 you will bill at your rates, as opposed to insurance
11 rates?
12    A   That's correct.
13    Q   Would you describe for me your relationship
14 with UCLA?
15    A   I'm on the clinical faculty and have been there
16 many years.
17    Q   You're paid by UCLA?
18    A   No.
19    Q   Do you have an office at UCLA?
20    A   No.
21    Q   Do you teach classes at UCLA right now?
22    A   I don't teach classes. I'm on the clinical
23 faculty and attend rounds and meet with the residents and
24 students periodically to talk about cases, but I don't
25 give lectures or run a class. I've done some of that in

24

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

| | |
|---|---|
| 1 the past but not lately. | 1 A A few months ago. |
| 2 Q When was the last time you ran a class or gave | 2 Q How does this occur? Do you have a contact at |
| 3 lectures at UCLA? | 3 UCLA that calls you and says to come and tend rounds? |
| 4 A Probably 3, 4 years ago. | 4 A They send a schedule and e-mail these days. |
| 5 Q Was it a class or lecture? | 5 Q So you're on some list of doctors who are |
| 6 A The last major teaching activity that I had was | 6 available to come and tend rounds, if they need it? |
| 7 doctoring classes, which met once a week for three hours | 7 A Yes. |
| 8 with the students, and that was the last time and that | 8 Q Are you still on that list? |
| 9 was probably several years ago the last time I did | 9 A Yes. |
| 10 doctoring, and it's very time-consuming and difficult to | 10 Q Do you have a contact at UCLA School of |
| 11 find the time in the week to do it. | 11 Medicine where if we wanted to contact them to get |
| 12 Q What's doctoring? | 12 information about your involvement, is there a point |
| 13 A It's a class they have in UCLA, teaching | 13 person to talk to? |
| 14 students a little bit about the broader aspects of taking | 14 A Phil Harbor. |
| 15 care of patients. | 15 Q H-a-r-b-o-r? |
| 16 Q And you said it was several years ago. Was it | 16 A Yes. |
| 17 in the 90's? 80's? | 17 Q What's his position with UCLA? |
| 18 A 90's, between 1995 and 2000 was the doctoring | 18 A He's the paid faculty member they have there. |
| 19 class. | 19 Q Paid faculty member in what? |
| 20 Q Did you teach the doctoring class for one | 20 A Occupational environmental medicine. |
| 21 semester, two semesters -- | 21 Q If I were to call UCLA and try to get you |
| 22 A Five years. | 22 there, do you have a voice mail account or would they |
| 23 Q Was it the same group of students for five | 23 take a message for you? |
| 24 years or get a new group every year? | 24 A No, I don't have a message sender there. |
| 25 A Different students. There is doctoring 1, 2 | 25 Q Is it accurate to say that you are an assistant |
| 25 | 27 |

| | |
|---|---|
| 1 and 3 and depends on which one I was involved in. | 1 professor of clinical medicine at UCLA? |
| 2 Q I hate to make you repeat it but you said once | 2 A Clinical assistant professor they call it. |
| 3 a week for three hours? | 3 Q And is there a deference between assistant |
| 4 A Yes, for a semester. | 4 professor of clinical medicine and a clinical assistant |
| 5 Q And that went on for five years? | 5 professor? |
| 6 A Yes. | 6 A No, just word order. |
| 7 Q And were you paid for that? | 7 Q Has anyone complained to you of your use of |
| 8 A No. | 8 UCLA's name on your published papers? |
| 9 Q It was voluntary work? | 9 A No, you're supposed to put UCLA's name on the |
| 10 A All of my clinical faculty work is voluntary, | 10 published papers. |
| 11 that's correct. | 11 Q Has anyone at UCLA ever asked you to stop |
| 12 Q Other than the doctoring class, have you taught | 12 representing yourself as being associated with UCLA? |
| 13 any other classes at UCLA in the last ten years? | 13 A No. |
| 14 A Yes. | 14 Q Are you involved in any litigation or claims |
| 15 Q Can you tell me what they were? | 15 regarding your use of UCLA's name on your published |
| 16 A I've given lectures to toxicity issues to the | 16 works? |
| 17 students and public health classes, residents in | 17 A No. |
| 18 occupational medicine and occupational environmental | 18 Q Are you board certified? |
| 19 medicine. | 19 A Yes. |
| 20 We used to have an elective where students | 20 Q In what? |
| 21 would come and spend time here in the office from | 21 A Internal medicine. |
| 22 anywhere from four to six weeks, and I've given up on | 22 Q Any others? |
| 23 that and it's too time-consuming. Those are the main | 23 A No. |
| 24 things I've done, tending round on a regular basis. | 24 Q Are you a pediatrician? |
| 25 Q What's the last time you tended rounds? | 25 A No. |
| 26 | 28 |

7 (Pages 25 to 28)

1 Q Have you ever practiced pediatric medicine?
2 A No.
3 Q Are you an oncologist?
4 A No.
5 Q Is it possible to be board certified as a
6 toxicologist?
7 A Yes.
8 Q Have you ever been board certified as a
9 toxicologist?
10 A No.
11 Q How does one become board certified as a
12 toxicologist?
13 A Join one of the groups that has a board
14 certification process and go through their procedures.
15 Q Is there some particular reason you've not done
16 that?
17 A I've not attended the meetings, the Society of
18 Toxicology or American College of Toxicology and am not
19 active in either organization and never belonged to them
20 and never -- I've got enough professional meetings to go
21 to in the American College of Occupational Environmental
22 Medicine and other meetings I attend, as the dioxin
23 meetings, adding another group of meetings, which is
24 something I've not done to now.
25 Q Is attending the regular meetings of a group

29

1 like that one of the conditions of maintaining your board
2 certification?
3 A I don't know.
4 Q In any event, if you were to become board
5 certified in the field of toxicology, they'd invite you
6 to meetings?
7 A It's the other way around, you go to meetings
8 and I think -- I have not checked it out, but I believe
9 that you apply to take the exam they give.
10 Q And there is an examination you have to pass in
11 order to obtain board certification?
12 A Yes, that's my understanding. That's how they
13 do it in the other disciplines, they administer a test to
14 make certain you have a certain body of knowledge.
15 Q Are you familiar with an organization called
16 the Collegium Ramazinni?
17 A Yes.
18 Q Are you a member of it?
19 A No.
20 Q What is it?
21 A It's a group that Selikoff started years ago
22 and it's where researchers in the field of occupational
23 medicine get together and present papers and just another
24 organization that exists.
25 Q Is there any particular reason you have not

30

1 joined the Collegium Ramazinni?
2 A No.
3 Q Forgive me if we've covered it but do you have
4 a regular practice in medicine that deals with things
5 other than occupational or chemical exposures?
6 A Environmental exposures.
7 Q So we can divide your patient load among
8 environmental exposures, occupational and other general
9 chemical exposures?
10 A Yes.
11 Q And those three exposure groups pretty much
12 describe the entirety of your practice; is that correct?
13 A Yes.
14 Q When you see someone for evaluation, as opposed
15 to treatment, do you typically make a diagnosis at the
16 end of the diagnosis?
17 A You make a tentative diagnosis based on the
18 history and physical examination. Sometimes you can't be
19 certain but usually there is an impression that we have,
20 a tentative diagnosis.
21 Q Now, when you reach a tentative diagnosis, do
22 you typically send patients to other specialists for more
23 in-depth treatment?
24 A In depth evaluation, you mean?
25 Q Sure, in-depth evaluation or treatment.

31

1 A We don't send patients typically to other
2 specialists for treatment. Depends what it is. If
3 patients have an acute appendix, we send him to a surgeon
4 to have the appendix removed or a freshly diagnosed
5 cancer that's not treated, I try to help them find an
6 oncologist to treat their cancer.
7 Usually that is not the case and usually you're
8 talking about some patients for evaluation and treatment
9 who have come to us because of the issues of toxicity.
10 We may even send them to other doctors for certain
11 testing, pulmonary function studies or smell testing,
12 neuropsychological testing or some other evaluations that
13 would be done by other specialists but usually not for
14 treatment, as a rule in my practice.
15 Q So other than in the instances you identified,
16 typically do you see a patient, provide an evaluation
17 report and that's the end of your involvement with the
18 patient?
19 A No. Usually there is some follow-up testing
20 done and possibly the communication of that information
21 of the patient. It depends on the circumstances. There
22 is no set rules for how we do it. It varies according to
23 the patient and the problems.
24 Q Would you say more often than not you're
25 involved in the follow-up evaluations or more often than

32

1     not your involvement ends with a single evaluation and
2     issuance of a report?
3        A   If it's an evaluation in the field, where we
4     see a patient as part of an examination for, say, a group
5     of patients, we probably would not see those patients
6     again. If a patient comes to the office for an
7     evaluation, we frequently see them again.
8        Q   And who decides whether someone comes to the
9     office or are seen in the field?
10       A   If you're seeing a large number of people, it's
11    much more practical to go to the field and see them
12    rather than have them come to the office.
13       Q   So smaller groups or individuals come to your
14    office here in California?
15       A   Correct.
16       Q   For larger groups involved in say big claims or
17    lawsuits, you go, in this instance, to Mississippi?
18       A   Yes.
19       Q   And you see the Mississippi patients in this
20    case and evaluate them and provide an evaluation report
21    and that's the end of your involvement, other than expert
22    testimony?
23       A   That's correct.
24       Q   There was a lawsuit I believe that was recently
25    settled involving the town of Jerome in Florida?

                33

1       A   Yes.
2       Q   Are you familiar with that lawsuit?
3       A   Yes.
4       Q   Were you involved in evaluating people in
5    Jerome for --
6       A   Yes.
7       Q   And I heard that lawsuit is settled. Has
8    anybody communicated that to you?
9       A   I heard that, as well.
10       Q   Are you involved in any follow-up treatment or
11    care for the Jerome, Florida residents that you evaluated
12    in that case?
13       A   No.
14       Q   And what was the constituent of concern or
15    contaminant of concern in that case?
16       A   There was creosote contamination of the ground
17    and water supply people were using.
18       Q   As a physician, have you treated someone for
19    pancreatic cancer?
20       A   Yes.
21       Q   How often?
22       A   Gosh, many times. Pancreatic cancer was -- I
23    guess probably in the range of 40, 50 patients.
24       Q   When did that occur?
25       A   Back in primary care and residency in medical

                34

1     school and training, really part of my career. In recent
2     years I'm not treating patients for cancer and I refer
3     them to oncologists.
4       Q   I want to get a better handle -- I have a list
5    of conditions and I imagine the answers will be similar.
6        In the early part of your career -- and I know
7    we asked for your CV and we'll get all this, but when did
8    you graduate medical school, what year?
9       A   1968.
10       Q   And during what years were you involved in the
11    primary care for patients?
12       A   Until 1993.
13       Q   So when we talked about pancreatic cancer, you
14    said you treated patients as a primary care physician and
15    a resident in medical school, et cetera.
16        Was that between the late 1960's and 1993?
17       A   Yes.
18       Q   Have you ever treated anyone for stomach
19    cancer?
20       A   Yes.
21       Q   How many people?
22       A   In the range of 15, 20.
23       Q   During what period did you do that?
24       A   Same period we talked about, '68 to '93.
25       Q   Have you ever treated anybody for breast

                35

1     cancer?
2       A   Yes.
3       Q   How many?
4       A   Probably a hundred.
5       Q   During what period?
6       A   Same period.
7       Q   Have you ever treated anyone for diabetes?
8       A   Yes.
9       Q   How many?
10       A   I would say a couple of thousand.
11       Q   During what period?
12       A   Same period.
13       Q   Did you ever treat anybody for liver
14    conditions, including elevated liver enzymes?
15       A   Yes.
16       Q   How many?
17       A   Hundreds.
18       Q   During what period?
19       A   Again, the same time frame, '68 to '93.
20       Q   Did you ever treat anybody for sclerosis of the
21    liver?
22       A   Yes.
23       Q   How many?
24       A   Dozens of patients.
25       Q   During what period?

