MISSOURI CANCER REGISTRY
MISSOURI DEPARTMENT OF HEALTH
STATE OF MISSOURI

CANCER CASES DIAGNOSED IN 1985-89

ZIP=64123

YEAR OF FIRST DIAGNOSIS OF THIS CANCER.

| DX_YR | FREQUENCY | PERCENT | CUMULATIVE FREQUENCY | CUMULATIVE PERCENT |
|-------|-----------|---------|----------------------|--------------------|
| 85 | 42 | 15.0 | 42 | 15.0 |
| 86 | 61 | 21.8 | 103 | 36.8 |
| 87 | 59 | 21.1 | 162 | 57.9 |
| 88 | 48 | 17.1 | 210 | 75.0 |
| 89 | 70 | 25.0 | 280 | 100.0 |

| SITEN | FREQUENCY | PERCENT | CUMULATIVE FREQUENCY | CUMULATIVE PERCENT |
|-------|-----------|---------|----------------------|--------------------|
| BRONCHUS & LUNG | 55 | 19.6 | 55 | 19.6 |
| LARYNX | 6 | 2.1 | 61 | 21.8 |
| MELANOMA | 1 | 0.4 | 62 | 22.1 |
| MULTIPLE MYELOMA | 2 | 0.7 | 64 | 22.9 |
| OTHER CANCER SIT | 210 | 75.0 | 274 | 97.9 |
| SKIN CANCER | 6 | 2.1 | 280 | 100.0 |

| AGEMO | FREQUENCY | PERCENT | CUMULATIVE FREQUENCY | CUMULATIVE PERCENT |
|-------|-----------|---------|----------------------|--------------------|
| 0 TO 14 | 4 | 1.4 | 4 | 1.4 |
| 15 TO 44 | 23 | 8.2 | 27 | 9.6 |
| 45 TO 64 | 76 | 27.1 | 103 | 36.8 |
| 65 TO 74 | 80 | 28.6 | 183 | 65.4 |
| 75 PLUS | 97 | 34.6 | 280 | 100.0 |

DATA UPDATED TO 3RD QUARTER 1991

MISSOURI CANCER REGISTRY
MISSOURI DEPARTMENT OF HEALTH
STATE OF MISSOURI

CANCER CASES DIAGNOSED IN 1985-89

ZIP=64123

TABLE OF SITEN BY AGEHO

SITEN          AGEHO

| FREQUENCY | 10 TO 14 | 15 TO 44 | 45 TO 64 | 65 TO 74 | 75 PLUS | TOTAL |
|---|---|---|---|---|---|---|
| BRONCHUS & LUNG | 0 | 2 | 24 | 16 | 13 | 55 |
| LARYNX | 0 | 0 | 4 | 0 | 2 | 6 |
| MELANOMA | 0 | 1 | 0 | 0 | 0 | 1 |
| MULTIPLE MYELOMA | 0 | 0 | 1 | 0 | 1 | 2 |
| OTHER CANCER SIT | 4 | 19 | 45 | 64 | 78 | 210 |
| SKIN CANCER | 0 | 1 | 2 | 0 | 3 | 6 |
| TOTAL | 4 | 23 | 76 | 80 | 97 | 280 |

TABLE OF SITEN BY DX_YR

SITEN          DX_YR(YEAR OF FIRST DIAGNOSIS OF THIS CANCER.)

| FREQUENCY | 85 | 86 | 87 | 88 | 89 | TOTAL |
|---|---|---|---|---|---|---|
| BRONCHUS & LUNG | 8 | 16 | 6 | 7 | 18 | 55 |
| LARYNX | 0 | 5 | 0 | 0 | 1 | 6 |
| MELANOMA | 1 | 0 | 0 | 0 | 0 | 1 |
| MULTIPLE MYELOMA | 0 | 0 | 0 | 1 | 1 | 2 |
| OTHER CANCER SIT | 32 | 39 | 52 | 39 | 46 | 210 |
| SKIN CANCER | 1 | 1 | 1 | 1 | 2 | 6 |
| TOTAL | 42 | 61 | 59 | 48 | 70 | 280 |

DATA UPDATED TO 3RD QUARTER 1991

MISSOURI CANCER REGISTRY
MISSOURI DEPARTMENT OF HEALTH
STATE OF MISSOURI

CANCER CASES DIAGNOSED IN 1985-89

ZIP=64124

YEAR OF FIRST DIAGNOSIS OF THIS CANCER.

| DX_YR | FREQUENCY | PERCENT | CUMULATIVE FREQUENCY | CUMULATIVE PERCENT |
|---|---|---|---|---|
| 85 | 56 | 16.9 | 56 | 16.9 |
| 86 | 76 | 22.9 | 132 | 39.8 |
| 87 | 54 | 16.3 | 186 | 56.0 |
| 88 | 77 | 23.2 | 263 | 79.2 |
| 89 | 69 | 20.8 | 332 | 100.0 |

| SITEN | FREQUENCY | PERCENT | CUMULATIVE FREQUENCY | CUMULATIVE PERCENT |
|---|---|---|---|---|
| BRONCHUS & LUNG | 71 | 21.4 | 71 | 21.4 |
| LARYNX | 12 | 3.6 | 83 | 25.0 |
| MALE GENITAL ORG | 3 | 0.9 | 86 | 25.9 |
| MELANOMA | 2 | 0.6 | 88 | 26.5 |
| MULTIPLE MYELOMA | 1 | 0.3 | 89 | 26.8 |
| NASAL CAVITIES | 1 | 0.3 | 90 | 27.1 |
| OTHER CANCER SIT | 236 | 71.1 | 326 | 98.2 |
| RESPIRATORY ORGA | 1 | 0.3 | 327 | 98.5 |
| SKIN CANCER | 5 | 1.5 | 332 | 100.0 |

| AGEMO | FREQUENCY | PERCENT | CUMULATIVE FREQUENCY | CUMULATIVE PERCENT |
|---|---|---|---|---|
| 15 TO 44 | 45 | 13.6 | 45 | 13.6 |
| 45 TO 64 | 106 | 31.9 | 151 | 45.5 |
| 65 TO 74 | 108 | 32.5 | 259 | 78.0 |
| 75 PLUS | 73 | 22.0 | 332 | 100.0 |

