**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **Fred Beck (Alice Hill on behalf of David Hill), et al.** | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | **Civil Action No.: 3:03cv60-P-D** |
| | ) | |
| **Koppers Inc., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MOTION OF DEFENDANTS BEAZER EAST, INC. AND KOPPERS INC.**
**TO EXCLUDE EXPERT TESTIMONY OF JAMES G. DAHLGREN**

      Pursuant to Federal Rules of Evidence 104(a) and 702, defendants Koppers Inc. and Beazer East, Inc. move to bar the testimony of plaintiff's expert witness Dr. James G. Dahlgren. Dr. Dahlgren's opinions should be excluded because neither he nor his opinions are reliable under the standards articulated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**I.    Introduction**

      Plaintiff claims that creosote and pentachlorophenol from the Koppers wood treating plant in Grenada, Mississippi ("the plant") caused David Hill to die of pancreatic cancer. In order to support this theory, plaintiff presents Dr. James G. Dahlgren as an expert to testify to general and specific causation. Dr. Dahlgren's proposed opinion testimony does not meet the admissibility requirements for expert testimony set forth in Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593 (1993).

      First, Dr. Dahlgren should be disqualified from testifying because he is not a competent and qualified expert witness. Dr. Dahlgren has a long history of having been excluded or

discredited by other courts that have found his methodology lacking. Moreover, he has shown a history of a lack of candor by providing incomplete and less than accurate answers under oath about these *Daubert* rulings. These rulings, and his lack of complete disclosure about them, fatally undermine his reliability as an expert witness.

Second, Dr. Dahlgren's proposed opinion testimony about the causes of David Hill's pancreatic cancer should be barred as unreliable because they are not the product of a reliable methodology. They lack factual foundation in the record and in the medical literature. Despite Dr. Dahlgren's sweeping conclusions that the chemicals from the plant caused David Hill's pancreatic cancer, Dr. Dahlgren cannot cite scientific or medical studies which establish that the chemicals at issue here can cause pancreatic cancer. Moreover, Dr. Dahlgren cannot state what amount of each of these chemicals and compounds is needed to cause pancreatic cancer. He cannot determine in any reliable manner the extent to which Mr. Hill has sustained a dose of the subject chemicals and compounds. Finally, Dr. Dahlgren has failed to conduct any analysis that explains how any chemicals here actually in fact caused Mr. Hill's pancreatic cancer. In short, Dr. Dahlgren's opinions are neither relevant nor reliable and will not assist the jury.

## II.    David Hill

Plaintiff David Hill was born in Grenada on March 27, 1947. (Ex. 1, David Hill Dep., May 12, 2004, p. 10-11). Mr. Hill grew up on a farm in the country, but lived at various addresses in the Tie Plant neighborhood for many years.

Mr. Hill worked as a groundskeeper for the Grenada Country Club for about 42 years. (*Id.* at 71, 76-77). As part of his work as a groundskeeper, he used arsenical insecticides like MSMA. (*Id.* at 77-78). Mr. Hill also had a personal landscaping business of his own. (*Id.* at 72). He used lawn chemicals, pesticides and fertilizers for his landscaping business which he

kept in his backyard utility shed. (Ex. 2, Alice Hill Dep., February 10, 2009, p. 18-19; Ex. 3, Nicholas Hill Dep., February 10, 2009, p. 17-25).

Mr. Hill smoked regularly and reports of how much he smoked ranged from a half pack a day (wife), to one pack of cigarettes a day (deposition), to up to two packs per day (told to his treating doctors) from his twenties until he died in 2004. (Ex. 1, David Hill Dep., May 12, 2004, p. 63; Ex. 4, Alice Hill Dep., December 14, 2004, p. 87-90; Ex. 5, Medical Records, June, 2004). Family members describe Mr. Hill as being a "heavy smoker" and remember Mr. Hill smoking "all of the time." (Ex. 6, Patricia Hill Dep., February 9, 2009, p. 17-18; Ex. 7, Nikki George Dep., February 9, 2009, p. 16-19). Mr. Hill was also exposed to second-hand smoke from his wife, Alice Hill, to whom he was married since 1976 and who reportedly smoked as much as he did. (Ex. 1, David Hill Dep., May 12, 2004, p. 25-27, 63-64; Ex. 6, Patricia Hill Dep., February 9, 2009, p. 44-45).

Shortly before he was diagnosed with cancer in May, 2004, Mr. Hill testified that he had been in good health for the last twenty years. (Ex. 1, David Hill Dep., May 12, 2004, p. 228). Mr. Hill died of pancreatic cancer on July 30, 2004 at the age of 57. (Ex. 8, David Hill Death Certificate).

## III.  Samples From Hill House At 183 Carver Circle

Both plaintiff and defendants have conducted extensive soil, dust and air sampling in the Carver Circle community. None of the homes at which David Hill lived before 2000 were sampled. In contrast, the Hill house at 183 Carver Circle – where he lived from 2000 until his death in 2004 – has been the subject of fairly extensive soil and dust sampling. Dr. Sawyer and the other plaintiff's experts rely exclusively on a single dust sample taken by their expert, Mr.

Horsak, who took a dust sample in the attic at 183 Carver Circle. The total dioxin in that sample was found to be 22,558 parts per trillion (ppt).

However, there are significant questions about the validity of the attic sample and what it represents. This dioxin number is over 40 times higher than other homes sampled.[1] Horsak himself concedes he has "no scientific explanation" why the sample is so much higher than elsewhere. (Ex. 9, Horsak Dep., May 28, 2009, p. 57). Another plaintiff's expert, Rodney J. O'Connor, calls it "an anomaly." (Ex. 10, O'Connor Dep., April 23, 2009, p. 58).[2]

More importantly, Dr. Sawyer and other plaintiff's experts ignored a number of more applicable sample results from both inside the house and from the outside soil taken by plaintiff's expert, Dr. O'Connor, and defense experts. First, Dr. O'Connor sampled for PAHs in the living space of the Hill home. **None** were detected.[3] Dr. O'Connor also took a dust wipe sample under a bed in the Hill home which measured 4.21 picograms (a picogram is one quadrillion of a gram), which was below EPA screening levels. (Ex. 10, O'Connor Dep., April 23, 2009, p. 192) (Ex. 12, Sawyer Dep., April 29, 2005, p. 14). Dr. O'Connor took two additional dust sample results from inside the Hill home which measured 221 ppt and 75.40 ppt. (Ex. 10, O'Connor Dep., April 23, 2009, p. 190). Both results were within acceptable

---

[1] It should be noted that another one of plaintiff's experts Dr. O'Connor chose not to sample in the attic because of the presence of rat poison and insulation. (Ex. 10, O'Connor Dep., April 23, 2009, p. 47-48). Moreover, Horsak's laboratory notes reflected his staff required 80 minutes to take the sample and in doing so mixed wood chips with the dust. This is significant given the recent tests, and chemical fingerprint analysis, which show the attic wood has been treated by someone with preservative containing pentachlorophenol, ostensibly for termite control. (Additional sampling of the wood in the attic is the subject of plaintiff's Objection to Magistrate Davis' Order allowing sampling in the attic.) [DE-1242].