                36

9 (Pages 33 to 36)

| | |
|---|---|
| 1   A   Same period. | 1   A   That's any kind of an adverse problem arising |
| 2   Q   Have you ever treated anyone for any form of | 2   in utero, around the time of birth, and, you know, |
| 3   skin cancer? | 3   obviously the patients who have birth defects or are |
| 4   A   Yes. | 4   premature or low birth weight or have high membrane |
| 5   Q   How many? | 5   disease or infant respiratory distress syndrome or other |
| 6   A   Again, I don't have a precise number but it's a | 6   complications around the birth process, they would be |
| 7   common condition. | 7   taken care of by doctors who specialize in that area and |
| 8   Q   Same time period? | 8   that's not my area of specialty. |
| 9   A   Yes. | 9   Q   That's something a neonatologist might take |
| 10   Q   Have you ever treated anyone for cardiovascular | 10   care of? |
| 11   disease? | 11   A   Yes. |
| 12   A   Yes. | 12   Q   Would your answer be the same for low birth |
| 13   Q   How many? | 13   weight, low birth length, low birth head size, |
| 14   A   Thousands. It's the most common disease that | 14   asymmetrical growth retardation or reduced mental and |
| 15   internists treat. | 15   motor development. |
| 16   Q   During what period? | 16   A   Yes. |
| 17   A   '68 to '93. | 17   Q   These are all things that a neonatologist would |
| 18   Q   Have you ever treated anyone for asthma? | 18   take care of? |
| 19   A   Yes. | 19   A   Correct. |
| 20   Q   How many? | 20   Q   One of the patients in this case has diabetes. |
| 21   A   I would say thousands of patients. | 21   Are you aware of that? |
| 22   Q   During what period? | 22   A   Yes. |
| 23   A   Same time period. | 23   Q   Did you send her to a specialist who treats |
| 24   Q   Have you ever treated anyone for chronic | 24   diabetics? |
| 25   bronchitis? | 25   A   No, I didn't refer her to anyone and didn't |
| 37 | 39 |
| 1   A   Yes. | 1   participate in her care at all. |
| 2   Q   How many? | 2   Q   One of the plaintiffs in this case has elevated |
| 3   A   I'd say hundreds to thousands. | 3   liver enzymes, are you aware of that? |
| 4   Q   Same time frame? | 4   A   Yes. |
| 5   A   Yes. | 5   Q   Did you refer that patient to a specialist in |
| 6   Q   Have you ever treated anyone for obstructive | 6   liver disease? |
| 7   lung disease? | 7   A   No, I didn't refer any of these patients to any |
| 8   A   Yes. | 8   doctors for any treatment for any condition at any time. |
| 9   Q   How many? | 9   Q   And I want to go through the list. Same goes |
| 10   A   Thousands. | 10   for cardiovascular disease, asthma, chronic bronchitis, |
| 11   Q   During the same time period? | 11   obstructive lung disease, dental problems -- |
| 12   A   Yes. | 12   A   I have never referred any of these patients at |
| 13   Q   Have you ever treated anyone for dental | 13   any time for any treatment for any of their conditions. |
| 14   problems? | 14   Q   Is it your opinion that any of the plaintiffs |
| 15   A   No, I don't treat dental problems. | 15   in this case have an increased risk of developing cancer |
| 16   Q   Have you ever treated anyone for birth effects, | 16   later in their life? |
| 17   including small birth size? | 17   A   Yes. |
| 18   A   No, I've not treated anybody for small birth | 18   Q   Who? |
| 19   size. | 19   A   All of them. |
| 20   Q   Birth effects is a term I've taken from your | 20   Q   Do you know what types of cancer the plaintiffs |
| 21   report and I want to make it clear I'm not talking about | 21   are at risk for developing later in life? |
| 22   birth defects. | 22   A   All types of cancer. It depends on which organ |
| 23       Is there a particular doctor who treats | 23   responds to the cancer-causing agents. These particular |
| 24   patients for birth effects, like the ones identified in | 24   cancer-causing agents arising from the Koppers facility |
| 25   your report in this case? | 25   -- dioxins, PAHs, pentachlorophenols -- are carcinogenic |
| 38 | 40 |

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

1 and reach almost all the tissues associated with numerous
2 types of cancers, and I would say that any type of cancer
3 has an increased risk for all types of cancer.
4     Q  Let's explore that. Are you aware of any
5 substance which is a canned carcinogen that causes cancer
6 in every organ?
7     A  Yes.
8     Q  What is that?
9     A  PAHs and the dioxins that I identified and I'd
10 say that chromium also fits in that category, as does
11 asbestos and numerous other carcinogens. Whatever tissue
12 they reach, they increase the risk of cancer in that
13 organ.
14         The organs with the highest exposure tend to be
15 where you see the most cancers occur and the organs with
16 the most rapid turnover and the highest exposure also
17 tend to be organs where you see the increase of the
18 number of cancers in the specific organ.
19         Dioxin, for example, is the most potent
20 carcinogen that we know of and causes cancer in the
21 lowest doses of any chemical and distributes widely
22 throughout. Wherever it's looked for, it's basically
23 been found, and certain tissue with higher lipid content,
24 such as adipose tissue, brain, liver have higher
25 concentrations, but it's basically distributed throughout

41

1     MR. LUNDY: You can answer the question.
2 BY MR. HOPP:
3     Q  Is asbestos associated with liver cancer in the
4 epidemiological literature?
5     A  I don't remember for sure.
6     Q  Is it your belief or opinion that because
7 asbestos is a potent carcinogen that where it is lodged
8 in the liver can cause cancer in the liver?
9     A  I think that's true, yes.
10     Q  And so a potent carcinogen like dioxin, PAH,
11 asbestos or chromium can cause cancer in any organ they
12 reach; is that right?
13     A  Yes.
14     Q  The only way they couldn't increase the risk of
15 cancer in a particular organ is that somehow the body
16 doesn't distribute that particular substance to the
17 organ?
18     A  That's correct.
19     Q  And since blood flows throughout the body,
20 there are not many organs that don't have the potential
21 at least for being a receptor for one of these
22 contaminants; is that correct?
23     A  That's correct.
24     Q  Going back to the 7 living plaintiffs in this
25 case, have you communicated to them that there is an

43

1 the body, as far as I know, to everywhere.
2     Q  We'll spend quite a bit of time and probably
3 not today going through studies you've cited and talking
4 about the epidemiology of the various agents, but I want
5 to understand your general approach here, and let's take
6 asbestos. It's closely tied to lunch cancer; is that
7 right?
8     A  If you take studies of asbestos workers, the
9 leading cause of death for asbestos exposed workers who
10 smoke cigarettes is lung cancer, yes.
11   .   Q  Are you aware of any epidemiologic literature
12 that says asbestos can cause increased risk of kidney
13 cancer?
14     A  Yes.
15     Q  Are you aware of any -- I'm trying to pick one
16 that's not in the literature and test the limits of your
17 theory.
18         Are you aware of any epidemiologic literature
19 that says asbestos is associated with increased risk of
20 liver cancer?
21     MR. LUNDY: I will object to the form of the
22 question insofar as it says the limits of his theory,
23 when he's sitting here giving you epidemiological
24 evidence and not necessarily his theory.
25     MR. HOPP: I understand the objection --

42

1 increased risk at cancer for all of their organs?
2     A  No.
3     Q  Have you recommended either to them personally
4 or through their lawyers the follow-up care they should
5 have in order to address this increased risk of cancer?
6     A  Yes. As I said in my report, they all need
7 regular medical monitoring.
8     Q  And the medical monitoring protocol set forth
9 in your report is something designed to address this
10 increased risk of cancer?
11     A  Yes.
12     Q  Is there any particular reason you didn't tell
13 the plaintiffs they were at an increased risk of cancer
14 in all their organs?
15     A  No, I don't have a reason that I didn't or
16 that is particularly standing out in my mind. It's just
17 not something I ordinarily do.
18     Q  Why not?
19     A  I don't have a particular reason why I don't
20 sit down and go over that with them, because probably
21 it's an unpleasant topic, and I just don't really feel
22 the need to go there.
23     Q  In this group of 7 living plaintiffs, are there
24 any you identified who are at greater risk than the
25 others for developing some particular form of cancer?

44

11 (Pages 41 to 44)

1  A  No, I have not looked at the issue that way
2  where I looked at the people with the highest level of
3  exposure and the highest risk and the most other risk
4  factors -- I have not looked at the data that way.
5      Q  So your opinion is generally they're at a
6  higher risk for all cancers, but you've not
7  differentiated among plaintiffs or among cancers?
8      A  Correct.
9      Q  Are you familiar with the field of
10 epidemiology?
11     A  Yes.
12     Q  Can you define epidemiology for us?
13     A  Study of epidemics.
14     Q  Any other definitions -- accepted definitions
15 or is that it?
16     A  I don't know what else to tell you.  That's
17 what the word means.
18     Q  Are you prepared to offer opinions in this case
19 in the field of epidemiology?
20     A  Yes.
21     Q  What makes you qualified to do that?
22     A  Well, my background, training and experience.
23 I've had extensive experience, published articles and
24 took a course in epidemiology in the school of public
25 health and it's been an integral part of my career in the

45

1  last 30 years.
2      Q  Let's talk about that.  You rely on published
3  sources as authority for your reports and opinions?
4      A  Yes.
5      Q  Much of what you rely on has been peer
6  reviewed?
7      A  Yes.
8      Q  What does it mean for a study to be peer
9  reviewed?
10     A  You submit an abstract and a paper, draft of a
11 paper, with your information in it, and the journal will
12 then send that manuscript to reviewers, usually to two
13 reviewers, and they will review the paper and decide
14 whether it's got scientific merit and whether it's useful
15 to the community that that particular journal is
16 addressed to and, if they feel it's appropriate and
17 scientific valid, they recommend it be published.  If
18 it's not recommended, it's not published.  So that's what
19 is meant by peer reviewed.
20     Q  There are a series of peer reviewed journals
21 that are available for doctors and epidemiologists or
22 members of the general public; correct?
23     A  Yes.
24     Q  And you probably have a bunch here in your
25 office; right?

46

1      A  I have some of the journals I subscribe to on a
2  regular basis.
3      Q  When we talk about the peer reviewers, I know
4  you said that the editors send it out to two peer
5  reviewers.  Let's take an example so we're clear.
6          If you were to do a study that you wanted to
7  publish in a peer reviewed literature and it had to do
8  with heart issues, cardiovascular issues, is there a
9  particular journal you'd send that to?
10     A  Well, if it's about the treatment of heart
11 disease with medication, you'd probably send it to
12 Journal of Cardiology.  If it's about cardiac disease
13 arising from occupational exposure, you send it to
14 Occupational Medicine Journal.
15     Q  Fair enough.  Each of the journals has someone
16 whose job it is to take submissions and to decide whether
17 or not to submit them for peer review; is that right?
18     A  Yes.
19     Q  There is an editor or series of editors for
20 these peer reviewed journals?
21     A  Yes.
22     Q  Does the editor do some sort of triage and look
23 at the article to see if it's worthy enough for peer
24 review?
25     A  That occasionally happens where the editor

47

1  makes the decision to not send it to a reviewer, if
2  that's the question.
3      Q  Does each journal have a list of reviewers that
4  they then send papers out to for peer review?
5      A  Yes.
6      Q  And are there reviewers selected based on the
7  subject of the paper, that is if it's occupational
8  exposure to asbestos, are there reviewers who specialize
9  in that discipline and review the paper?
10     A  Usually you pick a reviewer that has some
11 background, training and experience in the field so they
12 can understand it and judge it appropriately.
13     Q  Are you a peer reviewer for any journal?
14     A  I have been.
15     Q  Are you currently a peer reviewer?
16     A  Yes.
17     Q  What journals?
18     A  Environmental Research, Journal of Occupational
19 Environmental Medicine.  Those are the two that come to
20 mind at the moment and there are a couple of others that
21 send me articles to review.
22     Q  So Environmental Research and the second one is
23 Journal of Occupational --
24     A  And Environmental Medicine.
25     Q  Now, what does a reviewer look for when he or

48

1 she receives a paper?
2 A Well, they look for the scientific validity and
3 soundness of the study.
4 Q For example, you submitted papers to journals
5 for peer review and non-peer review; is that right?
6 A I've never submitted anything to a non-peer
7 review journal.
8 Q You've submitted papers to peer review
9 journals?
10 A Yes.
11 Q Is it the reviewer's job to go back and
12 double-check your data and see if you collected the data
13 in the right way?
14 A As part of their assessment, they will look at
15 the question of data and how the data was collected and
16 how the sample was collected.
17 Q Isn't it true that the reviewers are looking
18 more at the methodology and the documentation for the
19 methodology and how the study was done, as opposed to
20 getting the right results or that your numbers are
21 correct?
22 A They also look at the numbers and that the
23 statistics are done properly and the accounting is
24 consistent, and they look at all aspects of the paper.
25 Q And then the reviewers will submit comments?