DATA UPDATED TO 3RD QUARTER 1991

EMPLOYEE - OWNED
# Burns & M<sup>c</sup>Donnell
ENGINEERS- ARCHITECTS - CONSULTANTS

August 21, 1991

John P. Gibbs, M.D.
Corporate Medical Director
Kerr-McGee Corporation
P.O. Box 25681
Oklahoma City, OK 73125

> Health Profile Proposal
> Kansas City, Missouri Creosoting Facility

Dear Dr. Gibbs:

This is in response to your July 30 letter requesting a definitive proposal
for the Health Profile for Kerr-McGee's Kansas City Missouri facility.

The facility to be profiled is located in Kansas City, Missouri, and was
formerly used for wood treatment described as creosoting. Burns & McDonnell
will prepare a Health Profile for this facility in accordance with the
guidance issued by the Missouri Department of Health (MDoH).

Creosote is a coal tar distillate mixture of over 250 individual compounds.
The major components of creosote, constituting over half of the mixture, are
polynuclear aromatic hydrocarbons (PAHs) including phenanthrene, flouranthene,
fluorene, acenaphthene, and pyrene. Other components of creosote include
naphthalene, benzene, and phenols. We anticipate that the MDOH will not
require an individual evaluation of each chemical constituent. For the basis
of this proposal, it is assumed that the chemicals to be studied in the Health
Profile are as follows:

- o   PAHs,
- o   phenols,
- o   naphthalene, and
- o   benzene.

The expected health effects for the substances likely to be present will be
identified from standard toxicological source literature. The International
Classification of Diseases codes will be obtained for these health effects.

The exact study areas for comparison in the Health profile (state, county and
local boundary) will be negotiated with the MDoH. Once the study area is
agreed upon, the request for data will be submitted to MDoH.

The period expected to be reviewed will be the five-year period preceding the
most current data available. This will not constitute a full retrospective
review of the area for the facility's operational life.

**Mailing Address:**
P.O. Box 419173
Kansas City, Missouri 64141-6173

**Telephone:**
(816) 333-4375
Fax: (816) 333-3690 or (816) 822-3415

**Courier Delivery Address:**
4800 E. 63rd St.
Kansas City, Missouri 64130-4696

The gathering of data and statistical analysis is done by the MDoH. As
mentioned in our first letter, delays may occur at this stage for which Burns
& McDonnell cannot be responsible. Upon receipt of the data from MDoH, Burns
& McDonnell will review the statistical analysis performed by MDoH and perform
additional analysis as may be necessary.

Burns & McDonnell will then prepare a draft report using the format provided
in the MDOH guidance, "Guidelines for Writing a Hazardous Waste Profile".
This report will take the form of a scientific paper with four sections: an
introduction, methods, results, and discussion. With the required tables and
text, this report may be 50 to 60 pages in length.

The draft report (four copies) will be provided to you for review prior to
submission to MDOH. After revisions based on your comments, 12 copies of the
final draft will be sent to you for submission to MDOH; the MDOH review
committee requires seven copies of the final draft. After incorporation of
changes requested as a result of the MDOH review, 12 copies of the final
report will be prepared and sent to you for submission to the Missouri
Department of Natural Resources and your files.

As discussed previously, Burns & McDonnell will perform this work for you for
$14,570. A breakdown of this estimate is presented in Attachment 1. This
amount is an estimate and could be affected by an increase in the number of
chemicals (if it is found that addition of treatment chemicals other than
those identified earlier must be included) or if higher charges by MDOH, or
other alterations in the scope of work occur. The time schedule for this
project will be highly dependent on the responsiveness of MDOH to data and
review requests. Researching the health effects, ICD codes, and negotiating
the study areas with MDOH at the start of the project can be accomplished
within two to three weeks after your authorization to proceed. Preparation of
the initial draft report can also be done within a few weeks of receipt of the
data from MDOH.

If there are any questions, please contact Mr. James Mellem (816-333-4375).

Sincerely,

Paul A. Huskad Ph.D.
Vice President


James W. Mellem, P.E.


PAH/jll

## ATTACHMENT 1
### Kerr-McGee KC Creosoting Facility
### Cost Estimate
### Health Profile Proposal

1.  Labor                                        HRS

        a.  Request for data            40
        b.  Data review                 85
        c.  Draft report preparation    40
        d.  Find report preparation     _30_
                                        195         $12,300

2.  Expenses                                     Cost
        a.  Word processing             $ 150
        b.  CADD                        200
        c.  Photocopying                60
        d.  Telephone                   50
        e.  Printing                    250
        f.  Mail                        60
        g.  MDoH charge (estimated)     _1500_
                                                    2,270

3.  Total                                        $14,570

**Burns & McDonnell**
ENGINEERS - ARCHITECTS - CONSULTANTS
Kansas City, Missouri

Client _____

Project No. _____ Date _11/14/91_

_____

_____

Made By _____

Checked By _____

Preliminary _____ Final _____

TO: Accounting (Contract File 91-331-4-001)
FM: Jim Mueller

Subject: Liability Insurance
         Ken McGee

Rhonda Steinbergen of K-M called concerning
the required "additional insured" requirement
for this project. She agreed that this was
not originally required in the Agreement.
She asked if we wanted to split the cost
($500) of that add-on. I agreed to do
that. The revised v max fee amount is $35,250.