[2] Mr. Horsak also had his samples analyzed by another consultant, Dr. Millette, who uses microscopic techniques to identify substances. No evidence of creosote was detected in any sample. (Ex. 11, Horsak Dep., June 16, 2005, p. 89-92). These findings were not mentioned in any expert report of plaintiff.

[3] Dr. O'Connor never raised or mentioned the PAH testing in his report, nor do Dr. Sawyer or Dr. Dahlgren ever refer to it. The existence of this testing was found in the laboratory data.

background ranges.[4] (*Id.* at 191). Dr. Dahlgren never mentioned, addressed or referred to any of these samples in his reports.

Dr. O'Connor also took soil samples from the front yard of 183 Carver Circle. The results of these soil samples were 44 ppt and 53 ppt for dioxin. (*Id.* at 191). According to Dr. O'Connor, who took these samples, the results are "normal background for soil, worldwide." (*Id.* at 192). Again, Dr. Dahlgren never mentioned, addressed or referred to any of these samples in his reports.

Finally, defendants' expert, Michael Corn, conducted dioxin soil testing in both the front and back yards of 183 Carver Circle. His results there were the lowest for all of the homes in the Carver Circle community, with the front yard measuring 15.8 ppt and the back yard measuring 4.7 ppt. (Ex. 13, Michael Corn Report, May 31, 2005, at Table 9). These numbers are well within normal background numbers for soil. Again, Dr. Dahlgren never mentioned, addressed or referred to any of these samples in his reports.[5]

## IV. Dr. Dahlgren's Reports and Opinions Concerning David Hill

### A. October 24, 2004 Report

Dr. Dahlgren prepared three reports concerning David Hill. The first report, dated October 24, 2004, provides a brief seven page overview of David Hill's medical and social history. (Ex. 15, Dahlgren Report on David Hill, October 24, 2004).[6] Based on little more than the fact that Mr. Hill lived near the plant for several years, and second-hand reports that he suffered from congestion, coughing and burning of the eyes, nose and throat (reports which were contradicted by Mr. Hill's own deposition testimony), Dr. Dahlgren concludes, without any

---

[4]     Originally Dr. O'Connor never raised or mentioned these two results in his report.

[5]     It should also be noted that the U.S. EPA prepared an Environmental Indicators Report dated September 30, 2005 which analyzed all of the soil and attic data generated by the parties, and concluded that the plant did not pose a hazard to the health of the Tie Plant community. (Ex. 14, Environmental Indicators, Sept. 30, 2005).

explanation or justification, that David Hill's health problems "were caused and/or aggravated by his exposure to chemicals from Koppers." (*Id.* at 7).[7]

Dr. Dahlgren's 2004 report makes no mention of what effect, if any, Mr. Hill's smoking habit had on his pancreatic cancer.[8] Dr. Dahlgren completely ignores Mr. Hill's long history of smoking one to two packs of cigarettes a day for over twenty years in concluding that his pancreatic cancer was caused by exposure to chemicals and compounds from living near the plant and not by cigarette smoke.

## B.    March 12, 2009 Supplemental Report

Dr. Dahlgren prepared a supplemental report dated March 12, 2009. (Ex. 16, Dahlgren Report, March 12, 2009). In this two-page supplemental report, Dr. Dahlgren observes that "[t]here is no doubt that this man developed his cancer from the exposures from the Kopper's wood treatment in Grenada, Mississippi." (*Id.*). He cites some additional reports and articles which he claims "are supportive of my opinion expressed in my earlier report," but fails to explain or analyze how these articles support his conclusions. (*Id.*). He never references either the reports of Drs. Sawyer or Sharma, then summarily dismisses the notion that Mr. Hill's smoking may have been a cause of his pancreatic cancer, stating only that "[t]here was an increase in risk from his cigarette smoking but the level of carcinogenic agents was far greater from the plant than from his cigarette smoking." (*Id.*). He provides no dose calculation or causation analysis to support this conclusory statement.

---

[6]    The 2004 report was part of a larger report entitled "Health Effects on Nearby Residents from the Koppers Grenada Plant Operations" dated January 31, 2005, submitted by Dr. Dahlgren in this litigation.

[7]    Dr. Dahlgren's report runs through a litany of health problems that are purportedly associated with exposure to the chemicals from the Koppers plant, but there is no evidence in the record that Mr. Hill suffered from any of these health problems. Mr. Hill himself never testified that he experienced the symptoms that Dr. Dahlgren attributes to him.

[8]    In fact, Dr. Dahlgren significantly understated the extent of Mr. Hill's smoking habit as "about four or five cigarettes a day for several years," when Dr. Dahlgren's own documents and report show that Mr. Hill smoked a pack a day for over twenty years. (Ex. 15, Dahlgren Report on David Hill, October 24, 2004, p. 1).

##### C. May 22, 2009 Supplemental Report

Finally, after objections were made by defendants to the paucity of data in his March 12, 2009 report, Dr. Dahlgren attempts to provide some *post-hoc* justifications in a second supplemental report dated May 22, 2009. (Ex. 17, Dahlgren Report on David Hill, May 22, 2009). The three-page second supplemental report claims to "answer the question about the amount of carcinogenic exposure from the plant versus the amount of carcinogenic exposure from Mr. David Hill's cigarette smoking." (*Id.* at 1). Dr. Dahlgren cites to calculations of the amounts of PAHs/CTPV and dioxins allegedly inhaled by Mr. Hill provided by Dr. Sawyer, and attempts to compare the estimated total dose to the amount of PAHs and dioxins he is estimated to have inhaled from smoking. (*Id.* at 2). Dr. Dahlgren also mentions for the first time Mr. Hill's supposed exposure to arsenic "from burning of sludge and treated wood by Koppers," even though there is absolutely no mention of arsenic exposures by David Hill in his prior reports. (*Id.* at 2). Dr. Dahlgren concludes that "Mr. Hill was exposed to cancer causing chemicals from the Kopper's plant greatly in excess of the dose of carcinogens he received from his smoking and any other source." (*Id.* at 3).

Dr. Dahlgren's three reports are simplistic and contain sweeping conclusory generalizations that the chemicals from the plant contributed significantly to his cancer without any backup or support. Dr. Dahlgren's causation and dose analysis is inadequate and fails to meet the *Daubert* standards of reliability.