49

1 A Yes.
2 Q Usually in writing?
3 A Always in writing.
4 Q And the journal keeps those comments
5 presumably?
6 A They usually forward them to the author so the
7 author has the benefit. Frequently reviewers will ask
8 for clarifications or changes or additions or
9 subtractions even from the paper to make the paper more
10 useful, let's say, to the community that it's prepared
11 for.
12 Q Is it sometimes the case that the author will
13 look at the reviewer's comments and make changes to the
14 paper?
15 A Yes.
16 Q And then resubmit it?
17 A Yes.
18 Q Is it sometimes the case that the reviewers say
19 that this paper should not be published and there is no
20 second chance to submit it?
21 A That's correct.
22 MR. HOPP: We've gone for an hour, and should
23 we take a comfort break?
24 MR. LUNDY: Sure.
25 (Recess.)

50

1 BY MR. HOPP:
2 Q Just to return to the New York City fire
3 fighters study that we talked about earlier, at any point
4 did you collect data on New York City fire fighters that
5 did not respond to the World Trade Center cleanup to
6 obtain a baseline number?
7 A No, we didn't. Dave Prezant the medical
8 director for the fire department did do that, a PCB
9 analysis on several hundred of the firemen and their
10 values were a little higher than the background levels
11 for the general population and I didn't see the data.
12 They had quite a few and, again, I don't know
13 the exact number but in the range of 50 to 100 whose PCB
14 levels using the Webb McCall technique were over 12,
15 which was Dr. Prezant's cutoff, what he considered to be
16 high. But the Webb McCall technique really is not the
17 best technique to use but it's a quick and dirty way of
18 getting PCB estimates and a relative concentration of
19 PCBs from one person to another.
20 So they did have quite a few people that were
21 high on the PCB count, and I think it's fair to say that
22 the main thinking was that 9/11 was the reason for that.
23 Q I want to follow up on the prior answer. The
24 name is Dave Prezant?
25 A Yes.

51

1 Q And he's the medical director for the New York
2 City Fire Department?
3 A He and Dr. Kelly are two medical directors for
4 the New York City Fire Department.
5 Q I want to understand. We asked about
6 background, and you said he had collected data and he had
7 some that were quite high with the levels of over 12, and
8 that 9/11 was the reason for that.
9 The ones that were high, were they people who
10 responded to the 9/11 in the cleanup?
11 A Yes.
12 Q But I want to go back to my earlier question.
13 Did Dr. Prezant or anyone else to your knowledge collect
14 data on New York City fire fighters who did not
15 participate in the 9/11 cleanup, if any?
16 A Not to my knowledge.
17 Q Now, we were talking about peer review and
18 published data. Is it generally accepted among people in
19 your profession that a paper that's peer reviewed is in
20 some way more reliable than one that has not been?
21 A That is a very complex question, and each paper
22 I think has to be judged by some merit, and there are
23 papers in the peer-reviewed literature that have serious
24 faults with them and, vice versa, there are paper not
25 peer-reviewed that are perfectly wonderful.

52

13 (Pages 49 to 52)

1      The idea of peer review is probably overly
2  emphasized, and I understand why it's done, but I don't
3  think you can make a sweeping statement that
4  peer-reviewed stuff is good and non-peer-reviewed stuff
5  is bad or anything like that.
6      Q  Do you accept peer review as an indication of
7  reliability?
8      A  Well, it is certainly a process that is
9  attempting to increase the reliability.  As I say, there
10  are papers published that are not very good, and you can
11  say that the peer reviewers do a very good job, and I
12  don't have any other -- I don't think just because it's
13  peer-reviewed means it's good and, because it isn't, it's
14  bad.  It's part of the process and one has to judge the
15  data based on all of the factors in the equation.
16      Q  Let's talk about data.  You rely on data from
17  published sources; is that correct?  For the purpose of
18  your opinions in this case, you look at data contained in
19  published papers?
20      A  I have relied upon an extensive body of
21  published information about the toxicity of the chemicals
22  in this case.
23      Q  And you depend on the data to be accurate?
24      A  Yes, I do and, in a broad sweep, I think it's
25  accurate, yes.
                                                      53

1      Q  And if it's not accurate, if the data in the
2  published papers that you rely on is not accurate, that
3  can affect your conclusion; is that right?
4      The conclusions you draw from that data may be
5  wrong?
6      A  Anything is possible.  There could be errors.
7      Q  And when you take data from a published source,
8  in order to put it into one of your reports or for other
9  reasons, it's important you reproduce it accurately; is
10  that correct?
11      A  Yes.  You should be faithful to what the
12  article has stated.
13      Q  And that's because the reliability of your
14  conclusion depends on your accurate representation and
15  reproduction of the underlying data; is that correct?
16      A  I believe that is, in a very broad sense,
17  correct.  Obviously there is lots and lots of details
18  that have to be addressed but, in general, that's true.
19      Q  Now, you would never intentionally misstate or
20  mistranscribe data from other source, would you?
21      A  No.
22      Q  That would be dishonest?
23      A  Well, you might make a mistake.  It's not
24  necessarily dishonest.  There's certainly the possibility
25  of an error or misinterpretation and I wouldn't consider
                                                      54

1  that to be dishonest.
2      Q  But you would not intentionally misrepresent or
3  misstate data?
4      A  No.
5      Q  Any conclusions that would be drawn from
6  intentionally manipulated data would also be dishonest;
7  is that right?
8      A  I don't understand the question.
9      Q  If you intentionally misstated or someone else
10  intentionally misstated underlying data and then were to
11  draw conclusions from that intentionally misstated data,
12  the conclusions would be dishonest; correct?
13      MR. LUNDY:  I object to the form of the
14  question.  I don't know how he can testify about anybody
15  else's state of mind and forming any conclusions.
16  BY MR. HOPP:
17      Q  Can you answer the question?
18      A  I'm having trouble with your concept of
19  dishonest.  I suppose that people have misrepresented
20  data and done it intentionally, but that is not very
21  common.
22      Again, I think it's possible people make a
23  mistake or look at the data incorrectly, that they have a
24  bias that influences how they interpret the data.  I'm
25  not sure I'd call that necessarily dishonest.  In some
                                                      55

1  cases some of the data that has been collected has been
2  collected in such a way as to create a certain
3  impression.
4      They design the study from the beginning to get
5  the results they want, and you can say that is
6  manipulation of the data and could be labeled as
7  dishonest.  I have seen that done where the study design
8  is so obviously flawed that they're not necessarily going
9  to get data that can be relied upon, but you have to go
10  in an individual case to, you know, reach the conclusion
11  that dishonesty was the motivating factor.
12      Q  If you were aware that someone took a published
13  paper that had a value in it and then looked at the value
14  and either intentionally transposed or misstated a
15  follow-up paper that relied on the published data, that
16  is grounds for some type of discipline or some type of
17  report to a governing body?
18      MR. LUNDY:  I will object to the form.
19      THE WITNESS:  Again, I'm not in the business of
20  judging the motivations of people and I have never seen
21  anybody else do that either.  There has been some talk in
22  recent years about unethical research but we have to talk
23  about it in an individual case to be more specific.  I
24  mean -- I'm just not sure how to answer your question.
25  BY MR. HOPP:
                                                      56

14 (Pages 53 to 56)

1    Q   Have you ever encountered, either in published
2   accounts or personally someone who intentionally
3   misstated data?
4    A   No, but what I've seen people do, like Dr. Wong
5   did in his paper that he prepared in this case, where his
6   study design is so flawed that he intentionally I believe
7   designed the study to get negative results and had not
8   analyzed his data in a way that I would say is consistent
9   with generally accepted principles, and he built a bias
10  into his research which, in spite of that, he still had
11  some positive data, which he ignored, which I thought was
12  ridiculous but -- I think due to his bias, I didn't
13  consider it to be too honest.
14   Q   We'll talk further about Dr. Wong as we get
15  into it.
16      You rely on data that's not published, as well,
17  at least in this report not published in peer-reviewed
18  literature?
19   A   There are reports that we have obtained that
20  are studies that have been done and not published in the
21  peer-reviewed literature.
22   Q   And sometimes you rely on lab reports that have
23  been generated, like the ERGO lab reports?
24   A   Yes, we rely on studies we did on the
25  individual plaintiffs in this case who represented the
                                                        57

1   exposed population.
2    Q   Has any of the literature you rely on in your
3   list of hundreds of reference, is any of that a lab
4   report or unpublished lab report?
5    A   The references are references and lab reports
6   are lab reports.
7    Q   Other than the ERGO lab reports, have you
8   relied on other lab reports?
9    A   We talked about a lot of lab results that are
10  important and most important, other than the ERGO
11  results, are the results of the environmental testing
12  that's been done through 3TM, where they measure dioxins
13  and PAHs and house dust and soil and the environment of
14  the homes.
15      There's also the PAH adducts done by Dr.
16  Phillips in the cancer research laboratory in England and
17  the lab results done by Pacific Toxicology and lab
18  results that we performed on the various plaintiffs we've
19  seen.
20   Q   And it's important that the lab be reputable,
21  to use a good lab?
22   A   Yes, it's important that you use a lab that
23  gets accurate results.
24   Q   And it's important that the lab is careful in
25  how it handles samples?
                                                        58

1    A   Yes.
2    Q   And it's important that they have quality
3   control and quality assurance procedures in place?
4    A   Yes.
5    Q   And it's important that the lab be able to show
6   you it's QA/QC procedures?
7    A   Yes, that's important.
8    Q   And you rely on the lab to follow its QA/QC
9   procedures; correct?
10   A   Yes.
11   Q   And a lab will usually have QA/QC documentation
12  that it can provide with its report; right?
13   A   Usually, yes.
14   Q   In any event, you use a lab in part based on
15  its representation for quality; is that right?
16   A   Yes.
17   Q   And a reputable lab provides a lab report for
18  you; is that correct?
19   A   Yes, provides a lab report.
20   Q   The lab report should identify the task that
21  the lab was asked to perform; is that right?
22   A   Yes.
23   Q   And the lab report should identify the sample
24  collection procedures; is that correct?
25   A   It should include the sample collection
                                                        59

1   procedures? That doesn't usually occur. The report
2   doesn't include the sample collection protocols, no.
3       MR. LUNDY: I'll object insofar as all his
4   questions assume that a request is made for that data and
5   I think that -- he's implying that a request was made for
6   all of that data, and with that false implication I'm
7   objecting to the form of the question and whether a lab
8   or not does that and -- I think they all do it, but I
9   think your question is suggesting that we or Dr. Dahlgren
10  requested all that.
11      Listen to his question closely and don't assume
12  anything.
13  BY MR. HOPP:
14   Q   A lab report from a reputable lab also sets
15  forth the samples received and storage procedures; is
16  that correct?
17   A   A routine lab report doesn't include the QA/QC
18  procedures, and those are usually done only on special
19  request for most lab work. You don't get all of the
20  QA/QC procedures, sample-handling procedures, chain of
21  custody data -- all that stuff is available, if needed,
22  but it's not part of the lab report.
23   Q   A reputable lab will also provide a report
24  showing its sample preparation procedures; correct?
25   A   They will tell you if you ask what the sample
                                                        60

15 (Pages 57 to 60)

prep requirements and protocol are. These are standard
operating procedures in labs. It's not included in every
report because it's burdensome and a waste of everybody's
storage space, if nothing else.