CC: J. David Longford

Ken. McGee Fil.
91-382-4-001

## CONSULTANT AGREEMENT

AGREEMENT entered into as of the 13th day of November, 1991, between KERR-McGEE CHEMICAL CORPORATION, a corporation of the State of Delaware, whose address is P. O. Box 25861, Oklahoma City, Oklahoma 73125, ("KERR-McGEE") and BURNS & MCDONNELL, whose address is 4800 E. 63rd Street, Kansas City, Missouri 64130-4696 ("CONSULTANT").

The parties mutually agree as follows:

### ARTICLE I - WORK

CONSULTANT shall, when and as directed by KERR-McGEE, perform the following services ("the Work") for KERR-McGEE:

Perform a Health Profile as set forth in accordance with Exhibit A attached hereto and made a part hereof. The Health Profile shall meet the requirements of 10 CSR 25-7.264(2)(P) of the Missouri Code of State Regulations.

### ARTICLE II - COMPENSATION

1. As full compensation for the Work, KERR-McGEE shall pay CONSULTANT in accordance with Exhibit A attached hereto and made a part hereof. Such total compensation shall not exceed $14,570.00 without KERR-McGEE's prior written consent.

2. CONSULTANT shall submit invoices to KERR-McGEE on a monthly basis for all compensation earned and expenses incurred and KERR-McGEE shall pay such invoices, when accompanied by fully substantiated supporting documents, within 15 days after receipt thereof.

### ARTICLE III - INSURANCE

CONSULTANT agrees to purchase and maintain in CONSULTANT's own name Automobile Liability Insurance in the amounts of $100,000 each person and $300,000 each accident bodily injury and $100,000 each accident property damage. In the event KERR-McGEE requests CONSULTANT to rent a car in connection with the performance of any of the Work hereunder, CONSULTANT agrees to purchase additional Collision Damage Insurance and Personal Accident Insurance from the rental agency. KERR-McGEE agrees to reimburse CONSULTANT the premium for such additional insurance.

1

## ARTICLE IV - DATA AND INFORMATION

All data, information and processes furnished to CONSULTANT by KERR-McGEE or originating in the course of the Work are and shall be the exclusive property of KERR-McGEE, and all such data, information and processes, including designs, drawings, equations, memoranda and the like, shall be delivered to KERR-McGEE no later than at the conclusion of the Work without any copies or reproductions thereof being retained by CONSULTANT. CONSULTANT shall not, without KERR-McGEE's prior written consent, disclose to others any of the aforesaid data, information, processes or any of KERR-McGEE's technical data or proprietary information acquired by CONSULTANT from KERR-McGEE or make any use thereof for CONSULTANT's benefit. KERR-McGEE shall have full right to use such data, information and processes in any manner when and where it may designate without any claim on the part of CONSULTANT for additional compensation. It is understood that there shall be no restrictions upon CONSULTANT's right to disclose to CONSULTANT's other clients or to use for CONSULTANT's own benefit all such information, data and processes and general know-how which CONSULTANT can demonstrate was (i) in the public domain or freely available to others, (ii) known to CONSULTANT prior to receipt thereof from KERR-McGEE or (iii) was lawfully acquired by CONSULTANT from a third party or parties, without obligations of confidentiality to KERR-McGEE.

## ARTICLE V - NONDISCRIMINATION

CONSULTANT agrees that it shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

## ARTICLE VI - ASSISTANCE

CONSULTANT shall not employ or retain any person, firm or corporation without the prior consent of KERR-McGEE to perform any of the Work hereunder.

## ARTICLE VII - GENERAL

1.   CONSULTANT shall not disclose to KERR-McGEE nor use in the course of the Work any proprietary information, confidential information or trade secrets belonging to any other person, firm or corporation.

2.   This Agreement is not a part of any other agreement, does not depend for its consideration or its enforceability upon any other agreement and shall not be construed with or as a part of any other agreement past, present or future.

3. This Agreement shall not be modified, altered, amended or revoked except in writing duly executed by the parties hereto.

4. This Agreement supersedes all prior agreements of any kind or nature between the parties hereto relating to the Work.

5. Any notice hereunder to be given by either party to the other shall be in writing and shall be effective when sent by wire or deposited in the United States mail, postage prepaid, and addressed to the other party at the address given above.

6. This Agreement may be terminated by either party upon 10 days' advance written notice to the other. It is understood, however, that the obligations and duties of CONSULTANT under Articles IV, V, VI and VIII of this Agreement shall be continuing and shall survive termination of this Agreement.