## V.     The *Daubert* Standard in Toxic Tort Cases.

It is the duty of the trial judge to screen a proffered expert's testimony to determine admissibility. FED. R. EVID. 104(a);[9] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). As a first step, the Court should examine a witness' qualifications to determine whether he or she is, in fact, "qualified as an expert by knowledge, skill, experience, training, or education..." FED. R. EVID. 702. A trial judge enjoys wide latitude in determining the admissibility of experts. *Watkins v. Telesmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997). A trial judge should refuse to allow an expert witness to testify if the witness is not qualified. *See, e.g., Barrett v. Atlantic Richfield Co.*, 95 F.3d 375, 382 (5th Cir. 1996); *London v. Mac Corp.*, 44 F.3d 316, 318 (5th Cir. 1995). Defendants first assert that Dr. Dahlgren is not qualified to testify here.

Next, after assessing whether an expert witness is sufficiently qualified to testify, *Daubert* and Federal Rule of Evidence 702 require trial courts to serve as a "gatekeeper" by evaluating the proposed testimony to ensure that expert opinions presented to a jury are based on a factual foundation and are the product of reliable methodology. Under Rule 702, an expert may testify in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702. *Daubert* requires the trial judge to ensure that all scientific testimony or evidence admitted "is not only relevant, but reliable as well." *Daubert*, 509 U.S. at 589. "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir.

---

[9]      Rule 104(a) of the Federal Rules of Evidence provides that "[p]reliminary questions concerning the qualifications of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court."

2007). The burden is on the party seeking to have the court admit expert testimony to demonstrate that the expert's findings and conclusions are based on the scientific method, and therefore, are reliable. *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). Therefore, the burden is on plaintiff to establish that Dr. Dahlgren's opinions comply with Rule 702 and the *Daubert* standard.

The Fifth Circuit has articulated a two-step process in examining the admissibility of causation evidence in toxic tort cases. *Knight*, 482 F.3d at 351. First, the trial court must determine whether there is general causation. (*Id.*). Second, if it concludes that there is admissible general causation evidence, the district court must determine whether there is admissible specific causation evidence. (*Id.*). "General causation is whether a substance is capable of causing a particular injury or condition in the general population, while specific causation is whether a substance caused a particular individual's injury." (*Id.*). *see also U.S. v. Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003). In other words, general causation answers the question of whether exposure to a substance *can cause* a particular disease, while specific causation answers the question of whether an individual's exposure to a specific substance *was enough to cause* his or her disease. "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996). Evidence concerning specific causation in toxic tort cases is admissible only as a follow-up to admissible general causation evidence. *Knight*, 482 F.3d at 351 (*citing Raynor v. Merrell Pharm.*, 104 F.3d 1371, 1376 (D.C. Cir. 1997)). "[T]he expert's testimony must be reliable at each and every step or else it is inadmissible." *Knight*, 482 F.3d at 355.

Thus, the fundamental questions underlying the admissibility of Dr. Dahlgren's testimony are: (1) whether his prior disqualifications and his failure to disclose them should disqualify him from testifying; (2) whether the chemicals or compounds from the Koppers plant to which David Hill was allegedly exposed could have caused his pancreatic cancer; (3) what amount of exposure to each chemical or compound was required to cause pancreatic cancer; and (4) whether David Hill's exposure to such chemical or compounds was sufficient to actually cause his pancreatic cancer.

## VI. Dr. Dahlgren Is Not Qualified To Testify Because Of His Past History And Failure To Accurately Answer Questions About It.

### A. Dr. Dahlgren Has Been Excluded, Limited Or Discredited By At Least Nine Different Courts.

A district court should refuse to allow an expert witness to testify if the witness is not qualified to testify in a particular field or on a given subject. *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999); *Seatrax v. Sonbeck International*, 200 F.3d 358, 372 (5th Cir. 2000) (finding proposed expert not qualified to testify). Dr. Dahlgren's qualifications and methodology have been called into question by various state and federal courts, and he has been described as a "hired gun" for plaintiffs' attorneys in toxic tort cases (*see, e.g.,* Ex. 21, *Freese v. Schlage Lock Co.*; Ex. 24, *Parkhill v. American Superior Feed*). Since 2003, Dr. Dahlgren's opinion testimony has been excluded, limited or discredited in at least nine different actions because they were "scientifically unreliable," "nothing more than an untested and unproven hypothesis," "little more than speculation," "very simplistic," and "speculative and not supported by scientific evidence that is generally accepted by other experts in the field." These cases include:

- *Akee v. The Dow Chemical Company*, **Case No. 00-00382BMK (U.S. District Court, D. Haw.; Magistrate Judge Barry Kurren; December, 2003)** (opinions not scientifically reliable; "nothing more than an untested and unproven hypothesis"; reports

too general and factually unrelated to support his opinions) (Ex. 18, Magistrate Judge
Kurren's Opinion).

- *Valmont v. ConocoPhillips*, **Case No. 2003-6343 (14th Dist. Court of Louisiana;
Judge Wilford Carter; November, 2004)** (did not have "sufficient information to make
the diagnosis that he made"; "wasn't too impressed with Dr. Dahlgren"; "just [doesn't]
believe Dr. Dahlgren's assessment of the extent of [plaintiff's] injuries") (Ex. 19,
Transcript of Oral Ruling).

- *Babin v. Ecolab, Inc.*, **Case No. 2:04CV1595 (U.S. District Court, W.D. La.;
Magistrate Judge Wilson; July, 2005), reported at** *Babin v. Ecolab, Inc.*, **2005 WL
1629947 (W.D. La. 2005)** (opinion testimony based on erroneous assumptions about the
chemicals involved; "opinions" were "little more than speculation"; "[t]here is simply too
great an analytical gap between the opinion offered by Dr. Dahlgren and the data he
proffered to support his opinions.") (Ex. 20, Magistrate Judge Wilson's Opinion).

- *Freese v. Schlage Lock Company, Inc.*, **Case No. 04CV637 (El Paso County, Colo.
Dist. Ct.; Judge Rebecca S. Bromley; September, 2005** (finding Dr. Dahlgren's report
"very simplistic" and his "qualifications or credentials in this situation…questionable";
accused Dr. Dahlgren of being "very close to the hired gun" "who…simply run people
through a mill and then produce these [simple] reports.") (Ex. 21, Transcript of Hearing).

- *Green v. Alpharma, Inc.*, **Case No. 03-2150-2 (Cir. Ct. Washington County, Ark.;
August, 2006)** (barred Dr. Dahlgren from relying on Dr. Sawyer and Dr. O'Connor's
ingestion dose calculations because methodology employed to obtain the data did not
meet *Daubert* admissibility factors) (Ex. 22, Order Barring Dr. Dahlgren's Testimony
and Arkansas Supreme Court Opinion affirming the trial court's ruling).