Q   A lab report from a reputable lab tells you
what analytical method was used; correct?

A   Not always.

Q   A lab report from a reputable lab will tell you
what the results of its analysis were; correct?

A   Usually they'll tell you what analogues they
looked at and what the results are and what the normal
ranges are and that's it. They don't give you all the
rest of the stuff.

Q   A lab report from a reputable lab shows you
what the QA/QC procedures were that were used; is that
correct?

A   You asked that same question already, and I
said that no, routine lab reports do not include the
QA/QC procedures or the results of the QA/QC work done in
that run.

Q   The work you've done in this case or in other
cases, is it important that the data you rely on be
reproducible?

A   By definition, if the lab data and the lab
measurement you're taking is not reproducible, you would

61

not even do it. One of the things a lab has to do when
setting up a procedure is to make sure it's reproducible
and that the results on the same specimen will be in
agreement within -- depends on the type of test, but
within usually 5 to 10 percent, and sometimes lab tests
are so variable that we even accept up to 20 percent
variability, and you have to have reproducible results to
offer the test in the marketplace.

Q   Do you hold yourself out as a scientist?

A   I think what I do is scientifically sound, yes.

Q   Have you reached scientific conclusions in this
case?

A   I'm not sure what you mean by scientific
conclusions. I've reached medical conclusions about
medical facts in this case based on scientific evidence.
Scientific conclusions? I'm not certain what you mean by
that particular phrase.

Q   Are the conclusions you've reached, the medical
conclusions you've reached on the subject of causation
for the plaintiffs in this case, is that the subject of
your opinions, causation?

A   That is the major issue we're addressing. I'm
not disputing the diagnosis in most cases and you have
fairly clear-cut medical problems.

    The question I was asked to address is what is

62

the contribution of the chemicals arising from the wood
treatment plant on these health problems, and that's the
main issue, I believe medically, and not what their
diagnosis is, and there may be some dispute in some cases
about the diagnosis but I don't think it's primarily
that. It's primarily an issue of causation.

Q   Do you have a methodology that you apply in
order to answer the question you've been asked to answer
in this case?

A   Yes.

Q   Can you describe for us in general terms your
methodology for answering these medical causation
questions?

A   Sure. The first issue one has to establish is
what I'd call generic causation, and that's are the
chemicals in question capable of causing a health effect
and, if so, what type of health effects are they known to
cause based on studies done in animals or humans, case
report studies or epidemiological studies, mechanism
studies, in vitro studies, and there's a whole host of
different ways one can identify the toxicity spectrum of
the chemicals present in this case or any case.

    The second major issue is to evaluate the
individual patients or in this case plaintiff or subject
of the lawsuit to determine what their health problems

63

have been, what their medical history, occupational
history, residence history, family history, lifestyle,
habits, hobbies, as much information as one can obtain
about everything that has to do with their medical
history and lives.

    At the same time you collect that information,
you need to collect information of exposure, and what
does that person have in the way of a historical exposure
history, and they describe where they lived -- in this
case we're talking about residential or environmental
exposure, and how long they lived there, and how close to
the source, and whether or not they had opportunity for
additional exposure such as, in this case, people with
burn-treated wood inside their homes, play in the ditches
during the summer time and be exposed to water or
sediment.

    Even in this case some of the children would go
and climb on the wood in the wood treatment areas, as the
wood was curing or being allowed to be stored for a
period of time before it was shipped. Collect as much
information about that individual's health and exposure
data by history.

    And then, of course, look into whatever data
there was on exposure from the facility, as it relates to
the subject. What was known about the discharge of the

64

1 chemicals into the air, soil, water and other products
2 coming off the property that the subjects we're talking
3 about come in contact with, so we get as much
4 documentation of the chemicals and chemical levels and
5 that would occur.
6 Once we have information about dosage, we want
7 to also look at, as I said and repeat it to make it
8 clear, the differential diagnosis. If the patient has a
9 lung cancer and the issue is was it due to the exposure
10 of the dioxins and PAHs from Koppers versus their own
11 exposure to say cigarettes smoke they may have been
12 exposed to either from personal habit of smoking or
13 secondhand smoke from other family members.
14 In that case, we might collect data not only
15 from the patient but from other family members who would
16 have known about the person's exposure. In the case of
17 children who can't speak, we have to collect information
18 about second-hand smoke from, let's say, family members
19 or friends of the family that knew about it.
20 Putting together all the causative factors, we
21 apportion which factors are the most persuasive and
22 important and potent to address the issue of causation.
23 We also need to review the medical records to
24 be sure the history we obtained is accurate and backed up
25 by what the doctors have actually found, insofar as it is

65

1 reach the same result?
2 A Yes, they would be transparent and very clear
3 on what the basis of the opinion would be.
4 Q Is it important to you that the method by which
5 you collect and analyze your data has been subject to
6 some type of peer review?
7 A Well, I guess I would have to say that the
8 methodology that I have described is methodology used by
9 others, whether that has been peer-reviewed -- I mean, I
10 think somebody did write an article about peer review and
11 causation -- I can't remember the name of the author, but
12 there have been a few articles written and published in
13 various journals about an individual's opinion on how
14 they approached the causation question.
15 I don't remember the authors' names but, in
16 general, what I described to you is similar to what
17 others use for finding causation and has been a subject
18 of peer review.
19 Q You've published at least one health assessment
20 of population of people living near a wood treatment
21 plant; is that right?
22 A Yes.
23 Q And that health assessment was subject to peer
24 review?
25 A Yes.

67

1 possible. Frequently medical records, particularly for
2 things that happened in the past, are somewhat difficult
3 to get because they're destroyed, but we try to get as
4 much information as possible.
5 Then we can address the issue of specific
6 causation when we've established that the chemical can
7 cause certain diseases, does the person's specific
8 illness match with what's know about its generic
9 causation and if they had a sufficient dose of exposure
10 to cause that illness or contribute significantly to that
11 illness or health problem. So that's in a general way
12 how one approaches this question.
13 Q I want to ask specific questions about your
14 method.
15 Part of what you described is collecting data
16 on exposure and the plaintiff and collecting all of the
17 available data; correct?
18 A Correct.
19 Q And you reviewed all the relevant published
20 literature?
21 A Yes. I indicated under generic causation that
22 one would look at the medical literature in detail as to
23 what those chemicals are capable of causing.
24 Q Is it important to you that your conclusions
25 can be tested and someone else following your method can

66

1 Q At least twice?
2 A Yes.
3 Q Did you follow the same method in this case,
4 the same as in your published article?
5 A I think so, although we have more higher levels
6 in this case than we had in the Columbus, Mississippi
7 case. The levels are off the charts in Grenada, in the
8 house dust and soil and the people there, significantly
9 elevated values and really horrendously high values,
10 particularly the house dust values, which are so high as
11 to be, I think, capable of causing harm and really
12 incompatible -- people I don't think should stay in those
13 homes and should be remediated or torn down and need to
14 be moved immediately because they're experiencing
15 irreparable harm by staying where they are.
16 Q Now, we're talking about method and you said
17 there are distinctions between Columbus, Mississippi and
18 Grenada, Mississippi but is your answer that you followed
19 the same method in both cases, that is collecting and
20 analyzing?
21 A We collected and analyzed and had more data in
22 Grenada. We had the DNA adducts that we didn't have in
23 Columbus, and these document the presence of high levels
24 of PAH adducts which we did not have in Columbus.
25 These PAH adducts predict an increased risk of

68

17 (Pages 65 to 68)

1 cancer in these folks and, therefore, the exposure is
2 ongoing. The PAH adducts are usually only reflective of
3 the previous three to six months of exposure, so these
4 people have, I'd say, qualitatively higher exposures and
5 quantitatively higher exposures and at very, very high
6 risk and those exposures are ongoing and, therefore, this
7 is something of a medical emergency in my opinion.
8     Dr. Wolfson and Dr. Sawyer and Randy Horsak and
9 Devrage Sharma, all the other experts I've spoken to
10 about this are in agreement with me that this is a
11 medical emergency and that these people are living in a
12 highly dangerous environment and this needs to be
13 addressed on an urgent basis.
14     Q   Have you shared the concern with the
15 Mississippi Department of Public Health?
16     A   No. I've shared them with Mr. Lundy and his
17 associates and I believe they have communicated those
18 concerns to the defendants. Frankly, the idea of going
19 to the Mississippi Department of Health -- was that the
20 question or the environmental quality --
21     Q   Any public agency that would be responsible for
22 taking care of these people --
23     A   Well, that would be wonderful if they had a
24 track record of doing anything. I guess you can consider
25 contacting them and that's an idea that didn't cross my
                                                    69

1 mind just based on the history with health departments in
2 the last 30 years. They usually don't respond, even when
3 they should, but we can send them a letter and ask them
4 to look into this matter.
5     Q   The same question for any county authorities,
6 Health Department authorities?
7     A   No.
8     Q   Does your method, the method that you
9 described, have a known or potential error rate?
10     A   I'm not sure what you're talking about. An
11 error rate to a method?
12     Q   Yes.
13     A   I don't know how you put a quantitative value
14 on a qualitative process like that.
15     Error rate for an assessment protocol?
16     I guess what you're saying is always a hundred
17 percent accurate versus 50 percent accurate?
18     Q   Has it been tested, does it have an error rate?
19     A   You'll have to clarify what aspect of the
20 generic causation assessment. The rate of collecting the
21 generic causation data? It's there or it isn't. It's
22 one of those all or nothing.
23     Either the generic causation data is there or
24 it isn't. Either the patient's history is there or it
25 isn't. It's not like you can say that the likelihood
                                                    70

1 that the generic causation assessment is correct is 75
2 percent accurate. There is no way to say that. Either
3 they have it or they don't.
4     Q   So we're clear, I'm not talking about the
5 generic causation assessment. I'm talking about your
6 entire methodology which includes generic causation
7 assessment, all the data you stated you collected and
8 reaching a conclusion regarding a particular plaintiff
9 with respect to either causation or increased risk of
10 future disease.
11     Does that method that you painstakingly laid
12 out for us, albeit in generic terms, have a proven error
13 rate?
14     A   I don't think that the term error rate would
15 apply to what I described. You can apply the term an
16 error rate to the measurement of the dioxin in the blood.
17 You can apply the term error rate to certain other
18 aspects of the thing. Various tests can have error rates
19 but the overall methodology I don't think the term error
20 rate applies.
21     Q   Let's talk in more detail about the data you
22 collected. Is some of the data you collected data on the
23 source of a potential exposure?
24     A   The fingerprint, the pattern of the dioxins,
25 matches the dioxin exposure that you would expect from a
                                                    71

1 pentachlorophenol source. So that data collection did
2 address the issue of identifying the source.
3     Similarly, the 3TM data that was collected by
4 house dust also showed the same pattern, which is the
5 predominance of the larger chlorinated species of CDD and
6 the hexa CDD species. That's also fingerprinted to the
7 pentachlorophenol.
8     Q   The general idea being that you can't have
9 exposure without a source, and you have to identify the
10 source of the exposure that you evaluate; right?
11     A   As best you can, yes. There is obviously times
12 when you're not sure, but in this case it's clear that we
13 traced the dioxins to the pentachlorophenol based on the
14 fingerprinting that I mentioned.
15     Q   You also need to collect data on exposure;
16 correct?
17     A   Yes.
18     Q   Did you collect data on exposure in this case?
19     A   Yes.
20     Q   You can't have a toxic effect without the
21 exposure to the toxin; correct?
22     A   You have to be careful and there's a great deal
23 of variability in people's response and some respond to
24 very low levels.
25     In general what we say in toxicology is that
                                                    72

18 (Pages 69 to 72)

1 the dose is important and it has to be a sufficient dose
2 to create the effect and taking into account even the
3 most sensitive sub-populations, such as in-utero fetuses
4 that are growing in the womb, which are probably the most
5 susceptible to toxic effects and various agents, and the
6 dose in those cases were generally found to be quite
7 lower than say the effect it takes to have a toxic effect
8 on a full grown healthy adult.
9    Q  Is there a difference between exposure and
10 dose?
11    A  Well, you can have an exposure. If you have
12 exposure there is some dose associated with that. It can
13 be a high dose, medium or low dose, but if you had
14 exposure, you've had a dose. It's a question of how long
15 and how much but still if you had exposure, you had a
16 dose.
17    Q  And if you have not had exposure, you don't
18 have a dose?
19    A  Correct.
20    Q  For example, grain alcohol is toxic; correct?
21    A  It can be toxic. It depends on your definition
22 of toxic and dose that it would take to create any given
23 effect.
24    Q  It can have an acute or chronic effect;
25 correct?