7. CONSULTANT shall act solely as an independent contractor in performing the Work contemplated by this Agreement, and nothing herein shall constitute CONSULTANT the agent or employee of KERR-McGEE for tax purposes (FICA, income and the like) or otherwise.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

KERR-McGEE CHEMICAL CORPORATION

By: _____

Title: _____

BURNS & McDONNELL

By: _____

Title: _VP_____

3

EMPLOYEE - OWNED

# Burns & McDonnell

ENGINEERS-ARCHITECTS-CONSULTANTS

RECEIVED

AUG 2 6 1991

Medical Services

August 21, 1991

John P. Gibbs, M.D.
Corporate Medical Director
Kerr-McGee Corporation
P.O. Box 25681
Oklahoma City, OK  73125

Health Profile Proposal
Kansas City, Missouri Creosoting Facility

Dear Dr. Gibbs:

This is in response to your July 30 letter requesting a definitive proposal
for the Health Profile for Kerr-McGee's Kansas City Missouri facility.

The facility to be profiled is located in Kansas City, Missouri, and was
formerly used for wood treatment described as creosoting.  Burns & McDonnell
will prepare a Health Profile for this facility in accordance with the
guidance issued by the Missouri Department of Health (MDoH).

Creosote is a coal tar distillate mixture of over 250 individual compounds.
The major components of creosote, constituting over half of the mixture, are
polynuclear aromatic hydrocarbons (PAHs) including phenanthrene, flouranthene,
fluorene, acenaphthene, and pyrene.  Other components of creosote include
naphthalene, benzene, and phenols.  We anticipate that the MDOH will not
require an individual evaluation of each chemical constituent.  For the basis
of this proposal, it is assumed that the chemicals to be studied in the Health
Profile are as follows:

o    PAHs,
o    phenols,
o    naphthalene, and
o    benzene.

The expected health effects for the substances likely to be present will be
identified from standard toxicological source literature.  The International
Classification of Diseases codes will be obtained for these health effects.

The exact study areas for comparison in the Health profile (state, county and
local boundary) will be negotiated with the MDoH.  Once the study area is
agreed upon, the request for data will be submitted to MDoH.

The period expected to be reviewed will be the five-year period preceding the
most current data available.  This will not constitute a full retrospective
review of the area for the facility's operational life.

**Mailing Address:**
P.O. Box 419173
Kansas City, Missouri 64141-6173

**Telephone:**
(816) 333-4375
Fax: (816) 333-3690 or (816) 822-3415

**Courier Delivery Address:**
4800 E. 63rd St.
Kansas City, Missouri 64130-4696

The gathering of data and statistical analysis is done by the MDoH. As
mentioned in our first letter, delays may occur at this stage for which Burns
& McDonnell cannot be responsible. Upon receipt of the data from MDoH, Burns
& McDonnell will review the statistical analysis performed by MDoH and perform
additional analysis as may be necessary.

Burns & McDonnell will then prepare a draft report using the format provided
in the MDOH guidance, "Guidelines for Writing a Hazardous Waste Profile".
This report will take the form of a scientific paper with four sections: an
introduction, methods, results, and discussion. With the required tables and
text, this report may be 50 to 60 pages in length.

The draft report (four copies) will be provided to you for review prior to
submission to MDOH. After revisions based on your comments, 12 copies of the
final draft will be sent to you for submission to MDOH; the MDOH review
committee requires seven copies of the final draft. After incorporation of
changes requested as a result of the MDOH review, 12 copies of the final
report will be prepared and sent to you for submission to the Missouri
Department of Natural Resources and your files.

As discussed previously, Burns & McDonnell will perform this work for you for
$14,570. A breakdown of this estimate is presented in Attachment 1. This
amount is an estimate and could be affected by an increase in the number of
chemicals (if it is found that addition of treatment chemicals other than
those identified earlier must be included) or if higher charges by MDOH, or
other alterations in the scope of work occur. The time schedule for this
project will be highly dependent on the responsiveness of MDOH to data and
review requests. Researching the health effects, ICD codes, and negotiating
the study areas with MDOH at the start of the project can be accomplished
within two to three weeks after your authorization to proceed. Preparation of
the initial draft report can also be done within a few weeks of receipt of the
data from MDOH.

If there are any questions, please contact Mr. James Mellem (816-333-4375).

Sincerely,

Paul A. Husťad Ph.D.
Vice President

James W. Mellem, P.E.

PAH/jll

### ATTACHMENT 1
### Kerr-McGee KC Creosoting Facility
### Cost Estimate
### Health Profile Proposal

1.  Labor                                        HRS

    a.  Request for data                  40
    b.  Data review                       85
    c.  Draft report preparation          40
    d.  Find report preparation          _30_
                                          195         $12,300

2.  Expenses                                    Cost
    a.  Word processing               $ 150
    b.  CADD                             200
    c.  Photocopying                     60
    d.  Telephone                        50
    e.  Printing                        250
    f.  Mail                             60
    g.  MDoH charge (estimated)       _1500_
                                                    2,270

3.  Total                                           $14,570

November 13, 1991

Ms. Marianne Switzer
Kerr-McGee Chemical Corp.
P.O. Box 25861
Oklahoma City, OK 73125

                Re:    Consultant Agreement
                       Health Profile

Dear Ms. Switzer:

Enclosed is one signed copy of the Agreement.  We have kept one copy for
our records.

If there are any questions, please call me.

                                Sincerely,

                                James W. Mellem

                                James W. Mellem, P.E.