- *Abraham v. Union Pacific R.R. Co.*, **233 S.W.3d 13 (Texas Court Of Appeals; Chief
Judge Adele Hedges; June, 2007)** (questioning Dr. Dahlgren's dose evaluation which
was "subject to wide variance and largely open to speculation"; concluding "[t]here is no
reliable scientific evidence to connect appellant's exposure to creosote to appellant's
injuries other than the unsupported assertion of Dr. Dahlgren") (Ex. 23, Copy of
Opinion).

- *Parkhill v. American Superior Feed*, **Case No. 0722-CV-225-57 (N.M. Seventh
Judicial Dist. Ct., Judge Kevin Sweazea, July, 2007):** (finding his qualifications "less
than stellar" and characterized him as "a hired gun" who "come[s] in and give[s] an
opinion on the case"; methodology failed the *Daubert* standard because it could not be
tested, was not peer reviewed, contained no error rate, and did not quantify a dose) (Ex.
24, Transcript of Daubert Hearing Opinion).

- *Acosta v. Shell*, **Case No. CV 99-509 (N.M. Fifth Judicial Dist. Ct., Judge Freddie J.
Romero, October, 2007)** (barring Dr. Dahlgren testimony on general or specific
causation due to lack of insufficient scientifically reliable causation evidence; studies

relied upon inapplicable, of limited analytical value, and were not scientifically reliable to establish causation) (Ex. 25, Copy of Opinion).

- *Smith v. Legacy Partners Management*, **Case No. BC308986 (Los Angeles County, Cal., Judge Carolyn B. Kuhl, February, 2008)** (opinion testimony inadmissible because speculative and not supported by scientific evidence generally accepted by other experts; failed "to support his opinion based on specific findings in the medical literature on which he purportedly relies") (Ex. 26, Copy of Opinion).

These nine prior instances in which Dr. Dahlgren's opinion testimony has been barred, excluded or discredited call into question his qualifications to testify in this case. They demonstrate that his methodology and approach are speculative and based on insufficient and unreliable scientific evidence.

**B.     Dr. Dahlgren's Reliability Necessary to Qualify As A Witness Is Undermined By His Demonstrated Failure To Fully And Completely Answer Questions About His Past Disqualifications.**

Despite the fact that Dr. Dahlgren's opinion has been excluded, limited or discredited by courts on at least nine separate instances, Dr. Dahlgren has failed to accurately and fully answer questions about his record. Instead, he persists in insisting that he has been barred by courts no more than once or twice. In this case, during his most recent deposition on July 16, 2009, Dr. Dahlgren testified:

Q.     Do you recall how many times your testimony has been excluded by a Court which found your testimony not reliable?

A.     No.

Q.     Okay. Do you -- do you have any estimate of how many times your testimony has been excluded because a Court found your testimony not reliable?

A.     Once or twice, I guess, in my career.

*Q.     Once or twice in your career –*

*A.     Correct.*

*Q.     -- that's your testimony under oath?*

2001157-1                          12

### A.   Yes.

(Ex. 27, Dahlgren Dep., July 16, 2009, p. 91-92) (emphasis added). Dr. Dahlgren's insistence that he has been barred from testifying only "once or twice" in his career is particularly perplexing, especially given that he admitted at the *Barnes* trial that his opinions have only been limited or barred on three instances, after first <u>denying</u> that he had ever been barred:

> Q.   And out of those 200 cases, you have had parts of your opinions limited on three times?
>
> A.   Correct.

(Ex. 28, Barnes Trial Transcript, p. 1887) (*see also id.* at 1787-1792) (impeaching Dr. Dahlgren after he denied <u>ever</u> having his testimony barred by establishing that he had been barred in *Acosta, Akee*, and *Freese* cases discussed above).[10]

---

[10]   Dr. Dahlgren's failure to testify completely about his past disqualification is not limited to his testimony in this case. For example, Dr. Dahlgren testified under oath in a deposition on September 25, 2008 in the case *Davis v. BNSF Railway Co., et al.*, Case No. 25,151 (21st Judicial District, Burleson County, Tex) that a court had excluded his opinion only once or twice:

> Q.   You don't keep a file of cases where you got excluded?
>
> A.   No.
>
> Q.   How many times has that happened?
>
> A.   I don't know. I don't keep track.
>
> Q.   More than a dozen?
>
> A.   Oh, no. Once, maybe twice at the most.
>
> Q.   That's all?
>
> A.   Uh-huh, yes.

(Ex. 29, Dahlgren Dep. in *Davis v. BNSF Railway Co., et al.*, Case No. 25,151 (21st Judicial District, Burleson County, Tex., September 25, 2008, p. 20-21).

Similarly, at a preliminary *Daubert* hearing in the case *Parkhill v. American Superior Feed*, Dr. Dahlgren denied that his causation opinions in toxic tort cases had been previously excluded:

> Q.   Sir, Judges have excluded your causation opinions in toxic tort cases where you've had insufficient scientific data to support your opinions; you're aware of, that, aren't you?
>
> A.   No, I'm not aware of that.

(Ex. 30, Hearing Transcript in *Parkhill v. American Superior Feed, et al.*, May 15, 2007, p. 165). Dr. Dahlgren's pattern and practice of not being fully candid significantly undermines his reliability has a witness.

2001157-1                                  13

By giving incomplete and less than fully accurate answers, Dr. Dahlgren's reliability as an expert witness and the trustworthiness of his expert opinions are called into question. Dr. Dahlgren should not be permitted to testify if he cannot reliably answer questions fully, completely and truthfully. Given this demonstrated lack of reliability, Dr. Dahlgren should be barred from testifying at trial.

**VII. Dr. Dahlgren Has No Support For His General Causation Opinion That The Chemicals From The Plant Can Cause Pancreatic Cancer.**

Should the court deem Dr. Dahlgren qualified to testify, the court must next look at the reliability of his general and specific causation testimony. General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a certain substance can cause a particular disease. "District courts must carefully analyze the studies on which experts rely for their opinions before admitting their testimony." *Knight*, 482 F.3d at 351. Before one can turn to the question of what caused a specific injury, plaintiff must first independently "rule in" that the chemicals and substances in question in this case can cause pancreatic cancer as a matter of general causation. *See, e.g. Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (affirming district court's exclusion of plaintiff's experts because they lacked a proper basis for "ruling in" the drug in question as a potential cause of alleged injury). With respect to each of the chemicals and substances at issue in this case (creosote, pentachlorophenol, dioxins and PAHs), Dr. Dahlgren has admitted that he is not aware of epidemiological studies that link or "rule in" these substances as a potential causes of pancreatic cancer.

## A.    No Evidence That Creosote Can Cause Pancreatic Cancer

First, with respect to creosote, Dr. Dahlgren concedes that he has not identified any

scientific or medical literature linking creosote exposure to pancreatic cancer:

Q.    In this case have you searched the published literature on evidence whether creosote has been proven to cause pancreatic cancer?