73

1    A  Yes.
2    Q  And it can be a large or small dose depending
3 on the method of how the does is administered and how
4 much; correct?
5    A  Over a period of time, yes.
6    Q  In the example you've indicated, if someone
7 opens the bottle of grain alcohol and drinks it, they can
8 have an acute alcohol poisoning and die.
9    A  If they drank enough and fast enough, yes.
10    Q  If they drank enough over a long period of
11 time, say years, they can have liver cancer; is that
12 correct?
13    A  That's a possibility, yes.
14    Q  Liver cancer is a known toxic end point of
15 grain alcohol; correct?
16    A  Yes. Alcohol use is associated with increased
17 risk of liver cancer.
18    Q  Did you collect data on dose in this case?
19    A  Tried to, yes, in every case.
20    Q  How did you try to collect data on dose for
21 this particular case?
22    A  Most importantly was to obtain information
23 about the patient's personal history -- where they lived,
24 what they noticed, what they smelled, the symptoms they
25 experienced in response to exposures that occurred from

75

1    A  You can put a drop of grain alcohol on
2 somebody's skin and it probably would not have any
3 adverse effect. You can take a quart of grain alcohol
4 and drink it and it can kill you. It all depends on what
5 you're talking about.
6    Q  We keep hinting around this. You've identified
7 a sort of common theme with toxicology.
8       Are you familiar with a man by the name of
9 Paracelsus?
10    A  Yes.
11    Q  And he had a common phrase?
12    A  Yes.
13    Q  What was that famous phrase?
14    A  Dose makes the poison.
15    Q  Let's go back to the grain alcohol example.
16 What I'm looking for is something simple. If you don't
17 open the bottle, you don't have exposure; correct?
18    A  Okay. As long as you didn't break the bottle
19 or it didn't seep out, there is no exposure.
20    Q  If there is a barrier between you and the
21 source of exposure, you won't have the exposure; correct?
22    A  That's by definition.
23    Q  That's what we're talking about, definition.
24 And a dose is the amount of the toxin which crosses some
25 membrane and gets into your body; correct?

74

1 the plant.
2       Whether they played in ditches or burned
3 treated wood in their home or played in the ties and
4 walked into the plant and got close to the treating
5 cylinders or worked in the plant or other plants.
6       But focusing on the dose, the issue of the
7 exposure to the Koppers PAHs, pentachlorophenol and
8 dioxins, personal history was important and looking at
9 other data such as the estimated materials coming out of
10 the plant, what the contractions were in the house dust
11 in homes and what the company's practices were and the
12 tons of material they used, what kinds of pollution
13 control systems they had to try to reduce air emissions
14 or discharge of water and chemicals into the soil and
15 ditches and into the home area where these people lived.
16       Also reviewing the data collected by others,
17 such as 3TM and Sharma's data collection of what was done
18 in the plant and likely to be the quantitative aspects of
19 the exposure that occurs in the vicinity around the
20 plant.
21       So dose is the result of all of these
22 assessments. Doing a retrospective reconstruction is
23 somewhat difficult, but it's clear when you describe
24 living in a neighborhood and smelling the creosote and
25 noticing the particulate material building up inside the

76

19 (Pages 73 to 76)

1 homes, playing in ditches and playing on the ties with
2 skin absorption, inhalation through those routes, one can
3 get a good qualitative sense of high, medium, low
4 exposure and was their exposure different and unusual
5 compared to a general population in a certain class of
6 compounds.
7     In this case dose is, I think, fairly easy to
8 say that it was high, and the study we did in Columbus,
9 Mississippi and the study done by McGee in Kansas City,
10 Missouri shows that even people who don't experience as
11 high a level as these people in Grenada did have health
12 effects attributable to treatment plant environments.
13     We're talking here in Grenada about an exposure
14 that I consider to be helatious and it's incredible that
15 these people live right up next to the plant that
16 processes millions of pounds of toxic chemicals that we
17 talked about, discharging a huge amount into the air and
18 soil and water around the plant, contaminating this area,
19 like I said earlier, to such a degree that it's truly a
20 health hazard to live there right now.
21     Q   During the course of that extensive answer, you
22 hit upon a distinction I want to explore.
23     You used the term qualitative. Remember that?
24     A   Yes.
25     Q   Is there a difference between qualitative dose

77

1 information and quantitative dose information?
2     A   Well, there is such a thing in toxicology of
3 what we call high, low and medium exposures. Most of the
4 literature we have on occupational and environmental
5 exposures in the last hundred years of research in this
6 field has used qualitative dose.
7     In other words, we'll take a job description
8 that we'll say is a high exposure like, for example, in
9 coke ovens. Workers that are on top of the coke oven are
10 considered highly exposed. The workers on the ground or
11 in the vicinity but not on top of the cokers are
12 considered to have moderate exposure, and then workers in
13 another category, in another part of the steel plant
14 where making the coke is going on, is considered low
15 exposure.
16     Then you look at the health risks in the three
17 groups, and that's the way most research has been done.
18 It's qualitative. We can't go back and reconstruct 50,
19 30 or 20 years of exposure. We can't do that and we have
20 to make estimates. And that's what we do in all these
21 cases is make estimates.
22     We get as much quantification as possible, and
23 we've done that in this case, but we have to also start
24 talking about that this person was born and raised in
25 this environment and lived all their lives there and got

78

1 therefore a very high dose -- we can't say how many
2 micograms while in the mother's womb, but we can say they
3 were having exposure and we'd classify that exposure as
4 high.
5     Q   These qualitative exposure categories you
6 described are a way of describing dose in the absence of
7 physical measurements of the environment that someone was
8 in or physical blood, urine samples?
9     A   In the absence of Koppers not having a fence
10 line monitor when measuring the chemicals on an ongoing
11 basis.
12     Q   These high, medium, low exposure categories
13 are a surrogate for dose information; correct?
14     A   They're a surrogate for dose and give some way
15 to classify the dose that someone has experienced based
16 on all these factors I mentioned.
17     Q   You talked about, in your extensive answer a
18 moment ago, a quantitative method for obtaining this
19 information, in particular you mentioned 3TM; is that
20 right?
21     A   Yes.
22     Q   Is that Randy Horsak's company?
23     A   Yes.
24     Q   And Devrage Sharma?
25     A   Yes.

79

1     Q   And he also collected quantitative information;
2 correct?
3     A   He did quantitative measurements or estimates
4 based on how many pounds of the chemicals --
5     Q   He's the modeler?
6     A   Yes.
7     Q   Horsak went out into the neighborhood and
8 collected dirt and dust and things like that?
9     A   Yes.
10     Q   And took it to a lab and you have a lab report
11 or a series of lab reports from Mr. Horsak that describe
12 data collection, analytic procedures, etc., that give you
13 the results that Mr. Horsak obtained; correct?
14     A   Yes.
15     Q   Can you use that quantitative information in
16 your assessment of causation?
17     A   Yes, that's part of the assessment.
18     Q   How do you use the numbers, physical numbers
19 that someone collects and use them to evaluate causation?
20     A   Well, as I think I indicated, they're an
21 indication of current exposure, the levels in their homes
22 of PAHs and dioxins that can be used to estimate what
23 their current dose is, what they're being exposed to as
24 we speak, living in those homes.
25     In most all the homes, they're above safe

80

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

1 levels and in most of the house dust samples and soil
2 dust samples obtained in that neighborhood in the homes
3 of these plaintiffs we're talking about here today,
4 exceed the Mississippi Department of Environmental
5 Quality's cleanup standards for dioxin.
6     In some cases they reach levels that would be
7 likely to cause acute illness and not just chronic
8 illness, the levels are so high. But the ingestion of
9 the dust on their fingers and in the food and inadvertent
10 ingestion and absorption and inhalation levels of these
11 chemicals would be above safe levels, above the minimum
12 risk levels that have been established by the ATSDR for
13 these classes of compounds.
14     MR. HOPP: Can we take a quick break and bring
15 Mr. Collins into the room.
16     (Recess.)
17     MR. HOPP: We're back on the record.
18     Q   Dr. Dahlgren, when we took a break we were
19 talking about the difference between qualitative dose and
20 quantitative dose measurements in this case, and I
21 believe your response covered minimum risk levels and the
22 extent to which various regulatory thresholds are
23 exceeded in the neighborhood surrounding the Grenada
24 plant?
25     A   Yes.

81

1     Q   Other than looking at the data that Mr. Horsak
2 collected and comparing it to regulatory levels, have you
3 done anything else to identify quantitatively what the
4 doses are for the seven plaintiffs in this case?
5     A   We have measurements of PAH adducts and dioxins
6 in similarly situated people and exposed on the same
7 lines as these folks in the Beck case and found them to
8 be elevated.
9     As I said earlier in the discussion, the
10 patterns were compatible with the materials coming out of
11 the plant, so even though we've not done it on the
12 individual plaintiffs, we can safely assume that if we
13 were to make the blood measurements, they would be
14 similarly elevated to those we have measured.
15     Q   So we're clear, you have had some people from
16 Grenada, you have had their blood tested for dioxin and
17 PAH, DNA adducts; correct?
18     A   29 people, yes.
19     Q   And that doesn't include the 12 plaintiffs in
20 the Beck case; correct?
21     A   Correct.
22     Q   Why is that? Why did you not test the 12 in
23 the Beck case?
24     A   I think it's an economic issue. With the
25 dropping dollar, we're about $2,000 just to do the

82

1 dioxins and furans, and it's just because of the expense.
2 I forget the price of the DNA adducts, but this is not
3 yet been done, and I would like to do it but it's just
4 expensive.
5     Q   And the dropping dollar is at issue because
6 both labs are in Europe?
7     A   Yes.
8     Q   The laboratory that did the dioxin work is in
9 Germany?
10     A   That's correct. And even if we used the AXYS
11 lab in Canada, which is a reliable lab, the expense is
12 still very high without the dropping dollar. The
13 Canadian dollar is stronger than the U.S. dollar,
14 relatively speaking, but it's still approaching $2,000 to
15 do the studies that we need to do up there.
16     MR. BAILEY: $2,000 U.S. money?
17     THE WITNESS: Yes.
18 BY MR. HOPP:
19     Q   And the DNA adduct lab you used is in England?
20     A   Yes.
21     Q   Let's go back to the notion of quantitative
22 dose measurements.
23     Are there equations or scientific formulas that
24 exist that you can use to take the data that Mr. Horsak
25 collected and calculate the risk for any of the 12 in

83

1 this case?
2     A   Yes, I think you can construct a dose metric
3 that would allow you to estimate the cancer risk
4 associated with the current levels of exposure.
5     Q   And that's something done fairly frequently,
6 that is quantitative risk assessments for exposed
7 populations; right?
8     A   That's correct.
9     Q   Have you done that in this case?
10     A   No, Dr. Sawyer has done that in this case.
11     Q   Do you rely on Dr. Sawyer's quantitative risk
12 assessment?
13     A   Yes, I believe his risk assessment is done
14 properly.
15     Q   Now, I've been through your report and I don't
16 see any mention of Dr. Sawyer's risk assessment.
17     Do you cite it in your report?
18     A   No, I didn't see it. At the time I put my
19 report together, he was putting his report together and I
20 didn't have the actual data.
21     He told me in general that everybody in the
22 whole 12 had estimated risks that were unacceptably high
23 but I didn't have his actual numbers for each person
24 until recently. Now I have that data on the 12 people.
25     Q   Now that you have it, do you believe it

84

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

supports the opinions you gave without having it?

A Yes. It's entirely consistent with what I had estimated before, which was that these people have high exposures, based on the blood levels we did and the environmental testing and the subjective histories the patients gave and based on what we know on the amount of materials used and what we know about the epidemiological studies. All of it fits together and it's not at all surprising that Dr. Sawyer's data is consistent with all of that.