Enclosure
JWM/mm

*Rec'd* 11-4-91    9 42
CONFIDENTIAL - DATED MATERIAL    F M

| DISTRIBUTION |
| --- |
| ☐ Division Contracts Coordinator |
| ☑ Legal |
| ☐ Accounting |
| ☐ Division Manager |
| ☐ Project Development Director |
| ☐ _____ |
| ☐ _____ |
| ☐ _____ |

Return to *Mellen*
By (Date) 11-5-91

# ENGINEERING SERVICE PROPOSAL
# OR CONTRACT REVIEW FORM

### FILL OUT COMPLETELY
### ALLOW TWO WORKING DAYS FOR REVIEW
**IMPORTANT: ATTACH PHOTOCOPIES, NOT ORIGINALS.**

☐ PROPOSAL    ☒ CONTRACT

☒ WITH CLIENT    ☐ WITH SUBCONSULTANT    ☐ OTHER

| | |
| --- | --- |
| Client | *Ken - McCree* |
| Subconsultant (if applicable) | |

| Proposal or Contract No. | PB Effort Code  ☒  *JBR* |
| --- | --- |

Description and Location of Project
*KC,    Health profile*

Contract or Subcontract Value: $ *14,570*    B & Mc Effective Labor Multiplier: *3.00*

Proposal or Contract Manager: *Mellen*    Extension: *X3097*

Client Coordinator: *Mellen*    Extension:

Prior contract with this client? _____ If so, attach copy if it is different from this contract in terms and conditions.

Explain any involvement with toxic or hazardous materials, asbestos or other notable risks: _____

Other: _____

**Comments By Reviewer**

*Add our "Payments to Engineer" clause at as a new*
*3rd paragraph in Article II.*

*OK [?] Taylor to use exist. payment*
*language*

| Reviewed By  *Russ Kirby* | Date  *11/5/91* |
| --- | --- |

1. Route separate copies to Division Contracts Coordinator, Legal,
   Accounting and Division Manager for approval and comment.
2. Attach returned copies of this form to record copy of Proposal or Contract.

# BURNS & McDONNELL ENGINEERING COMPANY, INC.

## TERMS AND CONDITIONS FOR PROFESSIONAL SERVICES

DATE OF LETTER, PROPOSAL OR AGREEMENT: _____

CLIENT: _____

PROJECT: _____

### 1. SCOPE OF SERVICES
For the above-referenced project, Burns & McDonnell Engineering Company, Inc. ("Engineer") will perform the services set forth in the above-referenced Letter, Proposal or Agreement, of which these Terms and Conditions are a part.

### 2. PAYMENTS TO ENGINEER
A. Compensation will be as stated in the above-referenced Letter, Proposal or Agreement. Statements are payable upon receipt. A late payment charge will be added to all amounts not paid within 30 days of statement date. Such late payment charge shall be calculated at 1.5 percent per month from statement date. Any costs incurred by Engineer in collecting any delinquent amount shall be reimbursed by Client. If a portion of Engineer's statement is disputed, the undisputed portion shall be paid by Client by the due date. Client shall advise Engineer in writing of the basis for any disputed portion of any statement.

*add as new #3 to Article II.*

B. Taxes as may be imposed by state and local authorities, other than federal and state income tax and Kansas City, Missouri earnings tax, shall be in addition to the payment stated in the above-referenced Letter, Proposal or Agreement.

### 3. INSURANCE
A. During the course of performance of its services, Engineer will maintain the following minimum insurance coverages:

| Type of Coverage | Limits of Liability |
|---|---|
| Workers' Compensation | Statutory |
| Employers' Liability | $500,000 Each Accident |
| Comprehensive General Liability | |
| Bodily Injury and Property Damage | $1,000,000 Combined Single Limit |
| Automobile Liability | |
| Bodily Injury and Property Damage | $500,000 Combined Single Limit |

If requested, Engineer will provide to Client certificates as evidence of the specified insurance.

B. If the Project involves on-site construction-phase services by the Engineer, construction contractors shall be required to provide (or Client may provide) Owners' Protective Liability Insurance naming the Client as a Named Insured and the engineer as an additional insured, or to endorse Client and Engineer as additional insureds on construction contractor's liability insurance policies covering claims for personal injuries and property damage. Construction contractors shall be required to provide certificates evidencing such insurance to the Client and Engineer.

### 4. PROFESSIONAL RESPONSIBILITY
A. Engineer will exercise reasonable skill, care, and diligence in the performance of its services and will carry out its responsibilities in accordance with customarily accepted good professional engineering practices. If the Engineer fails to meet the foregoing standard, Engineer will perform at its own cost, and without reimbursement from Client, the professional engineering services necessary to correct errors and omissions which are caused by Engineer's failure to comply with above standard, and which are reported to Engineer within one year from the completion of Engineer's services for the Project.

B. In addition, Engineer will be responsible to Client for damages caused by its negligent conduct during its activities at the Project site to the extent covered by Engineer's Comprehensive General Liability and Automobile Liability Insurance as specified in Paragraph 3.

C. In no event will Engineer be liable for any special, indirect or consequential damages including, without limitation, damages or losses in the nature of increased Project costs, loss of revenue or profit, lost production, claims by customers of Client, or governmental fines or penalties.

D. The obligations and remedies stated in this Paragraph 4, Professional Responsibility, are the sole and exclusive obligations of Engineer and remedies of Client, whether liability of the Engineer is based on contract, warranty, tort or otherwise.

### 5. ESTIMATES AND PROJECTIONS
Estimates and projections prepared by Engineer relating to construction costs and schedules, operation and maintenance costs, equipment characteristics and performance, and operating results are based on Engineer's experience, qualifications and judgment as a design professional. Since Engineer has no control over weather, cost and availability of labor, material and equipment, labor productivity, construction contractor's procedures and methods, unavoidable delays, construction contractor's methods of determining prices, economic conditions, competitive bidding or market conditions and other factors effecting such estimates or projections, Engineer does not guarantee that actual rates, costs, performance, schedules, etc., will not vary from estimates and projections prepared by Engineer.