\*        \*        \*

A.    As far as I'm aware, none of the – very limited and inadequate studies of creosote-exposed individuals have revealed the specific excess of pancreatic cancer, if that's your question.

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1219-1220).

## B.    No Evidence That Pentachlorophenol Can Cause Pancreatic Cancer

Similarly, with respect to pentachlorophenol, Dr. Dahlgren has found no scientific or

medical literature establishing that pentachlorophenol exposure can cause cancer or pancreatic

cancer:

Q    Did you do a search for pentachlorophenol and pancreatic cancer?

A.    I don't recall specifically doing that, no. But, again, I think with very few studies on pentachlorophenol-exposed individuals – and I don't recall any study of any pentachlorophenol human studies that have looked at cancer of any kind.

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1221).

## C.    No Evidence That Dioxin Can Cause Pancreatic Cancer

With respect to dioxins, Dr. Dahlgren repeatedly testified during his deposition that he is

not aware of any epidemiological literature linking dioxin exposure to pancreatic cancer:

Q.    For the purposes of this case, that is, the David Hill case, did you look to see whether dioxin has been linked in the epidemiologic literature to pancreatic cancer?

A.    Yes.

Q. Is your answer for dioxin that the dioxin has been linked in the epidemiological literature to pancreatic cancer?

A. Not that I noticed.

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1222). He later answered a question with the following:

A. … Although, as I have stated, I am not aware of any studies that have directly linked that particular [pancreatic] cancer [to dioxin].

\* \* \*

Q. You said earlier that you are not aware of any specific papers that link dioxin to pancreatic cancer, correct?

A. That's what I said, yes.

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1223). He has also testified:

Q. Are you aware of any particular papers about dioxin-exposed communities or groups of workers which identifies pancreatic cancer as a risk of dioxin exposure?

A. I already answered that question earlier that I wasn't aware of one.

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1260-61).

**D. No Evidence That PAHs At Issue Can Cause Pancreatic Cancer**

With respect to PAHs, Dr. Dahlgren confirms that there are no studies that examine whether a certain level of PAH exposure from creosote can increase the risk of pancreatic cancer:

Q How much PAH exposure is necessary to increase someone's risk for pancreatic cancer above the baseline?

A. Any exposure above background would raise the risk above background risk. I don't think anybody has ever done an estimate of how many micrograms of background PAH exposure there is in the general population. I have never seen any data on that question

\* \* \*

> But I have not seen any similar data for PAHs. So I don't know that anybody could tell you, and I don't recall any studies in the literature that have taken the micrograms, and the background, you know, micrograms per kilogram background PAH exposure and then compared that to the micrograms per kilograms that have been shown in the animal test systems to be significantly associated with cancer or any other health effect.

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1259). Moreover, there are hundreds of different PAHs of which only a handful are potentially carcinogenic, and Dr. Dahlgren makes no effort whatsoever to break down which PAHs are carcinogenic, whether they are present in creosote, whether they are released in wood treating operations, and the extent to which the particular PAHs can cause pancreatic cancer. None of the studies relied upon by Dr. Dahlgren to support his PAH analysis support a causal link between PAHs and pancreatic cancer.

Recognizing that there is no scientific literature to support his conclusion that exposure to PAHs (or any other chemicals that have been put forth by plaintiff's experts) can cause pancreatic cancer, Dr. Dahlgren attempts to extrapolate from various scientific studies linking cigarette smoking to pancreatic cancer reasoning that both cigarettes and creosote contain PAHs. However, there is simply no scientific evidence – and Dr. Dahlgren can point to no studies or reports – that analogizes the PAHs in cigarette smoke to the PAHs contained in creosote. There are hundreds of different PAHs of which only a handful are carcinogenic, and no carcinogenic PAHs are released during wood treating operations because they do not volatilize at the temperatures generated. (Ex. 32, Report of Michael Corn, May 13, 2009, p. 17-21).

Even if creosote and cigarette smoke may have some of the same constituent PAHs, they are completely different compounds from the perspective of toxicology and epidemiology. The Fifth Circuit has cautioned about leaping from an accepted scientific premise to an unsupported one. *Moore*, 151 F.3d at 279 (5th Cir. 1998). "To support a conclusion based on such reasoning,

the extrapolation or leap from one chemical to another must be reasonable and scientifically valid." (*Id.*). Here, Dr. Dahlgren offers nothing more than the *ipse dixit* to suggest that the existing data linking smoking with pancreatic cancer proves that creosote (and PAHs generally) can cause pancreatic cancer. There is simply too great an analytical gap between the data and the opinion proffered, *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), and such an analytical leap is simply unreliable and unwarranted in this case.

E.     **No Evidence That A Combination of Dioxin and PAHs Can Cause Pancreatic Cancer**

Dr. Dahlgren also admits that there is no literature to support any alternative combination of PAHs and dioxins as causing or contributing to pancreatic cancer:

Q.     Now, are you aware of any published papers which identify a combination of PAHs and dioxin as causing or contributing to pancreatic cancer?

A.     You mean where someone was exposed to both?

Q.     Right.

A.     I am not aware of any studies that have done that…"

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1223-24).

F.     **No Evidence That Arsenic, Naphthalene, Benzene and Carbon Particulates Can Cause Pancreatic Cancer**

In his May 22, 2009 report, Dr. Dahlgren also mentions in passing several other chemicals and compounds, including arsenic, naphthalene, benzene and carbon particulates. For example, Dr. Dahlgren asserts that "Naphthalene is a suspect carcinogen and has a cancer slope factor. (Ex. 17, Dahlgren Report on David Hill, May 22, 2009, p. 2). Similarly, Dr. Dahlgren states that "Benzene is a class 1 human carcinogen." (*Id.*) Dr. Dahlgren claims that "Carbon particles under 2.5 microns are also carcinogenic." (*Id.*) Yet, Dr. Dahlgren cannot find any association between exposure to naphthalene, benzene or carbon particles and pancreatic cancer,

and he makes no attempt whatsoever to assess whether David Hill was exposed to these chemicals or the dose of any such exposure. Dr. Dahlgren also looks at arsenic, but he fails to cite any study or report establishing that arsenic can cause pancreatic cancer or show that David Hill was exposed to a particular dose which could have or did cause David Hill's pancreatic cancer. (*Id.*) Finally, Dr. Dahlgren fails to provide any causation analysis for any of the other chemicals modeled by Dr. Sharma.

> ### G. Dahlgren's Blood Work Is Unreliable

Dahlgren performed blood testing which is subject to the same deficiencies as Dr. Rosenfeld, which are discussed in the motion to bar his testimony. [D.E. 1267]. In any event, Dahlgren has admitted that blood levels of the people of Grenada were <u>not</u> elevated compared to his control group. (Ex. 27, Dahlgren Dep., 7-16-09, p. 89-90).