Q Now, we talked at length about how you collect data and the different types of data you collect.

Is the idea that you try to tie the exposures and doses you measured back into the specific conditions you see in the plaintiffs?

A Yes.

Q To do that you need a diagnosis on the plaintiffs?

A Yes.

Q Did you do a diagnosis for each of the plaintiffs in this case?

A Yes. As I stated, I relied on their own doctors for diagnoses of cancer and other serious diseases and I didn't make an independent diagnosis.

Now, in some cases we noticed the presence of

85

various respiratory complaints and various neurological and skin and other types of symptom complexes, if you will, that have not resulted in a diagnosis by their treating doctors.

In some cases they diagnosed asthma or bronchitis or pneumonia and in other cases the patients had the symptoms compatible with those diagnoses, and we can safely say that there are some patients where the diagnosis would be made based on their symptoms that they described to me or the findings on the tests we did or done by others. So there is a variety of different diagnostic groups here.

Q And one of those is the preexisting diagnoses you find in the medical records?

A Yes.

Q And you actually visited with each of the living plaintiffs; is that right?

A Right.

Q And did you reach additional independent diagnoses not reflected in the medical records?

A As I said, there is certain symptom complexes that allow themselves to be made into a diagnosis, and I have not necessarily rendered a diagnosis from those symptoms and in these cases, but it's possible to do so.

Q Why have you not rendered diagnoses based on

86

the symptom complexes you observed in these plaintiffs?

A As I said, I could, but in my report I laid out the symptom complexes that I believe have been aggravated by the exposures and not put a label on those symptom complexes.

For example, many of them had complaints of chronic productive cough or wheezing. We can diagnose bronchitis from the chronic productive cough and asthma from the wheezing but I have not done that. There is no particular reason for that, other than it doesn't make that much difference if we're describing the illness and health effects. You don't have to necessarily put a label on it. We're describing,what the problem is.

Q Is there some reason why you didn't put a label on it? Is there something stopping you from saying Mr. Jones has --

A No. There's nothing stopping me from saying Mr. Jones has bronchitis and in some cases we've said they have bronchitis based on their symptom complex but not in every case.

Q I'm sorry to make you go over this again. There's nothing stopping you and you have not done it.

Is there a particular reason why you have not diagnosed these plaintiffs based on their symptom complexes?

87

A We can go through individual patients and talk about labels for their symptom complexes, if you wish, and I just feel for purposes of describing the patient's injuries, it was better to describe, especially in those cases where the diagnosis had not been made in the medical records, simply describe what we've been told is the clearest and most simple way of communicating that information.

Q Now, once you collected the data and the environmental data, the qualitative exposure data you described earlier and the diagnosis or the symptom complexes you described, at that point you have to frame the question for each plaintiff; is that correct?

A Yes. You have to frame the question for each plaintiff.

Q And you did that for each one of the plaintiffs?

A Yes.

Q And what's the next step? You have the data and framed the question, what's the next step in your method?

A Well, the way you're constructing it, the next step is to look for other factors that could contribute to their health problems, and these are occupational, environmental, lifestyle, family history, hobbies, any

88

22 (Pages 85 to 88)

1 and all factors that would be important to cause those
2 symptoms in that individual patient -- so-called
3 differential diagnoses, although in a sense what we're
4 doing is differential causation assessment rather than
5 differential diagnosis, since we're dealing with a given
6 health problem.
7     And what we want to know is what is the
8 causative effect. They have an irritated bronchial tube
9 and cough, wheeze, short of breath, have chest pain, and
10 what's the reason they have those symptoms? If they
11 happen to be a heavy cigarette smoker or a life-long
12 history of asthma before moving into Carver Circle, I'd
13 talk about someone who had aggravation of a preexisting
14 problem rather than something where the exposures were
15 the primary cause.
16     Q  And we'll go through the individual reports on
17 the individual plaintiffs in this deposition, but have
18 you documented that effort for each one of the plaintiffs
19 in this case?
20     A  Yes. We have an extensive questionnaire and
21 history and evaluation of their depositions and their
22 medical records have been made available and all these
23 things are looked at with the concept in mind of trying
24 to find out any and all of those factors that are
25 important.

89

1     Q  In your experience, generally, have you ever
2 had a plaintiff in a lawsuit that presented to you and
3 have you ever reached the opinion that the exposure, the
4 issue in the lawsuit, was not the cause of the
5 plaintiff's problem?
6     A  Sure.
7     Q  How many times have you seen that?
8     A  Many hundreds of times.
9     Q  Did it happen in this case?
10     A  Some of the health problems are not related to
11 exposure, yes.
12     Q  And are those laid out in your summary, the
13 health problems that the plaintiffs have that are not
14 related in exposure?
15     A  In my conclusions I did not discuss this and I
16 talked about things that were related and not what's
17 unrelated.
18     Q  So anything not in your conclusion is
19 unrelated?
20     A  Well, I think so. I might have made a mistake
21 in some cases, but I tried to talk only about the issue
22 stuff, what I thought would be caused or aggravated by
23 the exposure.
24     Q  Now, once you've collected the data and
25 collected the diagnosis or the diagnostic indicators and

90

1 done your differential causation assessment, what's the
2 next step in your methodology for assessing causation?
3     A  We've already assessed their exposure to a
4 chemical that's known to cause the health effect at a
5 sufficient dose and taken into account all other possible
6 causes and now reached the point to reach a conclusion
7 about the patient's health problems and what role the
8 exposure had in causing or aggravating those things and
9 that's my conclusion phase.
10     Q  I want to talk about your use of
11 epidemiological literature to assess causation. We
12 talked earlier that you used epidemiological studies in
13 your general and specific causation assessments; do you
14 remember that?
15     A  Yes, they are used.
16     Q  Can you tell me what an epidemiological study
17 in this context is designed to do?
18     A  To see whether the exposed population has a
19 different pattern of illness than a comparison population
20 or control group.
21     Q  Now, you can't use an epidemiological study to
22 prove that a particular person got a particular disease
23 from a particular exposure, can you?
24     A  You have to look at groups of people. However, in
25 you can use that for generic causation purposes and, in

91

1 other words, you can say that since this population has a
2 higher prevalence of cancer and you know from other
3 information, for example, animal studies, case reports,
4 other epidemiological studies of similarly exposed
5 people, all showing that cancer is one of the effects
6 that this chemical has.
7     And then Joe Blow lives in the environment,
8 significantly close to it, I think you can make a
9 conclusion in the individual case that there has been a
10 contribution to an increased risk of cancer from that
11 exposure. So epidemiologic data is helpful in
12 establishing cause and effect relationship in that
13 context.
14     Q  But the point you made earlier is that
15 epidemiological studies look at groups of people and
16 compare exposed to unexposed populations?
17     A  The comparison groups have all the other risk
18 factors. They smoke the same, the same family history
19 and exposures to diet and same exposures in their work
20 activities. The only difference between the two groups
21 is this exposure, and that's the purpose of the study --
22 of course it's the ideal and it's hard to make it perfect
23 but by using large enough numbers, you get valid results
24 from such techniques.
25     Q  Let's for a moment focus on the difference

92

23 (Pages 89 to 92)

between general causation and specific causation and
you've used the terms several times.

Can you define the difference between general
and specific causation?

A General causation is looking at all the data
about the published and unpublished effects of the
chemical in either an animal test system, in vitro or in
human models, and that includes all the data, case
reports and epidemiological studies and all the
information that one brings to bear, even similar
chemicals, not identical but similar in their action.
That's generic causation. That the chemical X is capable
of causing disease Y, and that's the basis for that.

Q So what's specific causation, as distinguished
from general causation?

A Where an individual patient, subject or
plaintiff has been exposed to environment X and has
disease Y.

Q When you're doing your general causation work
and looking at epidemiological studies to evaluate
general causation, it's important that the studies you
look at be relevant to the exposure at issue?

A Yes.

Q If you look at a case involving solvent
exposure, you will not find proof of general causation in

93

studies of metal exposure; is that accurate?

A Correct. There is no reason to think that
those two classes of metal act similarly and would
act differently, although both can affect the respiratory
tract, but you would not use the study of chromium
exposure to look for generic causation in a group of
patients exposed to organic solvents.

Q You've done chromium cases; correct?

A Yes.

Q And you've done solvent exposure cases?

A Yes.

Q And in each instance you look for the studies
the closest as possible to the exposure in your study;
correct?

A Yes.

Q And if the study looks at the exact same
chemical or compound you're looking at and a similar or
identical exposure condition, you're actually going to
want to use that particular study; is that right?

A Yes. You want to use all the studies that are
relevant. It doesn't have to be identical exposure.
What we want is for the chemicals at issue to be similar
or as close to similar as possible.

With creosote you have a mixture that contains
PAHs, the most toxic element in creosote, so you can look

94

at studies involving that class of chemicals and there is
a lot of other settings in which PAHs occur and give us
relevant information about the health effects of that
compound.

Q So if a compound is made up of constituents,
you can look at studies that focus on constituents;
correct?

A Yes.

Q But you don't want to ignore studies that focus
on that compound; is that right?

A No, you wouldn't ignore them.

Q And why not ignore studies that focused on the
compound at issue?

A Because it's relevant.

Q And when you're looking at epidemiological
studies for proof of general causation, you want to look
for studies that examine the same disease or diseases
you're interested in; right?

A Well, you want to look at studies that looked
at all of the diseases. Certainly. You don't want to
preclude -- obviously, you want to look at all the
diseases that might conceivably occur.

Q Let's take another example. If you have a
discreet case involving TCE and kidney cancer, you want
to look at studies that address TCE and kidney cancer;

95

right?

A Yes, you want to do that.

Q And if a study looked particularly at TCE and
skin cancer or brain cancer or some other organ system,
that's not as relevant; correct?

A Well, it's not relevant to the question of
whether or not kidney cancer is shown to be associated
with TCE. It's relevant whether TCE is known to have a
carcinogenic effect on whatever tissue it is.

This whole concept that you can identify all of
the cancers associated with a given chemical by the most
common ones that have been described up to now in the
literature would be a mistake. You need to look at all
of the cancer.

I notice a number of studies have done that,
not looked at all the cancers and picked, let's say, the
cancers previously reported to be present in higher
concentrations or higher prevalence and that would be a
mistake, I think, because there is a great deal of
variability in how populations respond and individual
variations and different exposures and different time
frames.