### 6. ON-SITE SERVICES
Project site visits by Engineer during construction or equipment installation, or the furnishing of Project resident representatives shall not make Engineer responsible for construction means, methods, techniques, sequences or procedures; for construction safety precautions or programs; or for any construction contractor(s') failure to perform its work in accordance with the drawings and specifications.

### 7. CHANGES
Client shall have the right to make changes within the general scope of Engineer's services, with an appropriate change in compensation, upon execution of a mutually acceptable amendment or change order signed by an authorized representative of the Client and the President or any Vice President of the Engineer.

### 8. TERMINATION
Services may be terminated by the Client or Engineer by seven (7) days' written notice in the event of substantial failure to perform in accordance with the terms hereof by the other party through no fault of the terminating party. If so terminated, Client shall pay Engineer all amounts due Engineer for all services properly rendered and expenses incurred to the date of receipt of notice of termination, plus reasonable costs incurred by Engineer in terminating the services.

### 9. DISPUTES
In the event that a dispute should arise relating to the performance of the services to be provided and should that dispute result in litigation, it is agreed that the prevailing party shall be entitled to recover all reasonable costs of litigation, including staff time, court costs, attorneys' fees and other related expenses.

### 10. RIGHTS AND BENEFITS
Engineer's services will be performed solely for the benefit of the Client and not for the benefit of any other persons or entities.

### 11. ENTIRE AGREEMENT
These Terms and Conditions and the above-referenced Letter, Proposal or Agreement contain the entire agreement between the Engineer and Client relative to the Scope of Services herein. All previous or contemporaneous agreements, representations, promises and conditions relating to Engineer's services described herein are superseded. Since terms contained in purchase orders do not generally apply to professional services, in the event Client issues to Engineer a purchase order, no preprinted terms thereon shall become a part of this agreement. Said purchase order document, whether or not signed by Engineer, shall be considered as a document for the Client's internal management of its operations.

## CONSULTANT AGREEMENT

AGREEMENT entered into as of the _____ day of _____, 1991, between KERR-McGEE CHEMICAL CORPORATION, a corporation of the State of Delaware, whose address is P. O. Box 25861, Oklahoma City, Oklahoma 73125, ("KERR-McGEE") and BURNS & MCDONNELL, whose address is 4800 E. 63rd Street, Kansas City, Missouri 64130-4696 ("CONSULTANT").

The parties mutually agree as follows:

### ARTICLE I - WORK

CONSULTANT shall, when and as directed by KERR-McGEE, perform the following services ("the Work") for KERR-McGEE:

Perform a Health Profile as set forth in accordance with Exhibit A attached hereto and made a part hereof. The Health Profile shall meet the requirements of 10 CSR 25-7.264(2)(P) of the Missouri Code of State Regulations.

### ARTICLE II - COMPENSATION

1. As full compensation for the Work, KERR-McGEE shall pay CONSULTANT in accordance with Exhibit A attached hereto and made a part hereof. Such total compensation shall not exceed $14,570.00 without KERR-McGEE's prior written consent.

2. CONSULTANT shall submit invoices to KERR-McGEE on a monthly basis for all compensation earned and expenses incurred and KERR-McGEE shall pay such invoices, when accompanied by fully substantiated supporting documents, within 15 days after receipt thereof.

### ARTICLE III - INSURANCE

CONSULTANT agrees to purchase and maintain in CONSULTANT's own name Automobile Liability Insurance in the amounts of $100,000 each person and $300,000 each accident bodily injury and $100,000 each accident property damage. In the event KERR-McGEE requests CONSULTANT to rent a car in connection with the performance of any of the Work hereunder, CONSULTANT agrees to purchase additional Collision Damage Insurance and Personal Accident Insurance from the rental agency. KERR-McGEE agrees to reimburse CONSULTANT the premium for such additional insurance.

1

## ARTICLE IV - DATA AND INFORMATION

All data, information and processes furnished to CONSULTANT by KERR-McGEE or originating in the course of the Work are and shall be the exclusive property of KERR-McGEE, and all such data, information and processes, including designs, drawings, equations, memoranda and the like, shall be delivered to KERR-McGEE no later than at the conclusion of the Work without any copies or reproductions thereof being retained by CONSULTANT. CONSULTANT shall not, without KERR-McGEE's prior written consent, disclose to others any of the aforesaid data, information, processes or any of KERR-McGEE's technical data or proprietary information acquired by CONSULTANT from KERR-McGEE or make any use thereof for CONSULTANT's benefit. KERR-McGEE shall have full right to use such data, information and processes in any manner when and where it may designate without any claim on the part of CONSULTANT for additional compensation. It is understood that there shall be no restrictions upon CONSULTANT's right to disclose to CONSULTANT's other clients or to use for CONSULTANT's own benefit all such information, data and processes and general know-how which CONSULTANT can demonstrate was (i) in the public domain or freely available to others, (ii) known to CONSULTANT prior to receipt thereof from KERR-McGEE or (iii) was lawfully acquired by CONSULTANT from a third party or parties, without obligations of confidentiality to KERR-McGEE.

## ARTICLE V - NONDISCRIMINATION

CONSULTANT agrees that it shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

## ARTICLE VI - ASSISTANCE

CONSULTANT shall not employ or retain any person, firm or corporation without the prior consent of KERR-McGEE to perform any of the Work hereunder.