## VIII. Dr. Dahlgren Fails To Consider The Bradford-Hill Criteria In Analyzing Literature On The Causes Of Pancreatic Cancer.

Dr. Dahlgren never attempts to utilize the well-recognized Bradford-Hill standards in order to arrive at his general causation opinions. The factors considered by the Bradford-Hill criteria in assessing evidence of causation include: (1) temporal relationship; (2) strength of association; (3) dose-response relationship; (4) replication of findings; (5) biological plausibility (coherence with existing knowledge); (6) consideration of alternative explanations; (7) cessation of exposure; (8) specificity of the association; and (9) consistency with other knowledge. *See Knight v. Kirby Inland Marine, Inc.*, 363 F. Supp. 2d 859, 863 (N.D. Miss. 2005); Michael D. Green, et al., "Reference Guide on Epidemiology," Federal Judicial Center, *Reference Manual on Scientific Evidence* at 375. Dr. Dahlgren's failure to consider the Bradford-Hill criteria is another reason why he should not be permitted to testify to general causation.

## IX.    Dr. Dahlgren Unreasonably Ignores Extensive Research Linking Cigarette Smoking to Pancreatic Cancer.

Given Mr. Hill's long and extensive history of smoking, it is inexplicable how Dr. Dahlgren summarily dismisses the considerable scientific evidence linking smoking and pancreatic cancer and concludes that it was Mr. Hill's exposure to the chemicals from the plant that caused his pancreatic cancer. Dr. Dahlgren's analysis here is no different than that of the excluded experts in *Allen*, 102 F.3d at 198. In that case, the Fifth Circuit soundly rejected experts that disregarded known and extensive data regarding the plaintiff's extensive smoking history in favor of speculative data about the plaintiff's alleged exposures to the chemicals from the plant based on where he lived. As the Fifth Circuit explained in *Allen* in excluding the experts for not relying on facts reasonably relied on by other experts in the field:

In this case, there is no direct evidence of the level of Allen's exposure to EtO. The Kelsey/LaMontagne opinion relies principally on the affidavit of a coworker and on extrapolations concerning EtO handling at the hospital where Allen worked based on conditions in other hospitals in the 1970s. *The experts actually knew more about Allen's exposure to EtO through his smoking a pack of cigarettes a day than they did about his occupational exposure to the chemical. Nevertheless, Dr. Kelsey and Dr. LaMontagne discounted the effect of tobacco, while speculating that the workplace exposure was the cause of his brain cancer....Not only was the scientific knowledge absent, but the expert's background information concerning Allen's exposure to EtO is so sadly lacking as to be mere guesswork.* The experts did not rely on data concerning Allen's exposure that suffices to sustain their opinions under R. 703.

*Id.* at 198-99 (emphasis added). Here, as in *Allen*, there is no direct evidence of David Hill's exposure to the chemicals from the plant. Like the experts in *Allen* who made extrapolations concerning EtO handling at the hospital where Allen worked *based on conditions in other hospitals* in the 1970s, Dr. Dahlgren relies on Dr. Sawyer's speculative calculations on Mr. Hill's exposures to PAHs and dioxins based on *dust samples taken from other homes* and on *attic dust samples to which David Hill was never exposed.* Dr. Dahlgren's analysis is based on nothing

more than mere guesswork, and the court should reject it just as the Fifth Circuit rejected it in *Allen*.

In summary, Dahlgren fails to show scientific evidence or epidemiological studies linking exposure to creosote, pentachlorophenol, dioxins, PAHs, or chemicals mentioned in passing such as arsenic, naphthalene, benzene and particulates, to pancreatic cancer. Because of the absolute dearth of any support in the medical or scientific literature that these chemicals or compounds can cause pancreatic cancer, the Court should bar Dr. Dahlgren from providing any general causation opinion testimony linking these chemicals to pancreatic cancer.

**X.      There Is No Support For Dr. Dahlgren's Specific Causation Opinions.**

**A.      Dr. Dahlgren Does Not Know What Dose of Creosote, Pentachlorophenol, Dioxin and PAHs Can Cause Pancreatic Cancer.**

First, Dr. Dahlgren does not analyze or establish how much creosote, pentachlorophenol, dioxin or PAH is necessary to cause pancreatic cancer. In fact, Dr. Dahlgren concedes that he does not know what dose amount of dioxin or PAHs can cause pancreatic cancer:

Q.      Here's what I want to know, Doctor. What dose does it take of dioxin to cause pancreatic cancer?

A.      As I thought I said, *I don't know. And no one knows*.

*        *        *

Q.      And the same – you would give me the same answer if I asked you about the dose of PAHs and the dose of arsenic necessary to cause pancreatic cancer, correct?

A.      Yes.      I would think that *the dose to cause any cancer, including pancreatic cancer, is highly variable and not known*.

(Ex. 27, Dahlgren Dep., July 16, 2009, p. 149-151). Dr. Dahlgren simply has no idea what dose of creosote, pentachlorophenol, dioxins and PAHs is enough to cause pancreatic cancer. As

2001157-1                                   21

such, any specific causation analysis by Dr. Dahlgren would be wholly speculative and unreliable.

### B.    Dr. Dahlgren Does Not Know David Hill's Dose Exposure To Creosote, Pentachlorophenol, Dioxin and PAHs.

Even if Dr. Dahlgren knew what dose of each chemical or compound could cause Mr.

Hill's pancreatic cancer, he concedes that he never conducted an analysis to determine the

amount of chemicals or compounds to which Mr. Hill was exposed – at least not initially:

Q.    As part of your specific causation analysis, did you determine whether the plaintiff had a sufficient exposure to the alleged toxin in order to determine whether that toxin caused his disease?

       \*      \*      \*

A.    I believe the answer to your question is, what we have tried to do is to determine whether this person's level of exposure to the cancer-causing agent was significantly above background and therefore a significant contributing risk that he doesn't share with others. I think that's the important response to your question.

Q.    Did you do any type of dose response analysis for David Hill?

A.    I think in the sense that I have already indicated to you that I believe his dose of the chemicals from Koppers was quite high and that it was something that would be a very major contributing factor to his cancer. That is not to say that these other risks that we identified also didn't contribute, but that his dose was quite high. *You can't really do a dose response curve in an individual patient.*

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1249-50). (emphasis added). Dr. Dahlgren's specific causation conclusion that David Hill's dose "was quite high" is similar to the excluded expert in *Burleson v. Texas Dept. of Criminal Justice*, 393 F.3d 577, 583-84 (5th Cir. 2004), who also neglected to provide evidence of dose. In *Burleson*, the Fifth Circuit upheld the magistrate judge's reasoning that failure to provide evidence of the plaintiff's purported level of harmful exposure rendered the expert's testimony unreliable. (*Id.*).