So you want to keep an open mind about that and
certainly there is no reason to think that because a
chemical was predominantly causing kidney cancer in a

96

24 (Pages 93 to 96)

| | |
|---|---|
| 1 population, it's not capable of causing a disease in<br>2 other organs.<br>3    Q  Are you familiar with the concept of target<br>4 organs for chemical carcinogens?<br>5    A  Yes.<br>6    Q  Describe for me the concept of target organs.<br>7    A  Well, there are chemicals that cause a cancer<br>8 in a specific organ at higher concentrations and let's<br>9 take asbestos which we talked about earlier.<br>10    The most common cause of death in an asbestos<br>11 worker is lung cancer. Why is that? Because asbestos<br>12 fibers are present in the lung in high concentrations and<br>13 most of the fibers of the body are in the lung and it<br>14 makes sense that you will have most of the cancers in<br>15 that organ.<br>16    So a lot of the research that was done on<br>17 asbestos was focusing on lung cancer and that doesn't<br>18 mean it didn't cause cancer of the organs but meant that<br>19 it caused mostly cancers in that organ.<br>20    Q  Are there organs which particular chemical<br>21 carcinogens do not target?<br>22    A  Yes. There is fewer cancers, for example, in<br>23 the bone and bone tends to have fewer cancers overall<br>24 than say most other tissues in the body, and the reason<br>25 for that is probably relatively low concentration.<br>97 | 1 you look for particular ICD codes to see where the cancer<br>2 is elevated?<br>3    A  I don't usually look at the codes and look for<br>4 the description of the cancer. ICD9 codes are a way it<br>5 can be done but I don't usually memorize or use the ICD9<br>6 codes.<br>7    I look at lung cancer and there are several<br>8 types of ICD9 codes for lung cancer and different cells<br>9 types, and that doesn't help us in, for example,<br>10 asbestos. It causes several different kinds of lung<br>11 cancer and there is no benefit in breaking it down to the<br>12 different subtitles.<br>13    Q  Let's talk about hematolytic cancer. Are there<br>14 different ICD codes under the general classification of<br>15 hematoseptic cancers?<br>16    A  Yes, quite a few.<br>17    Q  Are those relevant? Don't particular toxicants<br>18 cause particular types of hematolytic cancer?<br>19    A  Benzene has a very strong association with<br>20 certain types of leukemias, acute leukemia being the most<br>21 prevalent type. Benzene is associated with several other<br>22 of the hematologic and lymphatic leukemias. It certainly<br>23 is something you can do but it is -- it is not<br>24 necessarily relevant to our discussion, for example, in<br>25 this case.<br>99 |
| 1 Various carcinogens, for example, asbestos doesn't get in<br>2 the bone, and there is relatively low concentrations of<br>3 most of the carcinogens in the bone.<br>4    However, there has been reports of increase in<br>5 connective tissue with dioxins, for example, and the<br>6 reason for that is unknown but bone is an example of<br>7 something with relatively low rates of cancer.<br>8    Q  But when you're doing a study like the one<br>9 you've done in this case, you want to identify the<br>10 relevant target organs and obtain all the studies that<br>11 look at the exposure at issue and the target organs at<br>12 issue?<br>13    A  Yes. And what I did in my report is try to<br>14 give all the relevant studies about each of the cancers<br>15 and health problems that have been published on that<br>16 subject.<br>17    Q  Do epidemiologists use what is called ICD codes<br>18 for diseases?<br>19    A  ICD stands for international classification of<br>20 disease, and it is used. ICD9 codes is one way of doing<br>21 epidemiological studies because you can quickly go<br>22 through a large database and identify the various types<br>23 of cancer.<br>24    Q  And when you evaluate an epidemiological study<br>25 for the purpose of doing a general causation analysis, do<br>98 | 1    Q  Let's move on. You mentioned different types<br>2 of studies and animal studies and case control studies<br>3 and case reports, etc.<br>4    Is it true there are different types of<br>5 epidemiological studies?<br>6    A  Yes.<br>7    Q  Are some considered more powerful in detecting<br>8 associations than other?<br>9    A  Yes.<br>10    Q  Which is better?<br>11    A  Where you have good exposed data and classify<br>12 you're exposed group accurately. Unfortunately, it's<br>13 rare that you have good exposure data, historically<br>14 anyway. So the biggest problem with most studies is they<br>15 don't have good data on exposure parameters. That's a<br>16 general point.<br>17    Q  Let's take a specific example. A clinical<br>18 trial is a type of epidemiological study, isn't it?<br>19    A  Yes.<br>20    Q  And you're studying a particular dose of a<br>21 particular exposure on a particular body system?<br>22    A  Yes. When you're doing a pharmacological<br>23 study, you're comparing a group of patients with the same<br>24 diagnosis. Part of the group gets the medicine and the<br>25 other part doesn't. You may have different doses<br>100 |

25 (Pages 97 to 100)

ESQUIRE DEPOSITION SERVICES<br>(323) 938-2461

1 depending on what you're doing.
2     Q   The advantage there, as you indicated, is you
3 know precisely the exposure level; correct?
4     A   Yes.
5     Q   And you can control for that exposure level,
6 that is you can control your population to determine
7 whether they have other risk factors for the item you're
8 studying; correct?
9     A   You design your study so that you have an equal
10 number in the two groups of all the risk factors and you
11 don't -- you want to isolate the one difference between
12 the exposed and unexposed group, what you're
13 administering.
14     Q   And clinical trials are particularly good at
15 that; right?
16     A   It controls variables pretty precisely because
17 of that.
18     Q   Is the size of a study population an indication
19 of the reliability or quality of a study?  Is a larger
20 study better than a smaller one?
21     A   No; especially if you dilute the effect like
22 Dr. Wong did in his study where you took every employee
23 who ever worked in any of the six Koppers plants and
24 threw them into the study.
25         Someone could have worked there one day and
                                                      101

1 worked in the office for an hour and been included in his
2 group.  You get large numbers, but you're getting a lot
3 of what we call misclassification bias and, you know, you
4 can have huge numbers, and a lot of those studies done by
5 Dr. Wong and others for industry do that.  They have
6 5,000 people in their cohort but the exposure of most of
7 them was not relevant, and so they're including people in
8 there that dilute the effect of what you're looking for.
9     Q   So you're saying as a general matter a larger
10 study is not, generally speaking, better than a smaller
11 study?
12     A   I didn't say that.  You said were larger
13 numbers automatically better and the answer is no.
14         Obviously, when you have larger numbers and
15 good exposure data, you can detect smaller differences.
16 For example, Dr. Selikoff who studied the asbestos
17 workers was able to show that not only were lung cancers
18 and mesothelioma in excess, but kidney and pancreatic and
19 colon cancer and a whole variety of other cancers were
20 also increased in proportion of the increased dose of
21 asbestos, making the point that it's a multi-organ
22 carcinogenic agent, and by having a very large population
23 that he studied prospectively over time with good
24 exposure data, he was able to demonstrate some of the
25 things that were not possible to demonstrate with smaller
                                                      102

1 numbers of people.
2     Q   Assuming that the quality of the exposure data
3 is equal, wouldn't a larger study have more statistical
4 power than a smaller study?
5     A   Yes.
6     Q   And the type of exposure data you collect,
7 that's important with respect to the quality of the
8 study, one with better exposure data is a higher quality
9 study than with worse exposure?
10     A   Yes.  That's the biggest problem with
11 environmental and occupational exposures, overcoming
12 misclassification problems.
13     Q   And one of the ways you can collect exposure
14 data is to go to the facility and measure it and measure
15 what people who worked there were exposed to?
16     A   Well, with creosote it's well shown now that
17 you have to do worker biological monitoring in order to
18 assess exposure because air monitoring is useless.
19         So all these studies done on air monitoring are
20 a huge waste of time, and most of the exposure workers
21 get in the creosote industry is from skin absorption.
22         For example, in the case of Dr. Wong's study
23 where he's looking at individuals in the creosote
24 industry and estimating exposure based on air
25 measurements, which I think was done traditionally, you
                                                      103

1 can't rely on that.
2         Dr. Borak did a study for McGee, published a
3 couple of years ago, that showed that air levels are very
4 low but the level of one hydroxipyrene in their urine is
5 very high and that's from skin absorption and the
6 creosote council just released their results where they
7 did detailed studies of workers in the creosote industry
8 and found the root of exposure was skin absorption and
9 not through the air.
10         In fact, Dr. Heikkila in Finland did the study
11 and found a similar result where it was through skin
12 absorption.  There were several other studies done, and I
13 don't recall the authors, that made the same point, so
14 you need to have accurate exposure data, and in the case
15 of the creosote industry, that's important, the
16 biological monitoring.
17     Q   We were talking generally about exposure data
18 and all I really want is a general idea.  If you have
19 better more reliable exposure data, you're likely to have
20 a better more reliable epidemiological study?
21     A   That's true.
22     Q   If you can actually go to the plant or take a
23 blood sample or some biologic monitoring of the people
24 you're interested in, that's more reliable than mailing a
25 questionnaire?
                                                      104

26 (Pages 101 to 104)

1    MR. LUNDY: I object to the form of the
2  question. Your question assumes that the plant is
3  operational, that there is treated ties in place and
4  assumes all these criteria that have to be in existence
5  which there is no proof that any of them are in existence
6  in studies the industry has done. So you're making a lot
7  of assumptions in your question, and I don't think this
8  witness can answer.
9    MR. HOPP: To be fair to me, you're talking
10 about creosote and I'm talking about epidemiologic
11 studies.
12   MR. LUNDY: So you're not talking about
13 creosote?
14   MR. HOPP: We're talking about epidemiology in
15 general, including creosote.
16   THE WITNESS: Well, the better your exposure
17 data, the better your study is going to be. I would
18 agree with that.
19 BY MR. HOPP:
20   Q  You're familiar with studies that studied
21 exposures by way of mailing questionnaires? You read
22 some of those, haven't you?
23   A  Mailing questionnaires have been used to assess
24 populations and it's the most cost-effective way to
25 collect information. I think they have validity and it

105

1  depends what questions they're asking and how they're --
2  what the purpose of the questionnaire survey is.
3    I found personally it's better to administer a
4  questionnaire than to send it to someone and have it
5  filled out on their own and, having said that, there is
6  still some value in a carefully done questionnaire study.
7    Q  And I'm certainly not arguing and would never
8  argue the point that there is no value. But we're
9  talking about ranking of epidemiological studies in order
10 of quality, and you've identified certain aspects that
11 make an epidemiological study have more quality than
12 another one, and one of those things you've identified is
13 exposure data, and there are different ways you can
14 collect exposure data; right?
15   A  Yes.
16   Q  And how you collect exposure data affects the
17 quality of your study, doesn't it?
18   A  Yes. The quality of the assessment does effect
19 the quality of your study.
20   Q  Now, there are other studies you might look at,
21 including animal studies; right?
22   A  Yes.
23   Q  And animals are different from humans and there
24 are biological differences between the species; correct?
25   A  Yes.

106

1    Q  And animal data may have some relevance but
2  what happens in a mouse given a particular dose of TCE is
3  not the same as what will happen to a person given the
4  same dose of TCE. Is that a generally accurate
5  statement?
6    A  I think it's generally accurate that there are
7  differences between mice and men.
8    Q  I read a book by that title. And there is also
9  case reports, individual case reports that one might look
10 at?
11   A  Yes.
12   Q  That's a type of study you'd throw into the
13 mix, isn't it?
14   A  Absolutely.
15   Q  Again, that's on the quality ranking an
16 individual case report is lower than say a closely
17 controlled clinical trial; is that right?
18   A  It depends on what end point you're looking at
19 and what you known about the exposure.
20     For example, when angiosarcoma was discovered
21 by Dr. Kreech (phonetic) in Louisville, Kentucky, looking
22 at a cancer that occurs like one out of a hundred
23 thousand patients with cancer and he had three in one
24 practice, and they all worked in the same plant and did
25 the same job, he didn't need a carefully controlled study

107

1  to know there was something wrong with that and he
2  published his study as a case report but it led to the
3  reduction of exposure to vinyl chloride from a thousand
4  parts per million to one part per million.
5    So no epidemiological study was needed to make
6  that conclusion because the data was so overwhelming.
7  The likelihood of these three people getting cancer from
8  some other causes is infinitesimal. So you didn't need a
9  big fancy study. If you have three patients with lung
10 cancer, it may be a bigger problem. It's a common
11 disease or three patients with diabetes, it's not so
12 clear.
13   Q  First of all, angiosarcoma is a unique
14 circumstance, that type of thing doesn't happen
15 frequently, what happened in the case of angiosarcoma?
16   A  Well, there is other examples where you have a
17 rare disease. The mesothelioma coming up in the original
18 reports by Wagner and showed this rare disease that was
19 only occurring among these asbestos miners and made the
20 point. He didn't have to do a big control study and he
21 knows in the general population this disease is rare and
22 finding a bunch of them, the numbers were so outlandishly
23 high that that was enough to establish causation.
24   Q  But for the more common cancer, like colon
25 rectal cancer, an individual case report is not going to

108

27 (Pages 105 to 108)

1 be as statistically powerful as a closely controlled
2 epidemiological study --
3     A  In that case, I stated you need a comparison
4 study to find out if there is a higher prevalence in that
5 population.
6     Q  Is there a method, is there a quality
7 instrument that you apply when you look at the
8 epidemiological studies to rank them or order them in
9 some way in terms of quality?
10     A  It depends on what the questions you're asking
11 are but, in general, exposure assessment is important,
12 selection of the population to avoid misclassification,
13 collection of your population so that you have all the
14 various variables, for example, cigarette smoking or
15 dietary factors or other environmental exposures are well
16 characterized so when you match your population, you
17 match it appropriately.
18     Q  The question I'm getting at is, is there a
19 method you can describe for me that you use when you
20 gather -- let me back up.
21     You do a literature search, correct, when you
22 evaluate a new exposure?
23     A  Yes.
24     Q  You go to files you've assembled and have
25 literature on a particular exposure and you pull all that

109

1 occurs after a short time after the exposure.
2     So you want dose and a decent population size
3 and proper statistical power and a well-matched control
4 group.  Then there's a lot of other sub questions you
5 want to ask, depending what end point you're looking at.
6     Q  What you've given me is a list of probably what
7 are great considerations that you would apply as you look
8 at individual studies and determine its quality.
9     But my question is I think more simple.  Is
10 there a method you have whereby you rank studies -- an A
11 pile, B pile and C pile?
12     A  I don't usually actually rank them.  When I
13 read them and analyze them, look at the data, I put it
14 into my framework and some papers add very little
15 information for various reasons and others add a lot more
16 information for various reasons, and there is a spectrum
17 but I don't necessarily go in and grade them.  As I said,
18 it depends what questions you're trying to derive from
19 these different studies.
20     Q  Other than to tell me you read the studies and
21 mentally order them along the spectrum that you just
22 described, is there any other way you can describe for me
23 the method for evaluating epidemiologic studies to come
24 to a causation?
25     A  Other than what I've said, no.