## ARTICLE VII - GENERAL

1.    CONSULTANT shall not disclose to KERR-McGEE nor use in the course of the Work any proprietary information, confidential information or trade secrets belonging to any other person, firm or corporation.

2.    This Agreement is not a part of any other agreement, does not depend for its consideration or its enforceability upon any other agreement and shall not be construed with or as a part of any other agreement past, present or future.

2

3. This Agreement shall not be modified, altered, amended or revoked except in writing duly executed by the parties hereto.

4. This Agreement supersedes all prior agreements of any kind or nature between the parties hereto relating to the Work.

5. Any notice hereunder to be given by either party to the other shall be in writing and shall be effective when sent by wire or deposited in the United States mail, postage prepaid, and addressed to the other party at the address given above.

6. This Agreement may be terminated by either party upon 10 days' advance written notice to the other. It is understood, however, that the obligations and duties of CONSULTANT under Articles IV, V, VI and VIII of this Agreement shall be continuing and shall survive termination of this Agreement.

7. CONSULTANT shall act solely as an independent contractor in performing the Work contemplated by this Agreement, and nothing herein shall constitute CONSULTANT the agent or employee of KERR-McGEE for tax purposes (FICA, income and the like) or otherwise.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

KERR-McGEE CHEMICAL CORPORATION

By: _____

Title: _____

BURNS & McDONNELL

By: _____

Title: _____

3

RECEIVED

AUG 26 1991

Medical Services

August 21, 1991

John P. Gibbs, M.D.
Corporate Medical Director
Kerr-McGee Corporation
P.O. Box 25681
Oklahoma City, OK  73125

       Health Profile Proposal
       Kansas City, Missouri Creosoting Facility

Dear Dr. Gibbs: ___

This is in response to your July 30 letter requesting a definitive proposal
for the Health Profile for Kerr-McGee's Kansas City Missouri facility.

The facility to be profiled is located in Kansas City, Missouri, and was
formerly used for wood treatment described as creosoting. Burns & McDonnell
will prepare a Health Profile for this facility in accordance with the
guidance issued by the Missouri Department of Health (MDoH).

Creosote is a coal tar distillate mixture of over 250 individual compounds.
The major components of creosote, constituting over half of the mixture, are
polynuclear aromatic hydrocarbons (PAHs) including phenanthrene, flouranthene,
fluorene, acenaphthene, and pyrene. Other components of creosote include
naphthalene, benzene, and phenols. We anticipate that the MDOH will not
require an individual evaluation of each chemical constituent. For the basis
of this proposal, it is assumed that the chemicals to be studied in the Health
Profile are as follows:

    o    PAHs,
    o    phenols,
    o    naphthalene, and
    o    benzene.

The expected health effects for the substances likely to be present will be
identified from standard toxicological source literature. The International
Classification of Diseases codes will be obtained for these health effects.

The exact study areas for comparison in the Health profile (state, county and
local boundary) will be negotiated with the MDoH. Once the study area is
agreed upon, the request for data will be submitted to MDoH.

The period expected to be reviewed will be the five-year period preceding the
most current data available. This will not constitute a full retrospective
review of the area for the facility's operational life.

Mailing Address:
P.O. Box 419173
Kansas City, Missouri 64141-6173

Telephone:
(816) 333-4375
Fax: (816) 333-3690 or (816) 822-3415

Courier Delivery Address:
4800 E. 63rd St.
Kansas City, Missouri 64130-4696

Dr. John Gibbs
August 20, 1991

The gathering of data and statistical analysis is done by the MDoH. As mentioned in our first letter, delays may occur at this stage for which Burns & McDonnell cannot be responsible. Upon receipt of the data from MDoH, Burns & McDonnell will review the statistical analysis performed by MDoH and perform additional analysis as may be necessary.

Burns & McDonnell will then prepare a draft report using the format provided in the MDOH guidance, "Guidelines for Writing a Hazardous Waste Profile". This report will take the form of a scientific paper with four sections: an introduction, methods, results, and discussion. With the required tables and text, this report may be 50 to 60 pages in length.

The draft report (four copies) will be provided to you for review prior to submission to MDOH. After revisions based on your comments, 12 copies of the final draft will be sent to you for submission to MDOH; the MDOH review committee requires seven copies of the final draft. After incorporation of changes requested as a result of the MDOH review, 12 copies of the final report will be prepared and sent to you for submission to the Missouri Department of Natural Resources and your files.

As discussed previously, Burns & McDonnell will perform this work for you for $14,570. A breakdown of this estimate is presented in Attachment 1. This amount is an estimate and could be affected by an increase in the number of chemicals (if it is found that addition of treatment chemicals other than those identified earlier must be included) or if higher charges by MDOH, or other alterations in the scope of work occur. The time schedule for this project will be highly dependent on the responsiveness of MDOH to data and review requests. Researching the health effects, ICD codes, and negotiating the study areas with MDOH at the start of the project can be accomplished within two to three weeks after your authorization to proceed. Preparation of the initial draft report can also be done within a few weeks of receipt of the data from MDOH.

If there are any questions, please contact Mr. James Mellem (816-333-4375).

Sincerely,

Paul A. Husrad Ph.D.
Vice President

James W. Mellem, P.E.