2001157-1                          22

**C. Dr. Dahlgren Did Not Calculate David Hill's Creosote and Pentachlorophenol Doses.**

Recognizing the flaws in his original specific causation analysis lacking any calculation or analysis of dose, Dr. Dahlgren finally attempts to provide a *post-hoc* justification for his conclusions in his second supplemental report. However, Dr. Dahlgren fails to provide or rely upon any exposure dose analysis pertaining to creosote and pentachlorophenol. As a result, Dr. Dahlgren should be barred from testifying regarding any specific causation opinions relating to creosote and pentachlorophenol.

**D. Dr. Dahlgren's PAH and Dioxin Dose Calculations Are Unreliable.**

Unlike creosote and pentachlorophenol, Dr. Dahlgren's second supplemental report attempts to calculate David Hill's dose exposure to PAHs and dioxins. As Dr. Dahlgren explained, he and Dr. Sawyer got together in May, 2009 – after he had already concluded that David Hill's pancreatic cancer was caused by his exposure to chemicals from the plant – "to figure out what the dose would be best analyzed as." (Ex. 27, Dahlgren Dep., July 16, 2009, p. 31). Putting aside the questionable reliability of a *post hoc* attempt to mathematically prove statements and conclusions that he had already made without the benefit of such an analysis, Dr. Dahlgren had previously conceded that any quantitative estimates about exposures to chemicals prepared by Dr. Sawyer (on which he relied) had questionable value:

> Q. Is your specific causation analysis a quantitative analysis or qualitative analysis?
>
> A. Well, we do have qualitative [sic] numbers of, for example, pack years. We have quantitative numbers of – I guess it is micrograms per kilogram in the house dust. We have some estimates about the exposures to chemicals in the air, although those are very limited. *We don't have a lot of good quantitative data in terms of how much reached any individual person.*
>
>     \*       \*       \*

> But in terms of boiling it down to a quantitative amount for David Hill per
> se and thus what the quantitative risk might have been for him, *we just
> don't have any way of doing that in a precise manner.*

(Ex. 31, Dahlgren Dep., January 10, 2006, p. 1234-35). Despite conceding that there is no good

quantitative data to conduct a quantitative dose analysis, Dr. Dahlgren nevertheless attempted to

calculate David Hill's dose exposure to PAHs and dioxin.

### 1. Dr. Dahlgren's PAH Calculations Do Not Relate To David Hill

First, with respect to Dr. Dahlgren's PAH calculations, Dr. Dahlgren testified that he

relied on Dr. Sawyer to conduct some calculations based on Coal Tar Pitch Volatiles (CTPV)

values contained in Figure 16-3 from Dr. Sharma's original report. (Ex. 27, Dahlgren Dep., July

16, 2009, p. 57-59). As part of that analysis, Dr. Dahlgren calculates the following total CPTV

dose:

> The amount of CTPV he inhaled is calculated by Dr. Sawyer at 5.7 ug/hour for
> the 14 hours he spent at home each day or 80 ug per day from air that contained 8
> $ug/m^3$ (2,580 times above the EPA air level of 0.0031 ug/ $m^3$) for 46 years.
> Except for the time he spent working he has an estimate total dose of 1,767,000
> ug of CTPV.

(Ex. 17, Dahlgren Report, May 22, 2009, p. 1).

However, Dr. Dahlgren's calculations are flawed on many levels. First, Dr. Dahlgren's

calculations are unreliable because he relies on data that is not specific to David Hill and that do

not reflect David Hill's exposure dose to PAHs. To the extent Dr. Sawyer relied on the data

contained in Figure 16-3 of Dr. Sharma's original report to make his calculations of David Hill's

dose (as Dr. Dahlgren explained he did), his reliance on Figure 16-3 is misplaced. Dr. Sharma

has disavowed any relationship between Figure 16-3 and David Hill:

> Q. This is from your report, sir, and it's Table – or Figure 16-1, 16-2, and 16-
> 3. My question is, first of all, tell me what are you attempting to depict in
> Figure 16-1, and how does it relate to David Hill?

A.      *This was not contained in my report for exposures to David Hill. This was a report figure contained in my original report.* I have been deposed on four separate occasions on that, its report supplement, as well as the revised form of the report. And in each of those I was asked questions ad infinitum about these three figures. I have nothing further to add to them other than what I've testified previously.

Q.      *Well, my question was just how does David Hill relate to this? Is he in here? Is he one of these data points?*

A.      *No.*

       \*       \*       \*

Q.      And here's my question, and maybe you answered it: *Are any of the data points that are on Figure 16-1, 16-2, or 16-3, are any of them David Hill's exposure numbers?*

       \*       \*       \*

A.      *They could not possibly be because these figures were prepared a full year before my work to calculate the exposures for David Hill were conducted.*

Q.      So when it says up on top there "TLV – Plaintiff's Exposure: Naphthalene," you're telling me David Hill is not one of those plaintiffs?

A.      You are taking a figure from a report and misrepresenting it through your questioning as if I have attempted to include David Hill amongst these plaintiffs. I have not –

Q.      I'm just asking.

A.      Please let me finish my answer. These figures that you've included as Exhibit 39 to this deposition were prepared a full year before my work to calculate David Hill's exposures were conducted. *They have no relevance to David Hill's exposure calculations.*

(Ex. 33, Sharma Dep., July 13, 2009, p. 98-100). (A copy of Figure 16-3 is attached as Exhibit 34.). Dr. Sawyer's exclusive reliance on Sharma's Figure 16-3 to assess Mr. Hill's alleged exposures to creosote and CTPVs is mistaken. As Dr. Sharma concedes, Figure 16-3 provides no dose information relating to David Hill and should not be used to calculate David Hill's

alleged exposure to creosote and CTPVs. Thus, Dr. Sawyer and Dr. Dahlgren's reliance on that data renders their analyses unreliable.

Second, there is no evidence that David Hill would have been exposed for 14 hours per day for 46 years as Dahlgren asserts. Moreover, David Hill's work as a groundskeeper for the Grenada Country Club and his side landscaping business would have kept him away from his home for more than ten hours a day.[11] Dr. Dahlgren's assumptions for his calculations are not grounded in the facts of this case.