111

1 out?
2     A  Yes.
3     Q  And I'm assuming you take the box or the stack
4 and put it on your desk or your conference room and have
5 the literature in front of you, is that one of the steps?
6     A  Yes.
7     Q  Is there a method you can show me, a piece of
8 paper or a ranking sheet or that you can describe for me
9 whereby you separate the wheat from the chaff when you
10 have your epi studies in front of you?
11     A  There are a lot of different things you look
12 at, the selection of the population, and one of the
13 powerful things with cancer studies is you have proper
14 latency.
15     Do you have a number of people who have long
16 enough time from the onset of exposure to identify
17 whether there is an excess cancer risk or have you loaded
18 it all with people who have less than 15 years from the
19 onset of exposure, in which case you look at the cancer
20 and you make a big chunk of your population people that
21 have not got proper latency and try to include them in
22 your study and you have a bad study.
23     So, you know, it depends.  If you're looking
24 for the prevalence of asthma from toluene de iso cyanate,
25 you don't care about latency because it's a disease that

110

1     MR. LUNDY:  Can we take a break?
2     MR. HOPP:  Couple more and we can.
3     Q  Do you think that that method you just
4 described for me is reproducible?
5     A  Sure.
6     Q  Do you think that any other epidemiologists
7 with similar training and qualifications to you would
8 reach the same conclusions of applying your spectrum
9 method?
10     A  I think so, yes.
11     MR. HOPP:  Now we'll break.
12     (Lunch break.)
13 BY MR. HOPP:
14     Q  Dr. Dahlgren, we're back on the record and
15 we'll focus on the 12 plaintiffs, and feel free to use
16 your notes, and I have your medical summaries on the 12
17 plaintiffs and we'll go through those in some detail,
18 most likely tomorrow, but let's go through them one at a
19 time and tell me generally your opinions.
20     Do you have opinions regarding each of the 12
21 plaintiffs in this case?
22     A  Yes.
23     Q  As we covered earlier this morning, opinions
24 relating to causation and increased risk of disease?
25     A  Yes.

112

28 (Pages 109 to 112)

1 Q I'd like to start with Patricia McNeal.
2 A I've got the report in front of me.
3 Q And for the record, you're looking at your
4 laptop computer, and Mr. Lundy's office produced to us
5 three disks containing your files in this case.
6 Have you turned over to Mr. Lundy's office all
7 of the material reports and various data you compiled on
8 these 12 plaintiffs?
9 A Yes.
10 Q And what you're looking at there, and we may
11 confirm this tomorrow most likely, is a medical report
12 you created on Ms. McNeal or a summary of some type?
13 A Yes.
14 Q That's one of the documents you turned over in
15 this case?
16 A Yes.
17 Q Tell us generally your opinions with respect to
18 Patricia McNeal.
19 As you're looking at your report, can you tell
20 us the date of the report you're looking at?
21 A The date of examinations is October 24, 2004
22 and the -- I don't have a specific date when the report
23 was prepared.
24 But in terms of my opinion about her, I believe
25 she was exposed significantly to PAHs, dioxins and
113

1 pentachlorophenol while living at Carver Circle, and has
2 lived there for many years -- it's listed here she lived
3 there for 26 years. She didn't always live on Carver
4 Circle but in that vicinity.
5 That she smelled odor when she lived at Carver
6 Circle in particular, and this caused her to have a
7 reduced sense of smell, which meant then after a while
8 she didn't smell it anymore, and it didn't mean it was
9 not there but that her smell became impaired and I think
10 was recently documented by Dr. O'Jile, who did do a test
11 on her smelling capacity and, according this smell test,
12 she has anosmia and can't smell at all. And she
13 complained about that, that as a consequence of being in
14 the neighborhood, she lost her sense of smell.
15 They used a local well that she believed was
16 contaminated with -- there was a well they had on Carver
17 Circle, and they used to take water from that well for
18 many years, and about five years prior to my examination
19 they switched to city water, but before that they -- she
20 believes that well was contaminated, although I don't
21 have any measurements that I have seen for that opinion.
22 Her biggest health problem based on her history
23 was severe asthma and she also has very severe
24 hypertension. Those are her two biggest health problems.
25 Q Hypertension?
114

1 A Correct.
2 Q Any other --
3 A She has some other health problems which we can
4 go through. Let me go to the summation page --
5 Q What I'd like to know for this and for each of
6 the other plaintiffs, and we'll go through it one by one,
7 is which of their health problems do you believe was a
8 result of a chemically-induced injury. If she has health
9 problems that are unrelated, let's not spend time on
10 that.
11 A Not discuss them?
12 Q Not right now.
13 A Okey-dokey. Related to the exposure, she has
14 neurologic complaints, and it's not probably entirely due
15 to her chemical exposure and probably a contribution from
16 her hypertension but she has headache, dizziness,
17 lightheadedness, loss of balance, loss of consciousness,
18 fatigue, somnolence, insomnia, irritability, loss of
19 concentration, recent and long-term memory loss,
20 instability of mood, decreased libido and driving
21 confusion, and I believe those neurologic complaints have
22 been aggravated by living where she did with the
23 exposures to the chemicals we've been talking about.
24 As I stated, she has significant asthma for
25 which she's on various medications and her symptoms from
115

1 her chest condition include chronic productive cough,
2 sometimes tinged with blood, chest tightness, pain in the
3 chest, shortness of breath, dry mouth, nose and throat
4 irritation and sore throat and sore nose and runny nose,
5 eye irritation, reduced sense of smell -- which is
6 probably a combination of neurologic and her respiratory
7 effects -- sinusitis.
8 She also has some autoimmune symptoms, which
9 have been aggravated by her exposure. She has sores in
10 her mouth, low blood count, anemia, low white blood cell
11 count, low platelet count, rash on her cheek and some
12 skin rash when her skin breaks out when out in the sun,
13 and this is photosensitivity, very characteristic of
14 creosote poisoning. Additional skin problems are
15 excessive dryness and itching and noticed changes in her
16 fingernails. All these are characteristic of creosote
17 exposure.
18 She has had two different cancers. One is skin
19 cancer diagnosed in 1994 and a cervical cancer, although
20 I need to -- that's in her medical records. She didn't
21 fill it out on her questionnaire and probably forgot
22 about it. She was diagnosed with carcinoma in situ of
23 the cervix, and she reported that as a skin cancer but
24 it's really a squamous cell carcinoma in situ of the
25 cervix, and that's in 1994, so it was only one cancer.
116

ESQUIRE DEPOSITION SERVICES
(323) 938-2461

1    I think those are the conditions that have been
2 caused or aggravated by her exposures.
3    Q  You said caused or aggravated. Have you made
4 any specific opinions about which of her conditions were
5 caused by exposure to PAHs, dioxins and penta and which
6 were merely aggravated by those exposures.
7    A  Well, her hypertension was contributing to her
8 neurologic symptoms and I didn't opine that her
9 hypertension was related to the exposure. It might have
10 been but I'm not offering that opinion at this time. So
11 that the contribution from her hypertension to her
12 neurologic symptoms is significant and her blood pressure
13 is quite high.
14    Q  I have to interrupt so we can complete that
15 thought. She has hypertension since before she was ever
16 lived in the neighborhood; is that right?
17    A  Yes. She had hypertension with her first
18 pregnancy when she was 16 years old, and that's clearly
19 predated her moving to that location.
20    Q  And it's your opinion that preexisting
21 hypertension has caused some of her neurological
22 injuries?
23    A  That's what I said, yes.
24    Q  And I want to make sure I understand. Is it
25 also your opinion that her exposure to PAHs, dioxins and
                                                    117

1 penta have also contributed to those neurologic
2 conditions?
3    A  Yes; the exposure to the chemicals we
4 discussed, the penta, the PAHs and dioxins have
5 contributed to the neurologic problems and made them
6 worse.
7    Q  Can you tell me what neurologic problems Ms.
8 McNeal would have had had she not been exposed to penta,
9 creosote or dioxins in the Carver Circle?
10    A  I have no way to meaningfully apportion those
11 factors.
12    Q  So you can't tell me whether her neurological
13 conditions were aggravated 10 percent, 5 percent or 90
14 percent by exposure; is that correct?
15    A  Well, I think I can say that both are
16 significant contributing factors to her current
17 neurological picture, and I don't know any meaningful way
18 to separate the two.
19    Q  So but for the exposure to creosote, penta and
20 dioxin, Ms. McNeal would have hypertension and resulting
21 neurological problems; is that correct?
22    A  I can't say that. I can say that patients with
23 hypertension, particularly if severe, do develop
24 neurologic problems but it's incorrect to say that she
25 would have had these neurologic symptoms from her
                                                    118

1 hypertension alone. All we can say is that she has these
2 health problems, and they are the result of the
3 combination of exposures that we see here.
4    Q  Are there any particular neurological problems
5 you can separate out, that is ones she would have had
6 anyway and ones she now has, as a result of the exposure,
7 that she would not have had had she not lived in the
8 neighborhood?
9    A  It's the same question basically. There's no
10 way to say that she would have had this problem had she
11 just had hypertension and lived somewhere else. It's
12 sort of -- you can't talk about such a hypothetical with
13 any basis. We have to talk about what we have in front
14 of us, which is a patient with these health problems, and
15 we know that hypertension is a factor in causing these in
16 some people and not all. Some patients with hypertension
17 don't have any of these symptoms.
18    If my understanding of this whole problem is
19 correct, she is more likely to have them from her
20 exposure because in her neighborhood a lot of people have
21 these symptoms, and I've examined hundreds of patients
22 with hypertension and many of them or most of them are
23 asymptomatic, and I would say that the most likely
24 situation here is that she has these symptoms from her
25 exposure rather than hypertension, but I can't really be
                                                    119

1 dogmatic about that.
2    Q  Ms. McNeal has severe hypertension; is that
3 correct?
4    A  She does have severe hypertension.
5    Q  And in someone with severe hypertension, would
6 it surprise you to see some neurological symptoms?
7    A  As I stated, one of the known side effects of
8 hypertension and severe hypertension. But, again, there
9 are patients that come in with hypertension, severe,
10 where they don't have it, and you can't make the
11 statement that she would have had it for sure absent --
12 it would be incorrect to say for sure that she would have
13 had these things just looking from what her blood
14 pressure was when I saw her. I'm pretty sure she was
15 quite high but I'm not finding the blood pressure here.
16    Q  Let's phrase it a different way or ask a
17 different way.
18    Without asking you to say yes or no, is it more
19 likely that a patient with severe hypertension is going
20 to have neurological symptoms, even if it doesn't always
21 happen?
22    A  Yes, depending on the severity of the blood
23 pressure and the response to medication, she would be
24 more likely if she had severe uncontrolled hypertension
25 to have neurologic symptoms rather than not.
                                                    120

30 (Pages 117 to 120)