PAH/jll

ATTACHMENT 1
Kerr-McGee KC Creosoting Facility
Cost Estimate
Health Profile Proposal

1.  Labor                                      HRS

        a.  Request for data              40
        b.  Data review                   85
        c.  Draft report preparation      40
        d.  Find report preparation       30
                                          195        $12,300

2.  Expenses                              Cost
        a.  Word processing             $ 150
        b.  CADD                          200
        c.  Photocopying                   60
        d.  Telephone                      50
        e.  Printing                      250
        f.  Mail                           60
        g.  MDoH charge (estimated)      1500
                                                     2,270

3.  Total                                          $14,570

## HAZARDOUS WASTE PROFILE SAMPLE
## DATA REQUEST

For further information or to request data contact:
  Wayne Schramm
  Missouri Department of Health
  Bureau of Health Data Analysis.
  P.O. Box 570
  Jefferson City, Missouri    65102-0570
  (314)751-6278
  573
  Sandy Stewart

1

**Mortality (Death Data):**

Geographical Regions:
    State of Missouri
    County area(s)
    Zipcodes decided upon as the specific site area.
    (Are usually lumped together as the specific site.)

Calendar years:
    1985-1989 Inclusive
    (Five most recent years.)

Age groups:
    0-14
    15-44
    45-64
    65-74
    75+

Information Requested:
ICD-9 codes of specific causes of death related to substances emitted by the facility and the major subcategories of cancer which are:

| Type of Cancer | ICD-9 Code |
| --- | --- |
| Total Cancers | 140-208 |
| Digestive Organs | 150-159 |
| Respiratory Organs | 160-165 |
| Breast | 174-175 |
| Genital Organs | 179-187 |
| Urinary Organs | 188-189 |
| Leukemia | 204-208 |
| Other Types of Cancer | 140-149, |
| | 170-173, |
| | 190-208 |

If specific types of cancers are caused by substances emitted at the facility, they must be included in the request.(ie. cancer of the trachea--ICD-9 code 162)*

2

**Morbidity (Hospital Discharge Data):**

Geographical Regions:
    State of Missouri
    County area(s)
    Zipcodes decided upon as the specific site area.
    (Are usually lumped together as the specific site.)

Calendar years:
    1982-86 Inclusive
    (Five most recent years.)

Age groups:
    0-14
    15-44
    45-64
    65-74
    75+

Information Requested:
    ICD-9 codes of specific hospital discharges related to substances
    emitted by the facility and the major subcategories of cancer
    which are:

| Type of Cancer | ICD-9 Code |
|---|---|
| Total Cancers | 140-208 |
| Digestive Organs | 150-159 |
| Respiratory Organs | 160-165 |
| Breast | 174-175 |
| Genital Organs | 179-187 |
| Urinary Organs | 188-189 |
| Leukemia | 204-208 |
| Other Types of Cancer | 140-149, |
| | 170-173, |
| | 190-203 |

If specific types of cancers are caused by substances emitted at
the facility, they must be included in the request.(ie. cancer of
the trachea--ICD-9 code 162)*

**Cancer Incidence (Cancer Registry):**

Contact: Dr. Jian Chang, Ph.D.
Bureau of Cancer Epidemiology and Control
Missouri Department of Health
201 Business Loop 70 West
Columbia, MO 65203
(314)875-2218
(must be contacted seperately--we will not contact him for you)

Geographic Regions:
  State of Missouri
  County area(s)
  Zipcodes decided upon as the specific site area.
  __ (Are usually lumped together as the specific site.)

Calendar years:
  1982-1986 Inclusive
  (Five most recent years.)

Age groups:
  0-14
  15-44
  45-64
  65-74
  75+

Information Requested:
  Those ICD-9 codes describing cancer (140-208) caused by
  substances emitted from the facility. If none of the substances
  emitted are carcinogens, all ICD-9 codes (140-208) are to be
  requested.*

4

**Natality (Birth Data):**

Geographic Regions:
    State of Missouri
    County area(s)
    Zipcodes decided upon as the specific site area.
    (Are usually lumped together as the specific site.)

Calendar years:
    1985-1989 Inclusive (Births)
    (Five most recent years.)

Information Requested:
    Total number of live births, those with a birth weight under
    2500 grams, those with a gestation under 37 weeks, and the
    number of fetal deaths.

**Natality (cont.):**

Geographic Regions:
State of Missouri
County area(s)
Zipcodes decided upon as the specific site area.
(Are usually lumped together as the specific site.)

Calendar years:
1982-1986 Inclusive  (Multi-Source Birth Defect Registry)
(Five most recent years.)

Information Requested:
Information from the multi-source birth defect registry includes
live births and number of anomalies by type (ICD-9 codes 740-
759).••

**Population:**

Geographic Regions:
State of Missouri
County area(s)
Zipcodes decided upon as the specific site area.
(Can be shown individually or lumped together.)


Calendar years:
Only year needed is 1980 Census Population data. (This is the
only year zipcode population is available.)

Age groups:
0-14
15-44
45-64
65-74
75+


Information Requested:
Populations of the various areas included in this study by
specific age groups listed above.

According to the attached sheet from the Missouri Register
dealing with Health Profiles, the purpose of the population is to
calculate "Site specific rates" which "should reflect a geographic
area of approximately three to five mile radius around the site.
Geographic areas of larger or smaller size can be used as long as
they contain an adequately sized population at risk."

* The health effects of substances emitted from the company (i.e., air or ground water) can be located in the following reference books:

Patty's Industrial Hygiene and Toxicology
Handbook of Toxic and Hazardous Chemicals and Carcinogens
Dangerous Properties of Industrial Materials (Sax)

These health effects can then be located in the International Classification of Diseases - 9th edition (ICD-9) and the appropriate codes selected.

**Natality data is to be requested from three different data sets--birth, hospital discharge, and multi-source birth defect registry (summation of various data sets dealing with congenital anomalies).