### 2. Dr. Dahlgren's Dioxin Calculations Do Not Relate To David Hill.

With respect to dioxins, Dr. Dahlgren does not calculate David Hill's dioxin exposure dose from the plant but again relies upon calculations made by Dr. Sawyer. He simply states that "[h]is dose of dioxin from the plant is 12.4 times higher than the dose from cigarette smoking" and claims that "Dr. Sawyer calculated a lifetime ingestion dose of dioxin from Koppers contamination in his house dust as 1.36 ug…" (Ex. 17, Dahlgren Report, May 22, 2009, p. 2). To the extent Dr. Dahlgren relied upon Dr. Sawyer's dioxin calculations, Dr. Dahlgren's calculations are flawed and unreliable because Dr. Sawyer's dioxin data is not specific to David Hill and does not accurately reflect David Hill's dioxin dose. As discussed in detail in Defendants' Motion to Exclude Expert Testimony of Dr. William R. Sawyer, Dr. Sawyer's flawed methodology of choosing thirteen homes unrelated to David Hill and of using attic dust samples instead of available household dust samples even though there is no evidence that David Hill ever accessed the attic provide unreliable numbers that have nothing to David Hill. Therefore, the Court should bar Dr. Dahlgren's CPTV, PAH and dioxin dose calculations as unsupported and unreliable.

---

[11]     In making his PAH calculations, Dr. Dahlgren also ignored more reliable PAH measurements taken from household dust samples from the living quarters at the Hill home at 183 Carver Circle which showed that there were no PAHs detected. (Ex. 10, O'Connor Dep., April 23, 2009, p. 30).

**E.      Dr. Dahlgren's Calculations And Comparisons Of David Hill's Dose Exposures From Cigarette Smoking Should Be Barred As Unreliable.**

Like his attempts to calculate David Hill's exposure to PAHs and dioxins from the plant, Dr. Dahlgren's calculations of Mr. Hill's exposure to PAHs and dioxins from cigarette smoke are not based on the facts of this case and are equally unreliable. For example, Dr. Dahlgren's cigarette PAH calculations based on David Hill smoking only 10 cigarettes a day ignores the multiple sources, including David Hill's own deposition testimony and his medical records, which establish that Mr. Hill smoked at least one pack (20 cigarettes) of cigarettes per day. Moreover, Dr. Dahlgren fails to take into account Mr. Hill's cigarette PAH exposure dose from secondhand smoke from his wife's smoking and Mr. Hill's own sidestream smoke. His failure to take into account second-hand smoke exposure is not insignificant. As one of the studies upon which Dr. Dahlgren himself relies in his May 22, 2009 report found, PAH content from sidestream smoke (which includes cigarette smoke from both others' smoking as well as from one's own smoking, i.e., smoke that is not directly inhaled through the cigarette) is the main determinant of smokers' and nonsmokers' exposure to PAHs in environmental tobacco smoke and is almost tenfold higher than PAH exposure directly from smoking a cigarette. Thus, Dr. Dahlgren's calculations greatly underestimate Mr. Hill's PAH exposure from his and his wife's smoking habits.

In summary, Dr. Dahlgren's *post-hoc* attempt to calculate David Hill's PAH and dioxin dose falls woefully short under any measure of reliability given that there is no evidence that these numbers used by Dr. Dahlgren relate to David Hill. Dahlgren cannot justify his wholly unsupported and unreliable opinions by dressing up his specific causation analysis *after the fact*. There is no basis for his conclusions, and the court should exclude Dr. Dahlgren from offering specific causation opinions in this case.

## XI.    Conclusion

Dr. Dahlgren should not be permitted to testify at trial because he is not qualified to provide expert testimony in this case. As evidenced by his prior disqualifications and failure to be forthright and candid when asked under oath about them, Dr. Dahlgren cannot be trusted to give reliable testimony regarding the cause of David Hill's pancreatic cancer. Dr. Dahlgren has no evidence that David Hill's pancreatic cancer was caused by his purported exposure to creosote, pentachlorophenol, PAHs and dioxins from the Koppers plant. He fails to show competent studies or articles that link exposure to creosote, pentachlorophenol, dioxins or relevant PAHs to pancreatic cancer. Under *Daubert* and its progeny, Dr. Dahlgren's testimony is simply unreliable and inadmissible. Defendants therefore respectfully request that this Court enter an order barring Dr. Dahlgren from testifying to any expert opinions in this action.

Dated this 14th day of September, 2009.         **Beazer East, Inc. and Koppers Inc.**
                                                **Defendants**


                                                By:    /s/ Cal R. Burnton, Esq.
                                                       One of its Attorneys


OF COUNSEL:
Cal R. Burnton, Esq.
Wildman, Harrold, Allen & Dixon, LLP
225 W. Wacker Drive, Suite 2800
Chicago, Illinois 60606-1229
(312) 201-2000 (phone)
(312) 201-2555 (fax)

Christopher A. Shapley, Esq. (MSB No. 6733)
Robert G. Gibbs, Esq. (MSB No. 4816)
William Trey Jones, III, Esq. (MSB No. 99185)
Burnini, Grantham, Grower, Hewes
248 East Capitol Street
P.O. Box 119
Jackson, Mississippi 39205-0119
(601) 948-3101 (phone)
(601) 960-6902 (fax)

Reuben V. Anderson, Esq.
Phelps Dunbar
200 South Lamar Street
P.O. Box 23066
Jackson, Mississippi 39225-3066
(601) 352-2300 (phone)
(601) 360-9777 (fax)

Jay Gore, III, Esq.
Gore, Kilpatrick, Purdie, Metz & Adock
135 First Street
P.O. Box Drawer 901
Grenada, Mississippi 38902
(662) 226-1891 (phone)
(662) 226-2237 (fax)

## CERTIFICATE OF SERVICE

I, Cal R. Burnton, hereby certify that I electronically filed the foregoing with the Court on September 14, 2009.  Notice of this filing will be sent to the following counsel of record by operation of the Court's electronic filing system:

| | |
|---|---|
| Hunter W. Lundy<br>Lundy, Lundy, Soileau & South, L.L.P.<br>P.O. Box 3010<br>Lake Charles, Louisiana  70602 | J.P. Hughes, Jr.<br>Carter C. Hitt<br>Hughes, Hitt & Brown, P.A.<br>510 Azalea Drive, Suite 100<br>Oxford, MS  38655 |
| Reuben V. Anderson, MSB No. 1687<br>Phelps Dunbar<br>200 South Lamar Street, P.O. Box 23066<br>Jackson, Mississippi 39225-3066 | John H. Daniels<br>Dyer, Dyer, Jones & Daniels<br>Post Office Box 560<br>Greenville, Mississippi  38702-0560 |
| Frank Thackston, Esq.<br>Lake Tindall, LLP<br>Post Office Box 918<br>Greenville, Mississippi 38702 | Glenn F. Beckham<br>Upshaw, Williams, Biggers, Beckham<br>& Riddick, LLP<br>309 Fulton Street<br>P.O. Box Drawer 8230<br>Greenwood, MS  38935-8230 |
| Andre F. Ducote<br>Lundy, Lundy, Soileau & South, L.L.P.<br>713 South Pear Orchard Road, Suite 203<br>Ridgeland, MS 39157 | |

This is the 14th day of September, 2009

/s/ Cal R. Burnton